No. 17-1331

IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Appellee,

v.

WAYNE A.G. JAMES,
Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT OF THE

VIRGIN ISLANDS, DIVISION OF ST. THOMAS AND ST. JOHN

APPELLANT WAYNE A.G. JAMES - APPENDIX II
PAGES 12-231

OMODARE JUPITER
Federal Public Defender
1115 Strand Street, 2nd Floor
Christiansted, VI 00820
Tel (340) 773-3585
Fax (340) 773-3742

BRENDAN A. HURSON
Assistant Federal Public Defender
1336 Beltjen Rd., Suite 202
Charlotte Amalie, VI 00802
Tel: (340) 774-4449
Fax:  (340)776-7683

*Counsel for Appellant Wayne A.G. James*

# APPENDIX TABLE OF CONTENTS

## VOLUME I

NOTICE OF APPEAL...............................................................................1

COURT ORDER (TRANSCRIPT EXCERPT) .......................................3

## VOLUME II

DOCKET ENTRIES ...............................................................................12

INDICTMENT [1] ..................................................................................33

MOTION TO DISMISS INDICMENT [87] ...........................................40

DEFENDANT'S MOTION TO FILE SUPPLEMENT UNDER SEAL [88] .......83

GOVERNMENT'S PROPOSED JURY INSTRUCTIONS AND
VERDICT FORM [93] ...........................................................................86

GOVERNMENT OPPOSITION TO MOTION TO DISMISS [103]...................106

OMNIBUS HEARING TRANSCRIPT.................................................133

## VOLUME III

DEFENDANT'S MOTION TO FILE EXHIBIT UNDER SEAL [109] ............232

GOVERNMENT MEMORANDUM IN SUPPORT OF
OPPOSITION TO MOTION TO DISMISS [114].................................235

DEFENDANT'S NOTICE OF FILING RESPONSE
TO COURT'S ORAL ORDER [119]....................................................242

DEFENDANT'S MOTION TO SUPPLEMENT THE RECORD [120]..............249

DEFENDANT'S SUPPLEMENT DATED MARCH 16, 2017[141]..................254

## VOLUME IV – UNDER SEAL

DEFENDANT'S UNREDACTED MOTION TO DISMISS [92].........................405

GRAND JURY TRANSCRIPT.............................................................................431

APPEAL

# District Court of the Virgin Islands
## District of the Virgin Islands (St. Thomas Division)
## CRIMINAL DOCKET FOR CASE #: 3:15-cr-00042-CVG-RM-1
### Internal Use Only

Case title: USA v. JAMES

Date Filed: 10/01/2015

Assigned to: District Judge Curtis
V. Gomez
Referred to: Magistrate Judge
Ruth Miller

### Defendant (1)
**WAYNE A.G. JAMES**

represented by **Kia Danielle Sears**
FEDERAL PUBLIC DEFENDER
OFFICE
1803 KONGENS GADE
ST THOMAS, VI 00802
340-774-4449
Fax: 340-776-7683
Email: kia_sears@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender*
*Appointment*

**Omodare B. Jupiter**
OFFICE OF THE FEDERAL
PUBLIC DEFENDER
1115 Strand Street, Suite 5073
Christiansted, VI 00820
340-773-3585 Ext.101
Fax: 340-773-3742
Email: Omodare_Jupiter@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender*

CERTIFIED A TRUE COPY THIS
16th DAY OF _Narch_ 20 17
GLENDA L. LAKE. ESQ.
CLERK OF COURT
BY _____
DEPUTY

**APP.12**

*Appointment*

**Brendan A. Hurson**
Office of the Federal Public
Defender
1336 Beltjen Rd. Suite 202,
St.Thomas, VI 00802-4701
St.Thomas, VI 00802
340-774-4449 (ext 102)
Fax: 340-776-7683
Email: brendan_hurson@fd.org
*ATTORNEY TO BE NOTICED*

**Michael A. Joseph**
Law Office of Michael A. Joseph
P.O. Box 936
Christiansted, VI 00821
340-772-4591
Fax: 340-772-0025
Email:
michaeljosephlaw@gmail.com
*ATTORNEY TO BE NOTICED*

**Pending Counts**

WIRE FRAUD
(1-2)
FEDERAL PROGRAMS
EMBEZZLEMENT
(3)

**Highest Offense Level
(Opening)**

Felony

**Terminated Counts**

None

**Highest Offense Level
(Terminated)**

None

**Disposition**

**Disposition**

**APP.13**

| **Complaints** | **Disposition** |
|---|---|

None

---

**Plaintiff**

**USA**           represented by **Justin D Weitz**

United State Department of
Justice
Public Integrity Section
950 Pennsylvania Avenue NW
Washington, DC 20009
202 514 1412
Fax: 202 514 3003
Email: justin.weitz@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: US*
*Attorney/Assistant U.S.Attorney*

**Nelson Luis Jones**
U.S. Attorney's Office
Ron De Lugo Federal Bldg
5500 Veterans Drive, Suite 260
St Thomas, VI 00802
340-774-5757
Fax: 340-776-3474
Email: nelson.jones@usdoj.gov
*LEAD ATTORNEY*
*Designation: Retained*

**Amanda Vaughn**
U.S. Department of Justice
1400 New York Ave. NW
Washington, DC 20530
202-514-1412
Fax: 202-514-3003
Email:
amanda.vaughn@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Delia L. Smith**

US Attorney's Office
Criminal Division
5500 Veteran's Drive
St. Thomas, VI 00802
340-774-5757
Fax: 340-776-3474
Email: delia.smith@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Ronald Sharpe**
UNITED STATES ATTORNEY
5500 VETERANS DRIVE
SUITE 260
ST. THOMAS, VI 00802
340-774-5757
Fax: 340-776-3474
Email: ronald.sharpe@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: US*
*Attorney/Assistant U.S.Attorney*

| Date Filed | # | Docket Text |
|------------|-----|-------------|
| 03/06/2017 | 140 | MOTION for a New Trial Date by USA as to WAYNE A.G. JAMES. (Vaughn, Amanda) (Entered: 03/06/2017) |
| 03/01/2017 | 139 | NOTICE *of Status of Appeal (Joint)* by USA as to WAYNE A.G. JAMES (Vaughn, Amanda) (Entered: 03/01/2017) |
| 02/27/2017 | 138 | TRANSCRIPT REQUEST */Omnibus Hearing* by WAYNE A.G. JAMES for proceedings held on 2/7/2017 before Judge Curtis V. Gomez. Court Reporter Chandra Kean (Jupiter, Omodare) (Entered: 02/27/2017) |
| 02/23/2017 | 137 | NOTICE OF ATTORNEY APPEARANCE: Brendan A. Hurson appearing for WAYNE A.G. JAMES (Hurson, Brendan) (Entered: 02/23/2017) |
| 02/13/2017 | 136 | EXHIBIT LIST by USA as to WAYNE A.G. JAMES (Weitz, Justin) (Entered: 02/13/2017) |
| 02/13/2017 | 135 | ORDER (CVG) that the Motion to Compel Rule 15 Depositions is GRANTED; and it is furtherORDERED that the video depositions of Brian Kalhoj and Adam Jon Kronegh shall commence promptly at 2:30 pm on February |

**APP.15**

| | | | |
|---|---|---|---|
| | | | 13, 2017, in Courtroom 3 at the Ron deLugo Federal Building in St. Thomas, United States Virgin Islands. (NAW) (Entered: 02/13/2017) |
| 02/13/2017 | ⬇️ | 134 | MOTION to Take Deposition *In Presence of U.S. District Judge or Magistrate Judge (Emergency)* by USA as to WAYNE A.G. JAMES. (Weitz, Justin) (Entered: 02/13/2017) |
| 02/10/2017 | | 133 | ORDER (CVG) The trial in this matter is hereby RESCHEDULED to commence promptly at 9:00 am on April 4, 2017; and it is further ORDERED that the parties shall advise the Court of the status of the appeal on the first day of each month. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (NAW) (Entered: 02/10/2017) |
| 02/10/2017 | | 132 | OPPOSITION by WAYNE A.G. JAMES re 130 MOTION to Compel *Rule 15 Depositions and Proposed Order* (Hurson, Brendan) (Entered: 02/10/2017) |
| 02/09/2017 | | 131 | OPPOSITION by USA as to WAYNE A.G. JAMES re 129 MOTION to Stay (Vaughn, Amanda) (Entered: 02/09/2017) |
| 02/09/2017 | ⬇️ | 130 | MOTION to Compel *Rule 15 Depositions and Proposed Order* by USA as to WAYNE A.G. JAMES. (Weitz, Justin) (Entered: 02/09/2017) |
| 02/09/2017 | ⬇️ | 129 | MOTION to Stay by WAYNE A.G. JAMES. (Jupiter, Omodare) (Entered: 02/09/2017) |
| 02/09/2017 | | 128 | NOTICE OF APPEAL (Interlocutory) by WAYNE A.G. JAMES Filing fee $505. (Jupiter, Omodare) (Entered: 02/09/2017) |
| 02/09/2017 | 🔒 | 127 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to WAYNE A.G. JAMES held on February 7, 2017, Omnibus Hearing, before Judge CURTIS V. GOMEZ. Court Reporter/Transcriber CHANDRA R. KEAN, RMR, Telephone number 340.775.8012. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/6/2017. Redacted Transcript Deadline set for 3/16/2017. |

**APP.16**

| | | | Release of Transcript Restriction set for 5/15/2017. (Kean, Chandra) (Entered: 02/09/2017) |
|---|---|---|---|
| 02/09/2017 | | 126 | ORDER (CVG) The Motion to Supplement the Record to Defendant's Motion to Dismiss Indictment 120 is hereby GRANTED. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (NAW) (Entered: 02/09/2017) |
| 02/09/2017 | | 125 | OPPOSITION by WAYNE A.G. JAMES re 115 MOTION in Limine *to Admit Certified Business Records Without a Custodian* (Hurson, Brendan) (Entered: 02/09/2017) |
| 02/09/2017 | ⊷ | 124 | MOTION to Compel *U.S. Marshal To Pay For Travel and Accomodations* by WAYNE A.G. JAMES. (Jupiter, Omodare) (Entered: 02/09/2017) |
| 02/09/2017 | | 123 | REPLY TO Oppostion of Motion by WAYNE A.G. JAMES re 122 Opposition to Motion (Hurson, Brendan) (Entered: 02/09/2017) |
| 02/09/2017 | | 122 | OPPOSITION by USA as to WAYNE A.G. JAMES re 121 MOTION to Continue *Trial or To Enter Order On Motion to Dismiss* (Vaughn, Amanda) (Entered: 02/09/2017) |
| 02/08/2017 | ⊷ | 121 | MOTION to Continue *Trial or To Enter Order On Motion to Dismiss* by WAYNE A.G. JAMES. (Attachments: # 1 Text of Proposed Order) (Hurson, Brendan) (Entered: 02/08/2017) |
| 02/08/2017 | | 120 | MOTION to Supplement *the Record to Defendant's Motion to Dismiss Indictment* by WAYNE A.G. JAMES. (Attachments: # 1 Text of Proposed Order) (Hurson, Brendan) (Entered: 02/08/2017) |
| 02/08/2017 | | 119 | NOTICE *of Filing Response to Court's Oral Order* by WAYNE A.G. JAMES (Attachments: # 1 Exhibit) (Hurson, Brendan) (Entered: 02/08/2017) |
| 02/08/2017 | | 118 | Sealed Document (Attachments: # 1 Exhibit Banco Popular Records, # 2 Exhibit Banco Popular Records, # 3 Exhibit Bank of America Records, # 4 Exhibit American Express Records, # 5 Exhibit American Express Records, # 6 Exhibit American Express Records, # 7 Exhibit American Express Records, # 8 Exhibit American Express Records, # 9 Exhibit Suntrust Bank Records, # 10 Exhibit Moneygram Records, # 11 Exhibit Choice Hotels Records, # 12 Exhibit |

| | | | |
|---|---|---|---|
| | | | Microsoft and Yahoo Records) (Weitz, Justin) (Entered: 02/08/2017) |
| 02/08/2017 | | 117 | Proposed Jury Instructions by WAYNE A.G. JAMES (Jupiter, Omodare) (Entered: 02/08/2017) |
| 02/08/2017 | | | **NOTICE OF CORRECTED DOCKET ENTRY FLIER IS INSTRUCTED TO FILE DOCUMENT IN THE PROPER FORMAT** as to WAYNE A.G. JAMES: Re: 108 Memorandum in Support, (CAB) (Entered: 02/08/2017) |
| 02/07/2017 | | 116 | NOTICE *of Ninth Discovery Production* by USA as to WAYNE A.G. JAMES (Weitz, Justin) (Entered: 02/07/2017) |
| 02/07/2017 | | 115 | MOTION in Limine *to Admit Certified Business Records Without a Custodian* by USA as to WAYNE A.G. JAMES. (Weitz, Justin) (Entered: 02/07/2017) |
| 02/07/2017 | | 114 | MEMORANDUM in Support of Opposition by USA as to WAYNE A.G. JAMES re 87 MOTION to Dismiss *Indictment or, In the Alternative, For Suppression of Evidence* (Vaughn, Amanda) (Entered: 02/07/2017) |
| 02/07/2017 | | 113 | ORDER (CVG) The Motion for Leave to File Document Under Seal 105 is hereby GRANTED. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (NAW) (Entered: 02/07/2017) |
| 02/07/2017 | | 112 | Sealed Document (Jupiter, Omodare) (Entered: 02/07/2017) |
| 02/07/2017 | | 111 | TRANSCRIPT REQUEST by USA as to WAYNE A.G. JAMES for proceedings held on 02/07/2017 before Judge Curtis V. Gomez. Court Reporter Chandra Kean (Weitz, Justin) (Entered: 02/07/2017) |
| 02/07/2017 | | 110 | ORDER (CVG) The Motion for Leave to File Document Under Seal 109 is hereby GRANTED. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (NAW) (Entered: 02/07/2017) |
| 02/07/2017 | | 109 | MOTION for leave to File Document Under Seal *(Ex. 2 to Supplement to Motion)* by WAYNE A.G. JAMES. (Attachments: # 1 Text of Proposed Order) (Hurson, Brendan) (Entered: 02/07/2017) |

**APP.18**

| 02/07/2017 | 108 | MEMORANDUM in Support by WAYNE A.G. JAMES re 87 MOTION to Dismiss *Indictment or, In the Alternative, For Suppression of Evidence (Supplement)* (Attachments: # 1 Exhibit 1 (Drafting Request and Pre-emption Letter)) (Hurson, Brendan) (Entered: 02/07/2017) |
| 02/07/2017 | 107 | Minute Entry for proceedings held before District Judge Curtis V. Gomez:Omnibus Hearing as to WAYNE A.G. JAMES held on 2/7/2017 (Court Reporter Chandra Kean.) (CAB) (Entered: 02/07/2017) |
| 02/07/2017 | 105 | MOTION for Leave to File *Document Under Seal* by USA as to WAYNE A.G. JAMES. (Weitz, Justin) (Entered: 02/07/2017) |
| 02/06/2017 | 104 | Sealed Document (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit) (Weitz, Justin) (Entered: 02/06/2017) |
| 02/06/2017 | 103 | OPPOSITION by USA as to WAYNE A.G. JAMES re 87 MOTION to Dismiss *Indictment or, In the Alternative, For Suppression of Evidence* (Weitz, Justin) (Entered: 02/06/2017) |
| 02/06/2017 | 102 | ORDER (CVG) The Motion for leave to File Document Under Seal 101 is hereby GRANTED. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (NAW) (Entered: 02/06/2017) |
| 02/06/2017 | 101 | MOTION for Leave to File *Document Under Seal* by USA as to WAYNE A.G. JAMES. (Weitz, Justin) (Entered: 02/06/2017) |
| 02/06/2017 | 100 | Sealed Document (Jupiter, Omodare) (Entered: 02/06/2017) |
| 02/06/2017 | 99 | ORDER (CVG) The Motion for leave to File Document Under Seal 98 is hereby GRANTED. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (NAW) (Entered: 02/06/2017) |
| 02/06/2017 | 98 | MOTION for leave to File Document Under Seal by |

| | | | |
|---|---|---|---|
| | | | WAYNE A.G. JAMES. (Attachments: # 1 Text of Proposed Order) (Jupiter, Omodare) (Entered: 02/06/2017) |
| 02/06/2017 | | 97 | MOTION to Suppress *Evidence Seized Pursuant to Search Warrants* by WAYNE A.G. JAMES. (Jupiter, Omodare) (Entered: 02/06/2017) |
| 02/06/2017 | | 96 | ORDER (CVG) The omnibus hearing scheduled for 9:00 am on February 7, 2017, is hereby RESCHEDULED to commence promptly at 10:00 am on February 7, 2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (NAW) (Entered: 02/06/2017) |
| 02/06/2017 | | 95 | NOTICE *of Filing Proposed Order* by WAYNE A.G. JAMES (Attachments: # 1 Text of Proposed Order) (Jupiter, Omodare) (Entered: 02/06/2017) |
| 02/06/2017 | | 94 | MOTION to Continue *Motions Hearing For One Hour* by WAYNE A.G. JAMES. (Jupiter, Omodare) (Entered: 02/06/2017) |
| 02/03/2017 | | 93 | Proposed Jury Instructions by USA as to WAYNE A.G. JAMES (Vaughn, Amanda) (Entered: 02/03/2017) |
| 02/03/2017 | | 92 | SEALED MOTION by WAYNE A.G. JAMES. (Jupiter, Omodare) (Entered: 02/03/2017) |
| 02/03/2017 | | 91 | Proposed Voir Dire by USA as to WAYNE A.G. JAMES (Weitz, Justin) (Entered: 02/03/2017) |
| 02/03/2017 | | 90 | ORDER (CVG) The Motion for leave to File Document Under Seal 88 is hereby GRANTED. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (NAW) (Entered: 02/03/2017) |
| 02/03/2017 | | 89 | ORDER (CVG) A suppression hearing is hereby SCHEDULED to commence promptly at 9:00 am on February 7, 2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (NAW) (Entered: 02/03/2017) |
| 02/03/2017 | | 88 | MOTION for leave to File Document Under Seal by WAYNE A.G. JAMES. (Attachments: # 1 Text of Proposed Order) (Jupiter, Omodare) (Entered: 02/03/2017) |
| 02/03/2017 | | 87 | MOTION to Dismiss *Indictment or, In the Alternative, For Suppression of Evidence* by WAYNE A.G. JAMES. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, |

| | | |
|---|---|---|
| | | # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I) (Jupiter, Omodare) (Entered: 02/03/2017) |
| 02/01/2017 | 86 | ORDER (CVG) denying 83 Motion to Continue as to WAYNE A.G. JAMES (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Entered: 02/01/2017) |
| 01/27/2017 | 85 | NOTICE *of Intent to Introduce Certified Business Records* by USA as to WAYNE A.G. JAMES (Vaughn, Amanda) (Entered: 01/27/2017) |
| 01/26/2017 | 84 | OPPOSITION by USA as to WAYNE A.G. JAMES re 83 Second MOTION to Continue *Jury Trial* (Weitz, Justin) (Entered: 01/26/2017) |
| 01/25/2017 | 83 | Second MOTION to Continue *Jury Trial* by WAYNE A.G. JAMES. (Jupiter, Omodare) (Entered: 01/25/2017) |
| 01/23/2017 | 82 | NOTICE *of Seventh and Eighth Discovery Productions* by USA as to WAYNE A.G. JAMES (Weitz, Justin) (Entered: 01/23/2017) |
| 11/28/2016 | 81 | NOTICE *of Sixth Discovery Production* by USA as to WAYNE A.G. JAMES (Vaughn, Amanda) (Entered: 11/28/2016) |
| 11/23/2016 | 80 | ORDER (CVG) The trial previously scheduled for January 18, 2017, is hereby RESCHEDULED to commence promptly at 9:00 AM on February 13, 2017.(This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (NAW) (Entered: 11/23/2016) |
| 11/23/2016 | 79 | ORDER (CVG) The trial previously scheduled for November 28, 2017, is hereby RESCHEDULED to commence promptly at 9:00 AM on January 18, 2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (NAW) (Entered: 11/23/2016) |
| 11/21/2016 | 78 | ORDER (CVG) Speedy trial waiver (NAW) (Entered: 11/21/2016) |
| 11/21/2016 | 77 | OPPOSITION by USA as to WAYNE A.G. JAMES re 76 MOTION to Continue *Jury Trial* (Vaughn, Amanda) (Entered: 11/21/2016) |
| 11/21/2016 | 76 | MOTION to Continue *Jury Trial* by WAYNE A.G. |

**APP.21**

| | | | JAMES. (Jupiter, Omodare) (Entered: 11/21/2016) |
|---|---|---|---|
| 11/21/2016 | | 75 | WAIVER of Speedy Trial by WAYNE A.G. JAMES (Jupiter, Omodare) (Entered: 11/21/2016) |
| 11/21/2016 | 🔒 | 74 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to WAYNE A.G. JAMES held on 09/15/16, before Judge Ruth Miller`. Court Reporter/Transcriber Tracy Gribben Transcription LLC, Telephone number 800-603-6212. Tape Number: FTR Gold. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/15/2016. Redacted Transcript Deadline set for 12/27/2016. Release of Transcript Restriction set for 2/22/2017. (Gribben, Terry) (Entered: 11/21/2016) |
| 11/21/2016 | 🔒 | 73 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to WAYNE A.G. JAMES held on 09/28/16, before Judge Ruth Miller. Court Reporter/Transcriber Tracy Gribben Transcription LLC, Telephone number 800-603-6212. Tape Number: FTR Gold. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/15/2016. Redacted Transcript Deadline set for 12/27/2016. Release of Transcript Restriction set for 2/22/2017. (Gribben, Terry) (Entered: 11/21/2016) |
| 11/21/2016 | 🔒 | 72 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to WAYNE A.G. JAMES held on 08/29/16, before Judge Ruth Miller. Court Reporter/Transcriber Tracy Gribben Transcription LLC, Telephone number 800-603-6212. Tape Number: FTR Gold. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/15/2016. Redacted Transcript Deadline set for 12/27/2016. Release of Transcript Restriction set for 2/22/2017. (Gribben, Terry) (Entered: 11/21/2016) |
| 11/18/2016 | | 71 | NOTICE *of Discovery Production* by USA as to WAYNE |

| | | | |
|---|---|---|---|
| | | | A.G. JAMES (Vaughn, Amanda) (Entered: 11/18/2016) |
| 11/18/2016 | | 70 | NOTICE *of Position as to Trial Date* by USA as to WAYNE A.G. JAMES (Weitz, Justin) (Entered: 11/18/2016) |
| 11/17/2016 | 🔒 | 106 | Minute Entry for proceedings held before District Judge Curtis V. Gomez:Omnibus Hearing as to WAYNE A.G. JAMES held on 11/17/2016 (Court Reporter Chandra Kean.) (Attachments: # 1 Chambers Conference) (CAB) (Entered: 02/07/2017) |
| 11/17/2016 | | 69 | NOTICE OF HEARING as to WAYNE A.G. JAMES Status Conference set for 11/17/2016 02:00 PM in STT Courtroom 1 before District Judge Curtis V. Gomez. (CAB) (Entered: 11/17/2016) |
| 11/15/2016 | | | Set Hearings as to WAYNE A.G. JAMES: Omnibus Hearing set for 11/17/2016 09:00 AM in STT Courtroom 1 before District Judge Curtis V. Gomez. (CAB) (Entered: 11/15/2016) |
| 11/15/2016 | | 68 | ORDER(RM) dated 11/15/16 as to WAYNE A.G. JAMES: An omnibus hearing is scheduled for 11/17/16 at 9:00am before District Judge Curtis V. Gomez in Courtroom 1. Defendant and his counsel must be present. (CAB) (Entered: 11/15/2016) |
| 11/15/2016 | ⏎ | 67 | Emergency MOTION to Withdraw as Attorney by Michael A. Joseph. by WAYNE A.G. JAMES. (Joseph, Michael) (Entered: 11/15/2016) |
| 11/14/2016 | 🔒 | 66 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to WAYNE A.G. JAMES held on 09/28/16, before Judge Ruth Miller. Court Reporter/Transcriber Tracy Gribben, Telephone number 800-603-6212. Tape Number: FTR Gold. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/8/2016. Redacted Transcript Deadline set for 12/19/2016. Release of Transcript Restriction set for 2/15/2017. (Gribben, Terry) (Entered: 11/14/2016) |
| 11/14/2016 | 🔒 | 65 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of |

| | | | |
|---|---|---|---|
| | | | Proceedings as to WAYNE A.G. JAMES held on 09/15/16, before Judge Ruth Miller. Court Reporter/Transcriber Tracy Gribben, Telephone number 800-603-6212. Tape Number: FTR Gold. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/8/2016. Redacted Transcript Deadline set for 12/19/2016. Release of Transcript Restriction set for 2/15/2017. (Gribben, Terry) (Entered: 11/14/2016) |
| 11/14/2016 | 📄 | 64 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to WAYNE A.G. JAMES held on 08/29/16, before Judge Ruth Miller. Court Reporter/Transcriber Tracy Gribben, Telephone number 800-603-6212. Tape Number: FTR Gold. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/8/2016. Redacted Transcript Deadline set for 12/19/2016. Release of Transcript Restriction set for 2/15/2017. (Gribben, Terry) (Entered: 11/14/2016) |
| 11/10/2016 | | 63 | NOTICE *of Fifth Discovery Production* by USA as to WAYNE A.G. JAMES (Vaughn, Amanda) (Entered: 11/10/2016) |
| 11/10/2016 | ⊞ | 62 | MOTION *to Use Danish Language Interpreter* by USA as to WAYNE A.G. JAMES. (Attachments: # 1 Exhibit Curriculum Vitae of Zofia Wysynski) (Weitz, Justin) (Entered: 11/10/2016) |
| 10/31/2016 | 🔒 | | (Court only) ***Staff notes Transcript request of hearings held on 9/15/16 & 9/28/16, before Magistrate Judge Ruth Miller, was uploaded and sent to Court Reporter Tracy Gribben (CAB) (Entered: 10/31/2016) |
| 10/28/2016 | 🔒 | | (Court only) ***Motions terminated as to WAYNE A.G. JAMES: (TRH) (Entered: 10/28/2016) |
| 10/28/2016 | 🔒 | | (Court only) ***Motions terminated as to WAYNE A.G. JAMES: 60 MOTION for Joinder *for Conference* filed by WAYNE A.G. JAMES, 57 MOTION for Hearing *by* |

| | | |
|---|---|---|
| | | *Telephone* filed by USA, 58 MOTION for Hearing filed by USA. (TRH) (Entered: 10/28/2016) |
| 10/28/2016 | 61 | Minute Entry for proceedings held before Magistrate Judge Ruth Miller:Telephone Conference as to WAYNE A.G. JAMES held on 10/28/2016 (Court Reporter N/A.) (TRH) (Main Document 61 replaced on 12/1/2016) (TRH). (Entered: 10/28/2016) |
| 10/28/2016 | 60 | MOTION for Joinder *for Conference* by WAYNE A.G. JAMES. (Joseph, Michael) (Entered: 10/28/2016) |
| 10/28/2016 | 59 | TRANSCRIPT REQUEST by USA as to WAYNE A.G. JAMES for proceedings held on 9/15/2016 and 9/28/2016 before Judge Ruth Miller. Court Reporter FTR Gold Recorder (Smith, Delia) (Entered: 10/28/2016) |
| 10/27/2016 | 58 | MOTION for Hearing by USA as to WAYNE A.G. JAMES. (Weitz, Justin) (Entered: 10/27/2016) |
| 10/27/2016 | | **NOTICE OF CORRECTED DOCKET ENTRY FLIER IS INSTRUCTED TO CORRECT SIGNATURE LINE** as to WAYNE A.G. JAMES: Re: 57 MOTION for Hearing *by Telephone* (CAB) (Entered: 10/27/2016) |
| 10/25/2016 | 57 | MOTION for Hearing *by Telephone* by USA as to WAYNE A.G. JAMES. (Weitz, Justin) (Entered: 10/25/2016) |
| 10/20/2016 | 56 | NOTICE *of Third and Fourth Discovery Productions* by USA as to WAYNE A.G. JAMES (Weitz, Justin) (Entered: 10/20/2016) |
| 10/19/2016 | 55 | NOTICE *of Demand for Reciprocal Discovery* by USA as to WAYNE A.G. JAMES (Weitz, Justin) (Entered: 10/19/2016) |
| 10/11/2016 | | (Court only) ***Motions terminated as to WAYNE A.G. JAMES: 10 MOTION for Detention filed by USA. (TRH) (Entered: 10/11/2016) |
| 10/11/2016 | 54 | ORDERED (CVG) The trial in this matter previously scheduled for October 17, 2016, is hereby RESCHEDULED to commence promptly at 9:00 AM on November 28, 2016. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (NAW) (Entered: 10/11/2016) |
| | | |

**APP.25**

| 10/07/2016 | 53 | Receipt for Surrender of Passport as to WAYNE A.G. JAMES Passport Number xxxxxx1413 issued by US (CAB) (Entered: 10/07/2016) |
|---|---|---|
| 10/07/2016 | 52 | JUSTIFICATION OF SURETY as to WAYNE A.G. JAMES (TRH) (Entered: 10/07/2016) |
| 10/07/2016 | 51 | RELEASED ON BOND (APPEARANCE BOND ) as to WAYNE A.G. JAMES (TRH) (Entered: 10/07/2016) |
| 10/05/2016 | 50 | ORDER (CVG) Speedy Trial Waiver (NAW) (Entered: 10/05/2016) |
| 10/05/2016 | 49 | RELEASED ON BOND (APPEARANCE BOND ) as to WAYNE A.G. JAMES (TRH) (Entered: 10/05/2016) |
| 10/05/2016 | 48 | Minute Entry for proceedings held before Magistrate Judge Ruth Miller:Detention Hearing as to WAYNE A.G. JAMES held on 10/5/2016 (Court Reporter FTR GOLD RECORDER.) (TRH) (Entered: 10/05/2016) |
| 10/05/2016 | 47 | ORDER (RM) Setting Conditions of Release (TRH) (Entered: 10/05/2016) |
| 10/05/2016 | 46 | APPLICATION AND CHECKLIST FOR SPEEDY TRIAL EXTENSION by WAYNE A.G. JAMES (CAB) (Entered: 10/05/2016) |
| 10/04/2016 | | **NOTICE OF CORRECTED DOCKET ENTRY FLIER SHOULD FILE CERTIFICATE OF SERVICE IN THE PROPER FORMANT** as to WAYNE A.G. JAMES: Re: 44 MOTION to Continue *trial* (CAB) (Entered: 10/04/2016) |
| 09/30/2016 | 45 | REPLY TO to Motion by USA as to WAYNE A.G. JAMES re 44 MOTION to Continue *trial* (Vaughn, Amanda) (Entered: 09/30/2016) |
| 09/30/2016 | 44 | MOTION to Continue *trial* by WAYNE A.G. JAMES. (Joseph, Michael) (Entered: 09/30/2016) |
| 09/29/2016 | 43 | ORDER (RM) granting 41 Motion to appear by telephone as to WAYNE A.G. JAMES (1): An attorney for the government must be present, although off-island counsel may appear by telephone. Counsel shall call the Chambers of the undersigned by no later than 5:00 p.m. on October 4, 2016 to provide a telephone number at which counsel may be contacted for the hearing. (This is a TEXT ENTRY |

| | | |
|---|---|---|
| | | ONLY. There is no.pdf document associated with this entry.) (Entered: 09/29/2016) |
| 09/29/2016 | 42 | NOTICE OF HEARING as to WAYNE A.G. JAMES Detention Hearing set for 10/5/2016 12:30 PM in STT Courtroom 2 before Magistrate Judge Ruth Miller. (TRH) (Entered: 09/29/2016) |
| 09/28/2016 | 41 | MOTION to Appear by Telephone by USA as to WAYNE A.G. JAMES. (Vaughn, Amanda) (Entered: 09/28/2016) |
| 09/28/2016 | 40 | Minute Entry for proceedings held before Magistrate Judge Ruth Miller:Pretrial Conference as to WAYNE A.G. JAMES held on 9/28/2016, Motion for reconsideration of Detention Hearing set for 10/5/2016 12:30 PM in STT Courtroom 2 before Magistrate Judge Ruth Miller.) DEFENDANT SHOULD BE PRESENT. (Court Reporter FTR GOLD RECORDER.) (TRH) (Entered: 09/28/2016) |
| 09/27/2016 | | **NOTICE OF CORRECTED DOCKET ENTRY FLIER IS INSTRUCTED TO FILE CERTIFICATE OF SERVICE IN THE CORRECT FORMAT** as to WAYNE A.G. JAMES: Re: 39 Opposition to Motion (CAB) (Entered: 09/27/2016) |
| 09/26/2016 | | **NOTICE OF CORRECTED DOCKET ENTRY FLIER IS INSTRUCTED TO FILE A CERTIFICATE OF SERVICE** as to WAYNE A.G. JAMES: Re: 36 MOTION for Detention *Reconsideration 1*, 38 MOTION for Detention *Reconsideration 3*, 37 MOTION for Detention *Reconsideration 2* (CAB) (Entered: 09/26/2016) |
| 09/26/2016 | | **NOTICE OF CORRECTED DOCKET ENTRY FILER IS INSTRUCTED TO FILE DOCUMENTS IN THE CORRECT FORMAT** as to WAYNE A.G. JAMES: Re: 36 MOTION for Detention *Reconsideration 1*, 38 MOTION for Detention *Reconsideration 3*, 37 MOTION for Detention *Reconsideration 2* (CAB) (Entered: 09/26/2016) |
| 09/26/2016 | 39 | OPPOSITION by USA as to WAYNE A.G. JAMES re 36 MOTION for Detention *Reconsideration 1*, 38 MOTION for Detention *Reconsideration 3*, 37 MOTION for Detention *Reconsideration 2* (Weitz, Justin) (Entered: 09/26/2016) |
| | | |

| 09/22/2016 | 38 | MOTION for Detention *Reconsideration 3* by WAYNE A.G. JAMES. (Joseph, Michael) (Entered: 09/22/2016) |
|---|---|---|
| 09/22/2016 | 37 | MOTION for Detention *Reconsideration 2* by WAYNE A.G. JAMES. (Joseph, Michael) (Entered: 09/22/2016) |
| 09/22/2016 | 36 | MOTION for Detention *Reconsideration 1* by WAYNE A.G. JAMES. (Joseph, Michael) (Entered: 09/22/2016) |
| 09/15/2016 | 35 | ORDER(RM) OF DETENTION as to WAYNE A.G. JAMES (TRH) (Entered: 09/15/2016) |
| 09/15/2016 | 34 | Minute Entry for proceedings held before Magistrate Judge Ruth Miller:Motion Hearing as to WAYNE A.G. JAMES held on 9/15/2016 re 10 MOTION for Detention filed by USA (Court Reporter FTR GOLD RECORDER.) (TRH) (Entered: 09/15/2016) |
| 09/15/2016 | | (Court only) ***Staff notes FTR Recorder 33 was uploaded and sent to Court Reporter Tracy Gribben on 9/15/16. (CAB) (Entered: 09/15/2016) |
| 09/15/2016 | 33 | TRANSCRIPT REQUEST by USA as to WAYNE A.G. JAMES for proceedings held on 08/29/2016 before Judge Ruth Miller. Court Reporter FTR GOLD RECORDER (Smith, Delia) (Entered: 09/15/2016) |
| 09/13/2016 | 32 | Minute Entry for proceedings held before Magistrate Judge Ruth Miller:Telephone Conference as to WAYNE A.G. JAMES held on 9/13/2016 (Court Reporter N/A.) (TRH) (Entered: 09/13/2016) |
| 09/13/2016 | | (Court only) ***Motions terminated as to WAYNE A.G. JAMES: 28 MOTION to Reschedule Hearing on Motion for Detention and to Appear by Telephone filed by USA, 30 MOTION for Joinder *for Rescheduling Hearing* filed by WAYNE A.G. JAMES. (TRH) (Entered: 09/13/2016) |
| 09/13/2016 | 31 | NOTICE OF HEARING as to WAYNE A.G. JAMES Motion Hearing Rescheduled to 9/15/2016 02:00 PM in STT Courtroom 2 before Magistrate Judge Ruth Miller. (TRH) (Entered: 09/13/2016) |
| 09/12/2016 | 30 | MOTION for Joinder *for Rescheduling Hearing* by WAYNE A.G. JAMES. (Joseph, Michael) (Entered: 09/12/2016) |
| 09/12/2016 | 29 | NOTICE OF ATTORNEY APPEARANCE Delia L. Smith |

| | | |
|---|---|---|
| | | appearing for USA. (Smith, Delia) (Entered: 09/12/2016) |
| 09/09/2016 | 28 | MOTION to Reschedule Hearing on Motion for Detention and to Appear by Telephone by USA as to WAYNE A.G. JAMES. (Vaughn, Amanda) (Entered: 09/09/2016) |
| 09/09/2016 | 27 | NOTICE OF HEARING as to WAYNE A.G. JAMESHearing on Motion for Detention set for 9/14/2016 09:30 AM in STT Courtroom 2 before Magistrate Judge Ruth Miller. (TRH) (Entered: 09/09/2016) |
| 09/06/2016 | | **NOTICE OF CORRECTED DOCKET ENTRY SIGNATURE LINE IS INCORRECT** as to WAYNE A.G. JAMES: Re: 26 Notice (Other) (CAB) (Entered: 09/06/2016) |
| 09/02/2016 | 26 | NOTICE *of Second Discovery Production* by USA as to WAYNE A.G. JAMES (Vaughn, Amanda) (Entered: 09/02/2016) |
| 09/01/2016 | | **NOTICE OF CORRECTED DOCKET ENTRY FLIER IS INSTRUCTED TO FILE CERTIFICATE OF SERVICE IN THE CORRECT FORMAT** as to WAYNE A.G. JAMES: Re: 25 Opposition to Motion (CAB) (Entered: 09/01/2016) |
| 08/31/2016 | 25 | OPPOSITION by WAYNE A.G. JAMES re 10 MOTION for Detention , 24 Notice (Other) (Joseph, Michael) (Entered: 08/31/2016) |
| 08/30/2016 | 24 | NOTICE *of Supplemental Information Regarding Detention* by USA as to WAYNE A.G. JAMES (Attachments: # 1 Exhibit) (Weitz, Justin) (Entered: 08/30/2016) |
| 08/29/2016 | 23 | ORDER (RM) granting 22 Motion for Protective Order as to WAYNE A.G. JAMES (1) (TRH) (Entered: 08/29/2016) |
| 08/29/2016 | 22 | MOTION for Protective Order by USA as to WAYNE A.G. JAMES. (Weitz, Justin) (Entered: 08/29/2016) |
| 08/29/2016 | 21 | Order(RM) Proceedings held before Magistrate Judge Ruth Miller: Arraignment held on 8/29/2016, ( Expert Witness List due by 10/7/2016., Jury Trial set for 10/17/2016 09:00 AM in STT Courtroom 1 before District Judge Curtis V. Gomez., Omnibus Hearing set for 10/11/2016 09:30 AM in STT Courtroom 1 before District Judge Curtis V. Gomez., |

**APP.29**

| | | | |
|---|---|---|---|
| | | | Pretrial Conference set for 9/28/2016 09:30 AM in STT Courtroom 2 before Magistrate Judge Ruth Miller.). Discovery due by 9/6/2016. Motions due by 9/19/2016. (Court Reporter FTR GOLD RECORDER.) (TRH) (Entered: 08/29/2016) |
| 08/29/2016 | 📄 | 20 | Minute Entry for proceedings held before Magistrate Judge Ruth Miller:Arraignment as to WAYNE A.G. JAMES (1) Count 1-2,3 held on 8/29/2016, Detention Hearing as to WAYNE A.G. JAMES held on 8/29/2016 (Court Reporter FTR GOLD RECORDER.) (TRH) (Entered: 08/29/2016) |
| 08/29/2016 | | | **NOTICE OF CORRECTED DOCKET ENTRY FLIER IS INSTRUCTED TO FILE CERTIFICATE OF SERVICE IN THE PROPER FORMAT** as to WAYNE A.G. JAMES: Re: 16 Notice of Attorney Appearance - Defendant (CAB) (Entered: 08/29/2016) |
| 08/28/2016 | | 19 | NOTICE *of First Discovery Production* by USA as to WAYNE A.G. JAMES (Weitz, Justin) (Entered: 08/28/2016) |
| 08/26/2016 | | 18 | NOTICE OF HEARING as to WAYNE A.G. JAMES Arraignment set for 8/29/2016 01:00 PM in STT Courtroom 2 before Magistrate Judge Ruth Miller. (TRH) (Entered: 08/26/2016) |
| 08/26/2016 | | 17 | Order(RM) Relieving and Appointing Counsel as to WAYNE A.G. JAMES: Attorney Omodare B. Jupiter relieved. (TRH) (Entered: 08/26/2016) |
| 08/26/2016 | | 16 | NOTICE OF ATTORNEY APPEARANCE: Michael A. Joseph appearing for WAYNE A.G. JAMES (Joseph, Michael) (Entered: 08/26/2016) |
| 08/26/2016 | | 15 | AMENDED ORDER as to WAYNE A.G. JAMES re 13 Order Appointing Public Defender (RM) dated 8/26/2016 (KAB) (Entered: 08/26/2016) |
| 08/26/2016 | | 14 | NOTICE OF ATTORNEY APPEARANCE Amanda Vaughn appearing for USA. (Vaughn, Amanda) (Entered: 08/26/2016) |
| 08/25/2016 | | 13 | ORDER (RM) dated 8/25/16 APPOINTING FEDERAL PUBLIC DEFENDER as to WAYNE A.G. JAMES (CAB) (Entered: 08/25/2016) |
| | | | |

| 08/25/2016 | | 12 | NOTICE OF HEARING as to WAYNE A.G. JAMES Detention Hearing set for 8/29/2016 01:00 PM in STT Courtroom 2 before Magistrate Judge Ruth Miller. (TRH) (Entered: 08/25/2016) |
|---|---|---|---|
| 08/25/2016 | 🔒 | 11 | Minute Entry for proceedings held before Magistrate Judge Ruth Miller:Initial Appearance as to WAYNE A.G. JAMES held on 8/25/2016 (Court Reporter FTR GOLD RECORDER.) (TRH) (Entered: 08/25/2016) |
| 08/25/2016 | | 10 | MOTION for Detention by USA as to WAYNE A.G. JAMES. (Weitz, Justin) (Entered: 08/25/2016) |
| 08/25/2016 | | 9 | Arrest Warrant Returned Executed on 8/25/2016. in case as to WAYNE A.G. JAMES. (TRH) (Entered: 08/25/2016) |
| 08/12/2016 | | | Terminate Hearings as to WAYNE A.G. JAMES: (CBF) (Entered: 08/12/2016) |
| 08/11/2016 | | 8 | NOTICE OF HEARING as to WAYNE A.G. JAMES Initial Appearance set for 8/18/2016 09:00 AM in STT Courtroom 1 before District Judge Curtis V. Gomez. (CBF) (Entered: 08/11/2016) |
| 07/29/2016 | | | Case unsealed as to WAYNE A.G. JAMES (CAB) (Entered: 07/29/2016) |
| 07/28/2016 | | 7 | ORDER (RM) granting 6 Motion to Unseal Case as to WAYNE A.G. JAMES (1) (CBF) (Entered: 07/28/2016) |
| 07/28/2016 | | 6 | MOTION to Unseal Case by USA as to WAYNE A.G. JAMES. (Attachments: # 1 Text of Proposed Order) (Jones, Nelson) (Entered: 07/28/2016) |
| 10/06/2015 | 🔒 | | (Court only) ***Staff notes Certified copy of Arrest Warrant delivered to USMS 10/6/15 (CBF) (Entered: 10/06/2015) |
| 10/06/2015 | 🔒 🔒 | 5 | Arrest Warrant Issued by Magistrate Judge Ruth Miller in case as to WAYNE A.G. JAMES. (CBF) (Entered: 10/06/2015) |
| 10/02/2015 | 🔒 | 4 | (Court only) Minute Entry for proceedings held before District Judge Curtis V. Gomez: (Court Reporter Chandra Kean.) (CAB) (CAB). (Entered: 10/02/2015) |
| 10/01/2015 | | 3 | ORDER (CVG) dated 10/1/15granting 2 Motion to Seal Case as to WAYNE A.G. JAMES (1) (CAB) (Entered: |

**APP.31**

| | | 10/02/2015) |
|---|---|---|
| 10/01/2015 | 2 | MOTION to Seal Case by USA as to WAYNE A.G. JAMES. (CAB) (Entered: 10/02/2015) |
| 10/01/2015 | 1 | SEALED INDICTMENT as to WAYNE A.G. JAMES (1) count(s) 1-2, 3. (CAB) (Entered: 10/02/2015) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| UNITED STATES OF AMERICA and<br>the PEOPLE OF THE VIRGIN ISLANDS<br><br>v.<br><br>WAYNE A.G. JAMES,<br><br>Defendant. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>******* |

CRIMINAL NO. $2015 - 42$

Wire Fraud, 18 U.S.C. § 1343; Federal
Program Embezzlement, 18 U.S.C.
§ 666(a)(1)(A); Forfeiture, 18 U.S.C.
§ 981(a)(1)(C), 28 U.S.C. § 2461(c)

## INDICTMENT

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

All dates and times in this Indictment are alleged to be "on or about" the specific date stated. At all times relevant to this Indictment:

1.     **WAYNE A.G. JAMES** served as a senator in the Legislature of the Virgin Islands ("Legislature") from January 2009 through January 2011, following his November 2008 election by voters in the St. Croix district.

2.     The Legislature was a component of the Government of the Virgin Islands, which received, during each year from 2009 through 2011, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, guarantee, and other form of federal assistance.

3.     The Fireburn was a labor riot that occurred in St. Croix in 1878. Many historical documents related to the Fireburn were located in Denmark.

4.     While a senator, **JAMES** proposed using Legislature funds to obtain historical documents related to the Fireburn from the Danish National Archives, located in Denmark.

**JAMES** proposed using Legislature funds to obtain, translate, and distribute copies of the documents to institutions in the U.S. Virgin Islands.

## COUNTS ONE AND TWO
### (Wire Fraud, 18 U.S.C. § 1343)

5.  The allegations contained in Paragraphs 1 through 4 of this Indictment are realleged as though fully set forth herein.

6.  From in or about April 2009 through in or about January 2011, in the District of the Virgin Islands and elsewhere, the defendant,

### WAYNE A.G. JAMES,

knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

### Purpose of the Scheme to Defraud

7.  The purpose of the scheme to defraud was to enrich the defendant, **WAYNE A.G. JAMES**, by appropriating Legislature funds for **JAMES's** own personal use and benefit.

### Manner and Means of the Scheme to Defraud

8.  **JAMES** obtained cash advances from the Legislature, payable to **JAMES**, for all expenses related to the Fireburn research project, purportedly to effect transfers to Denmark on behalf of the Legislature. **JAMES** obtained cash advances ostensibly for payment to the Danish National Archives, but in fact only paid part of them to the Danish National Archives, converting the remainder for his personal use.

2

**APP.34**

9. **JAMES** double-billed the Legislature for expenses, obtaining a cash advance for payment to the Danish National Archives for work for which he had received a previous cash advance.

10. **JAMES** submitted invoices for research and translation work that was never done, and **JAMES** received Legislature funds for payment of these invoices.

11. **JAMES** submitted an invoice for translation work that was completed before his election to the Legislature, and **JAMES** received Legislature funds for payment of this invoice.

Execution of the Scheme to Defraud

12. On or about the dates set forth below, in the District of the Virgin Islands and elsewhere, **JAMES**, for the purpose of executing the scheme and artifice to defraud described above, and attempting to do so, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds; that is **JAMES**, to cash checks payable to him from Legislature, caused the following interstate wire communications, each transmission constituting a separate count:

| Count | Approximate Date | Wire Communication |
|-------|------------------|--------------------|
| 1 | 10/19/2010 | From Banco Popular in the U.S. Virgin Islands to Banco Popular in Puerto Rico. |
| 2 | 10/22/2010 | From Banco Popular in the U.S. Virgin Islands to Banco Popular in Puerto Rico. |

All in violation of Title 18, United States Code, Section 1343.

3

**THE GRAND JURY FURTHER CHARGES THAT:**

## COUNT THREE
(Federal Program Embezzlement, 18 U.S.C. § 666(a)(1)(A))

13.     The allegations contained in Paragraphs 1 through 11 of this Indictment are realleged as though fully set forth herein.

14.     From in or about October 2010 through in or about September 2011, in the District of the Virgin Islands and elsewhere, the defendant,

### WAYNE A.G. JAMES,

while an agent of the Government of the Virgin Islands, did embezzle, steal, obtain by fraud, and otherwise without authority knowingly convert to the use of any person other than the rightful owner, and knowingly misapply, property that was valued at $5,000 or more, and was owned by, and was under the care, custody, or control of an organization, government, or agency which received more than $10,000 in federal program funds in a one-year period; that is, **JAMES** obtained at least $5,000 in Government of the Virgin Islands funds based on false representations that the money would be used to fund historical research, when in fact **JAMES** appropriated a portion of the money to his own use.

All in violation of Title 18, United States Code, Section 666(a)(1)(A).

4

## FORFEITURE ALLEGATIONS

The Grand Jury for the District of the Virgin Islands further finds that:

15.     Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), in the event of the defendant's conviction on any of Counts One through Three of this Indictment.

16.     Upon conviction of any of the offenses set forth in Counts One through Three of this Indictment, the defendant,

### WAYNE A.G. JAMES.

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.  Such forfeitable property includes a sum of money equal to the amount of proceeds obtained as a result of the offenses.

17.     If any of the property described above, as a result of any act or omission of the defendant:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided without difficulty,

5

**APP.37**

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

The Grand Jury returned a TRUE BILL.

Raymond Hulser
Chief, Public Integrity Section
Criminal Division
Department of Justice

_____

Amanda R. Vaughn
Justin D. Weitz
Trial Attorneys

Ronald W. Sharpe
United States Attorney
District of the Virgin Islands

_____

Nelson Jones
Assistant United States Attorney


DISTRICT COURT OF THE VIRGIN ISLANDS: Returned into the District Court on

this ___ day of October, 2015, by Grand Jurors and filed.

_____

CURTIS V. GOMEZ
U.S. DISTRICT JUDGE

Rec'd JD 01-5T 10 01'15 PM 05:25

7

**APP.39**

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS & ST. JOHN
* * *

|   |   |   |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| | ) | NO. 15-CR-42 |
| WAYNE A.G. JAMES | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION TO DISMISS INDICTMENT OR, IN THE ALTERNATIVE, FOR
SUPPRESSION OF EVIDENCE OBTAINED IN VIOLATION OF SPEECH OR
DEBATE IMMUNITY GRANTED BY 48 U.S.C. § 1572 (d)**

**NOW COMES** defendant Wayne A.G. James, through undersigned counsel, Omodare Jupiter, Federal Public Defender for the District of the Virgin Islands, and Brendan A. Hurson, Assistant Federal Public Defender, to respectfully request that the three (3) count indictment pending against him be dismissed. In the alternative, Mr. James moves to suppress evidence obtained in violation of the legislative immunity afforded him by 48 U.S.C. § 1572 (d). In support of this motion, counsel states as follows:

**INTRODUCTION**

"Legislators in the Virgin Islands, like their counterparts in the national and many state legislatures, enjoy immunity for actions taken in the regular course of the legislative process." Gov't of Virgin Islands v. Lee, 775 F.2d 514, 519 (3d Cir. 1985). This immunity comes directly from a federal statute which mandates that "[n]o member of the [Virgin Islands] legislature shall be held to answer before any tribunal other than the legislature for

any speech or debate in the legislature . . . ." 48 U.S.C. § 1572 (d). This statute has been analogized to the Speech or Debate Clause of the United States Constitution. Lee, 775 F.2d at 519. Though its constitutional counterpart protects members of the national legislature, its purpose is identical to the immunity bestowed upon members of the Virgin Islands' legislature: "to insure that the legislative function . . . . may be performed independently." Eastland v. U. S. Servicemen's Fund, 421 U.S. 491, 502(1975).

The government sought an indictment charging erstwhile Virgin Islands legislator Wayne James with fraud and embezzlement. See Indictment, 1. The indictment is frank in acknowledging that the conduct at the heart of all three counts occurred "[w]hile [Mr. James was] a senator . . . ." and relates to his actions as a legislator. Id. at 1-2. These admissions are fatal to the government's attempt to prosecute Mr. James because the legislative immunity bestowed upon Mr. James prevents inquiry into acts within the legislative sphere even if, as the government claims (and Mr. James vociferously disputes), those acts were improper or illegal. As such, the Court must strike all charges in the Indictment that fall within the scope of legislative immunity. See United States v. Johnson, 383 U.S. 169, 184-85(1966) ("We hold that a prosecution under a general criminal statute dependent on [legislative acts] necessarily contravenes the Speech

or Debate Clause."); <u>McSureley v. McClellan</u>, 553 F.2d 1277, 1299 (D.C. Cir. 1976) (<u>en</u> <u>banc</u>) ("[T]he Speech or Debate Clause acts as an exclusionary rule and testimonial privilege, as well as a substantive defense."). Because the prosecution of Wayne James is based entirely on conduct related to legislative acts, the instant indictment must be dismissed.

Moreover, this immunity has been interpreted "broadly, to include not only 'words spoken in debate,' but anything 'generally done in a session of the House by one of its members in relation to the business before it.'" <u>Johnson</u>, 383 U.S. at 179 (citation omitted).

In the alternative, significant evidence to be presented at trial (and already presented to the grand jury), was obtained in violation of Mr. James' legislative immunity. For example, emails sent as part of his official legislative duties, critical documents related to his legislative acts and official duties, and testimony related to his senatorial duties and responsibilities was improperly secured through search warrants and subpoenas. Because the procurement of this evidence ran afoul of Speech or Debate immunity, it must be suppressed.

<u>**FACTS**</u>

The celebration of emancipation in the Danish West Indies was short-lived as slavery was converted into an institutionalized system of contract labor that saw chains replaced by oppressive

labor contracts.  These contracts bound most former slaves to the same plantations where they were once enslaved.  As former slaves found themselves unable to escape the control of the plantation owners, anger fomented into justifiable revolt in 1878.  This revolt, known as the Fireburn, was led in large part by several women now known as the "Fireburn Queens."  The Fireburn culminated in the scorching of hundreds of acres of land, the deaths of dozens of black laborers, and modest changes to the contract system giving rise to the revolt.

Regardless of its limited success in achieving immediate freedom, as one of the largest and most significant black-led labor revolts of the post-slavery era, the Fireburn was nonetheless significant.  Years later, it remained an event of tremendous historical and cultural significance to the citizens of the Virgin Islands, and to Wayne James in particular.  Despite this local interest and significance, nearly all documents related to the Fireburn were removed from St. Croix and taken to Denmark.  Many of the documents were in the Danish National Archives, and remained written only in a foreign language.  In short, critical records memorializing a seminal moment in Virgin Islands' history was inaccessible to the people it impacted most – the people of the Virgin Islands.  In response, Mr. James devoted significant portions of his life to researching the subject and sharing his work to ensure that time would not diminish the contributions of

the Fireburn Queens and the significance of the 1878 revolt. <u>See</u> St. Thomas Source, Wayne James Says He's Found a 4th Fireburn 'Queen', August 4, 2004 (available at http://stthomassource.com/content/news/local-news/2004/08/05/wayne-james-says-hes-found-4th-fireburn-queen) (last visited February 2, 2017).

Mr. James was elected as a senator in the Legislature of the Virgin Islands in 2008. Indictment, 1. He was a legislator in the 28th Legislature, serving from January 2009 through January of 2011. <u>Id.</u>

Mr. James brought his interest in the Fireburn with him to the legislature. Chosen to head the Youth, Education and Culture Committee, Mr. James immediately undertook legislative efforts to ensure proper commemoration of the Fireburn, including preservation of critical documents memorializing the event that were housed in Denmark. Mr. James' interest in the Fireburn ripened as a senator into a full-blown legislative effort to ensure that critical Fireburn documents were accessible to the citizens of the Virgin Islands. He also joined in the legislative efforts to ensure that the Fireburn was officially recognized as a day of significance through, among other things, a territorial day of remembrance and commemoration during the centennial transfer events in 2017.

There is no dispute that, like all senators, Mr. James received funds from the Virgin Islands legislature to further his legislative goals and priorities.  Indictment, 1-2.  These funds were utilized primarily to seek out, procure, and translate documents that would prove instrumental to Mr. James' legislative efforts to properly commemorate the Fireburn.  Mr. James' efforts in that regard are easily traced to legislation.

For example, Mr. James voted in favor of Senate Bills 28-0010 and 28-0159, both originally entitled "[a]n Act amending title 1 Virgin Islands Code, chapter 11, section 171 commemorating laborers on Fireburn Day as a day to be revered and remembered in the Virgin Islands."  V.I. Senate Bill 28-0159 (attached as Ex. A).  Both bills were originally proposed in and debated by the committee chaired by Mr. James.  Ultimately, Bill No. 28-0159, amended slightly, was passed by the Senate on March 8, 2010.  It was signed into law by then-governor John P. de Jongh, Jr. on April 7, 2010.  See V.I. Senate Act # 7158 (attached as Ex. B).

Mr. James' interest in legislation related to the Fireburn is also manifest in emails to then Senate President Louis Hill.  For example, following a trip to Denmark to review Fireburn documents, Mr. James emailed Senator Hill to inform him of what he learned and the "critical role" it served "in the research component of several bills I will introduce during the 28th Legislature."

October 8, 2009 Email from Wayne James to Senate President Louis Hill, Bates # USDOJ 2079 (attached as Ex. C).

Committee hearing transcripts also affirm Mr. James' commitment to researching the Fireburn for future legislation. See Tr. of Committee Debate on Bill # 28-159 (comments of Senator Thurland) ("I am glad to see that there is also a lot of research that is now being done – contemporary research that is being done. And Mr. [James] has been one of the people who have been devoted to carrying on a significant part of that research from -- in the words of my Majority Leader -- a "black man's perspective.") (relevant page attached as Ex. D).

Indeed, the government alleges that the funds utilized to secure and translate Fireburn documents were available to Mr. James solely because he was a member of the senate and therefore had access to "legislative funds." Indictment 1-2. And these funds were only available to Mr. James because they were being utilized to research for potential bills related to the Fireburn and to contribute to the vibrant legislative discourse on the topic.

Discovery provided the government in connection with this prosecution contains numerous documents connecting the charged conduct with legislation. For example, in an email to Mr. James seeking an interview, FBI agent Jackson Purkey noted that "[the FBI is] currently looking into a number of **matters concerning activities conducted in the Virgin Islands Legislature** by several

individuals **during your tenure as a Senator**." August 17, 2015 Email from SA Purkey, 1 (attached as Ex. E)(emphasis added). Further, in correspondence from Mr. James' Special Advisor, Ms. Hortense Rowe, the request for funds for Fireburn-related materials were unequivocally to be **"used for legislation."** May 1, 2010 Memo from H. Rowe, 1 (attached as Ex. F) (emphasis added).

███████ was called before the grand jury[1] and testified that Mr. James' interest in the Fireburn was related to legislation. Indeed, government counsel deliberately elicited testimony that the only way to secure funding for the documents was to connect it to legislation:



███████████████ (attached as **Sealed Ex. 1**)(emphasis added).

It is undisputed that Mr. James did, in fact, introduce legislation of the exact kind noted by ████. During his tenure as a senator, he proposed Bill No. 28-0143, - An Act amending 3 V.I.C., Chapter 19, to create the Centennial Commission charged

---

[1] Reference to undisclosed Grand Jury matters is redacted. An unredacted copy of this motion will be filed under seal.

with, among other things, examining and commemorating the
Fireburn. This Bill was signed into law on April 7, 2010.  See
V.I. Senate Act # 7157 (attached as Ex. G).

Asked during her grand jury testimony to explain how Mr. James
intended use the legislature's funds to further his desire to see
the Fireburn properly commemorated, ████████ noted that Mr. James
intended to secure from the Danish ████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████  Id. at 22.    Asked
further to explain where the funds for this work was to come from,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████  Id. at 24 (emphasis added).   This, according to ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████  Id. at 25.

It is these types of transactions – the use of legislature
funds to further research the Fireburn for legislative purposes -
that are at the heart of the government's allegations against Mr.
James, and at the center of its presentation to the grand jury.

Count one alleges wire fraud in the form of an October 19,
2010 "wire communication" from "Banco Popular in the U.S. Virgin

Islands to Banco Popular in Puerto Rico.  Indictment, 3.  This transaction represents the deposit of a check made payable to Wayne James and drawn on the account of the Legislature of the Virgin Islands.  GJ Ex. # 48 (attached); see also Testimony of Nick Peru, 63 (noting that Ex. 48 was a check cashed on October 19, 2010 matching an invoice request for repayment of services related to the recovery and translation of Fireburn documents) (available on request).

Count two alleges a similar communication on October 22, 2010. Indictment, 3.  This transaction also represents the deposit of a check made payable to Wayne James and drawn on the account of the Legislature of the Virgin Islands.  GJ Ex. # 47 (attached as Ex. H); see also Testimony of Nick Peru, 62 (noting that Ex. 47 was a check cashed on October 22, 2010 matching an invoice request for repayment of services related to the recovery and translation of Fireburn documents).

Count three essentially repeats similar claims – that Mr. James defrauded a federal program by "obtain[ing] at least $5,000 in Government of Virgin Islands funds based on false representations that the money would be used to fund historical research [of the Fireburn], when in fact James appropriated a portion of the money to his own use."  Indictment, 4.  As with the first two counts, the allegation in Count three rests on the claim

that Mr. James procured legislative funds ostensibly for legislative research, but actually for his own use.

Mr. James' case is set for trial on February 13, 2017.

### ARGUMENT

Mr. James is charged by indictment with two counts of wire fraud in violation of 18 U.S.C. §1343, and one count of federal program embezzlement in violation of 18 U.S.C. §666(a)(1)(A). Regardless of its alleged illegality, a Virgin Islands senator cannot be prosecuted for acts legitimately related to his service as a senator. Mr. James served as a senator in the legislature from 2009 to January of 2011. The alleged illegal conduct occurred almost exclusively within that time period, including two (2) wire transfers in 2010 and a series of acts from late 2010 through 2011. Further, the vast majority of evidence the government intends to offer in its case-in-chief memorializes acts committed in the course of that service. As such, the indictment must be dismissed. In the alternative, all evidence secured in violation of this clear privilege must be suppressed.

### 1. The Indictment Must Be Dismissed

Where an "activity is found to be within the legitimate legislative sphere, balancing plays no part . . . [as t]he speech or debate protection provides an absolute immunity from judicial interference." Eastland, 421 U.S. at 509 n.16. This mandate comes

directly from the "Speech or Debate Clause" of the United States Constitution. See U.S. Const. art. I, § 6.

It is true that "[t]he Federal Speech or Debate Clause, of course, is a limitation on the Federal Executive, but by its terms is confined to federal legislators." United States v. Gillock, 445 U.S. 360, 374 (1980). However, in passing 48 U.S.C. § 1572(d), Congress explicitly provided that Virgin Island legislators "prosecuted under federal law should be accorded the same evidentiary privileges as a Member of Congress." Id. at 374. Such was the conclusion reached by then-Chief Judge Finch in Hispanos Unidos v. Gov't of U.S. Virgin Islands, 314 F. Supp. 2d 501, 503 (D.V.I. 2004)when he held that "[t]he Speech or Debate Clause of the Revised Organic Act of 1954 states that "[n]o member of the legislature shall be held to answer before any tribunal other than the legislature for any speech or debate in the legislature . . . [and] Congress intended this clause to provide legislative immunity." "Because the policies underlying the Speech or Debate Clause of the United States Constitution and the Speech or Debate Clause of [48 U.S.C. § 1572(d)] are also closely parallel, the Third Circuit Court of Appeals has found 'that the interpretation given to the Speech or Debate Clause of the Federal Constitution, while not dispositive as to the meaning of the legislative immunity provision of the Virgin Islands, is,

nevertheless, highly instructive.'" Id. (citing Government of the Virgin Islands v. Lee, 775 F.2d 514, 520 (3d Cir.1985)).

In interpreting this "highly instructive" analog, the Supreme Court has held that the privilege should be read "broadly, to include not only 'words spoken in debate,' but anything 'generally done in a session of the House by one of its members in relation to the business before it.'" Johnson, 383 U.S. at 179 (citing Kilbourn v. Thompson, 103 U.S. 168, 179 (1880)).

The Third Circuit Court of Appeals has similarly interpreted the immunity of V.I. legislators to be broad. See Lee, 775 F. 2d at 516. In Lee, a former Virgin Island legislator was accused of improperly seeking partial reimbursement from the legislature for a trip to New York and Washington D.C. that the government claimed was a personal excursion. That legislator, on the other hand, "claimed that the purpose of his trip was for legislative fact-finding." Id. Reviewing the matter as one of first impression, the Third Circuit held that "as a general matter, legislative fact-finding is entitled to the protection of legislative immunity . . . ." Id. at 517.

In so holding, the Court first reviewed the purpose of the legislative immunity clause affirming that "the central role . . . is 'to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary. . . .'" Id. at 520 (quoting Gravel v. United States, 408 U.S. 606, 617 (1972)).

Turning to the question of the scope of legislative immunity, the Lee Court affirmed that:

> legislative immunity protects "only acts generally done in the course of the process of *enacting legislation*...." Shielded activities must play "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House."

Id. at 520 (citations omitted)(emphasis in original).

The Lee Court surveyed decisions on point and noted that other Circuits had widely construed Speech or Debate immunity to encompass legislative fact-finding. For example, it noted that a sister circuit had "no doubt that information gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation" and was thus immune from inquiry and prosecution. Id. at 521 (citing McSurely v. McClellan, 553 F.2d 1277, 1286 (D.C.Cir.1976)). Relying on the Supreme Court's pronouncement in Gravel, the Third Circuit affirmed its D.C. counterpart's finding that "the acquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the privilege so that congressmen are able to discharge their constitutional duties properly." Id. (citing McSurely, 553 at 1287).

Similarly, the Third Circuit cited favorably to <u>Miller v.</u>
<u>Transamerican Press, Inc.</u>, 709 F.2d 524, 530 (9th Cir.1983), in
which the Ninth Circuit held that "[o]btaining information
pertinent to potential legislation is one of the 'things generally
done in a session of the House' . . . concerning matters within
the 'legitimate legislative sphere.'" <u>Id.</u> at 521 (citations
omitted from <u>McSurely</u>).

The <u>Lee</u> Court concluded with an unequivocal recognition that
senatorial fact-finding and information-gathering is beyond
judicial inquiry:

> We agree that fact-finding, information
> gathering, and investigative activities are
> essential prerequisites to the drafting of
> bills and the enlightened debate over proposed
> legislation. **As such, fact-finding occupies a**
> **position of sufficient importance in the**
> **legislative process to justify the protection**
> **afforded by legislative immunity.** Legislators
> must feel uninhibited in their pursuit of
> information, for "[a] legislative body cannot
> legislate wisely or effectively in the absence
> of information respecting the conditions which
> the legislation is intended to affect or
> change. . . ."

<u>Id.</u> at 521-22 (<u>citing</u> <u>McGrain v. Daugherty</u>, 273 U.S. 135,
175(1927)(emphasis added). This is a widely held understanding
among courts that have addressed the issue. <u>See</u>, <u>e.g.</u>, <u>Doe v.</u>
<u>McMillan</u>, 412 U.S. 306, 313 (1973) (finding that Speech or Debate
immunity extended to "authorizing an investigation," "holding
hearings," "preparing a report," and "authorizing the publication
and distribution."); <u>Eastland</u>, 421 U.S. at 504 ("Congress's

15

**APP.54**

efforts to acquire information during committee investigations or through the issuance of subpoenas constitute legislative acts protected by the Speech or Debate Clause.").

Relevant to the instant case is the understanding that, in the Third Circuit, Speech or Debate immunity covers even so-called *informal* acts of legislative fact-finding. Jewish War Veterans of the U.S. of Am., Inc. v. Gates, 506 F. Supp. 2d 30, 55 (D.D.C. 2007) (citing Lee, 775 F.2d at 521). Ultimately, "the controlling principle is . . . that a [legislator's] gathering of information beyond the formal investigative setting is protected by the Speech or Debate Clause so long as the information is acquired in connection with or in aid of an activity that qualifies as 'legislative' in nature." Id. at 57.

The Fourth Circuit Court of Appeals case of United States v. Dowdy, 479 F.2d 213, 224 (4th Cir. 1973), is informative in this regard. In Dowdy, a former Congressman was prosecuted for numerous offenses related to alleged bribery tied to his role as legislator. Id. at 217. He raised numerous arguments on appeal, including a claim that "substantial portions of the allegations of the indictment and of the proof at trial revolved around his actions as [a legislator] and that his actions and motivations in this regard were immune from judicial scrutiny under the 'speech or debate' clause of the constitution." Id. Specifically, Dowdy alleged that evidence of preparation for committee hearings

including meetings with various government officials and "the receipt and acceptance of documents" was improperly presented to the grand jury and the petit jury at trial. Id. at 224.

Agreeing with the defendant in significant part, the Fourth Circuit held that the "conversations and arrangements" with government officials, including the collection of "a considerable amount of documentary evidence of reports of investigations which defendant . . . obtained" was improperly submitted to fact-finders in violation of the speech and debate clause. Id. The Court ruled unequivocally that:

> This evidence was an examination of defendant's actions as a Congressman, who was chairman of a subcommittee investigating a complaint, in gathering information in preparation for a possible subcommittee investigatory hearing. As such, it was an examination of legislative acts . . . and is condemned . . . when the prosecution proceeds under a statute of general application. It was a complete disclosure of all that transpired including proof of documents that were obtained and, hence, was a general inquiry into the legislative acts of a Congressman and his motives for performing them.

Id. at 224-25.[2] This was the Court's conclusion despite its frank recognition that the "defendant's actual motives in communicating

---

[2] Dowdy includes a discussion of a possible exception to the presentation of evidence for certainly "narrowly drawn statutes" that specifically authorize "probing into legislative acts and the motivations therefore." Dowdy, 479 U.S. at 225. There can be no claim that the broad and generally applicable offenses alleged in this indictment – wire fraud and embezzlement – are so "narrowly drawn" as to overcome speech and debate immunity. Id.

with various government officials and in obtaining certain
government documents could have been, as the government contends,
for improper non-legislative purposes." Id. at 226. "But," it
held, "we reject the government's argument that it was proper for
the jury to receive all of the evidence and to pass upon the issue
of what activities were legislative, protected from examination by
the speech or debate clause, and what were not." Id.

It bears noting that the Fourth Circuit further rejected the
government's implied claim that Speech and Debate Immunity is
"applicable only when a pure legislative motive is present." Id.
To the contrary, the Court held:

> The clause does not simply protect against
> inquiry into acts which are manifestly
> legislative. In our view, it also forbids
> inquiry into acts which are purportedly or
> apparently legislative, even to determine if
> they are legislative in fact. Once it was
> determined, as here, that the legislative
> function (here, full investigation [of an
> issue] to determine if formal subcommittee
> hearings should be held) was *apparently* being
> performed, the propriety and the motivation
> for the action taken, as well as the detail of
> the acts performed, are immune from judicial
> inquiry.

Id. (emphasis in original). Ultimately finding that the evidence
adduced at trial and considered by the jury that was related to
legislative fact-finding was improperly admitted, the Fourth
Circuit reversed convictions on several of the charged counts. Id.

## 2. The Instant Indictment Must Be Dismissed Because the Charges Rest on Activities Protected by Speech and Debate Immunity.

As noted, the Virgin Islands legislators are protected from criminal or civil liability for actions undertaken "in the regular course of the legislative process." Lee, 775 F.2d at 519. Thus, having established that immunity exists for legislators like Mr. James for legislative acts, both formal and informal, close scrutiny of the instant indictment reveals that the prosecution cannot be sustained as it runs afoul of this well-established immunity.

"On a motion to dismiss an indictment under the Speech or Debate Clause, the district court must examine the indictment to determine whether its charges are predicated upon evidence of legislative acts." United States v. Menendez, 132 F. Supp. 3d 610, 620 (D.N.J. 2015)(citing Fields v. Office of Eddie Bernice Johnson, 459 F.3d 1, 13 (D.C.Cir.2006)). "This plays out in a two-step framework for identifying legislative acts protected by the Speech or Debate Clause." United States v. Menendez, 831 F.3d 155, 166 (3d Cir. 2016). First, this court must "look to the form of the [alleged acts] to determine whether it is inherently legislative or non-legislative." Id. "If an act is neither manifestly legislative nor clearly non-legislative, then it is ambiguously legislative," and immunity "will turn on the content, purpose, and motive" of the alleged acts at issue. Id. at 168-69.

Here, Mr. James' acts were inherently legislative in nature. For example, the collection, translation, and retention of Fireburn documents was done for the express purpose of crafting and debating legislation related to Fireburn commemoration. "Preparations for a committee hearing are clearly protected by the Speech or Debate Clause . . . ." Menendez, 132 F. Supp. 3d at 627; see also Dowdy, 479 F.2d at 224-26 (finding that the collection of documents and records in anticipation of a *possible* subcommittee hearing were legislative in nature); McSurely, 553 F.2d at 1286 ("The [Supreme Court has held] that 'the power to investigate and to do so through compulsory process plainly falls within" the test for legislative activity . . . .")(citation omitted).

As noted, Mr. James' committee held hearings on Fireburn legislation on January 10, 2010, just a few months before the alleged illegal acts at issue in Counts 1 and 2 of the indictment, and in the midst of the allegations in Count 3. This committee hearing was an integral step in the passage of V.I. Senate Bill 28-0159, "commemorating laborers on Fireburn Day as a day to be revered and remembered in the Virgin Islands." Moreover, Mr. James researched and organized a Centennial Celebration committee, ultimately sponsoring a bill that provided funds for the planning and execution of the year-long celebration.[3] Thus, the allegations

_____

[3] The Centennial Celebration Bill (# 7157) clearly envisioned further legislative action as it merely created a fund and

contained in the indictment rest exclusively on acts taken in furtherance of legislation, the precise type of action immune from inquiry under 48 U.S.C. § 1572(d) and Lee, 775 F.2d at 518.

Even if this court does not find the collection of Fireburn documents to be explicitly legislative, "the content, purpose, and motive" of Mr. James' alleged actions establish that they were legislative in nature. Even "informal" actions by a legislator can qualify for speech and debate immunity. Lee, 775 F.2d at 521. Moreover, "without exception," the Supreme Court has "read the Speech or Debate Clause *broadly* to effectuate its purposes . . . ." Eastland, 421 U.S. at 501–02 (emphasis added).

Here, Mr. James' contact with the Danish National Archives, the process of seeking the advancement of funds from the Virgin Islands' Legislature, and the use of wire transfers and deposits to facilitate translation and document production were, at minimum, informal legislative acts related to Mr. James' legislative role. These types of acts, ". . . are endowed with Speech or Debate Clause immunity . . . ." United States v. Rose, 790 F. Supp. 340, 343 (D.D.C. 1992).

There can be no debate that the location, translation, and dissemination of Fireburn documents was "related to and in furtherance of a legitimate task" of the Virgin Islands

---

department to begin "formulating plans and making preparations" for the 2017 Centennial. See V.I. Senate Act # 7157, 1.

legislature. <u>Eastland</u>, 421 U.S. at 505.  Grand jury testimony, memos, emails, and the indictment itself establish as much.  Thus, like the issuance of subpoenas for records in <u>Eastland</u>, Mr. James' efforts to secure Fireburn documents -- including the financial transactions at the heart of this indictment -- are likewise protected by Speech and Debate immunity.[4]  The indictment must be dismissed.

### 3.  In the Alternative, Suppression is Warranted.

In the alternative, all evidence obtained in violation of the immunity noted above must be suppressed.  First, government staff is immune from questioning related to a senator's legislative acts. <u>Gravel</u>, 408 U.S. at 616-17 ("We have little doubt that we are neither exceeding our judicial powers nor mistakenly construing

---

[4]  The allegations in this case stem exclusively from an effort to secure documents from Denmark, a sovereign nation well beyond the reach of legislative subpoena issued by Mr. James' committee.  Regardless, Mr. James' personal efforts to secure Fireburn documents through phone calls, emails, and wire are analogous to the legislative subpoenas of the kind held immune from inquiry in <u>Eastland</u>.  421 U.S. at 505.  "'(W)here the legislative body does not itself possess the requisite information . . . [e]xperience has taught that mere requests for such information often are unavailing . . . so some means of compulsion are essential to obtain what is needed.'" <u>Id.</u> at 505-06 (quoting <u>McGrain</u>, 273 U.S. at 175). "To conclude that the power of inquiry is other than an integral part of the legislative process would be a miserly reading of the Speech or Debate Clause in derogation of the 'integrity of the legislative process.'" <u>Id.</u> (citations omitted).  To find that Mr. James' behavior was different than that in Eastland ignores the complex reality of the legislature's efforts to secure Fireburn documents from Denmark and runs afoul of the Supreme Court's mandate to interpret Speech and Debate immunity "broadly." <u>Id.</u> at 510.

the Constitution by holding that the Speech or Debate Clause
applies not only to a Member but also to his aides insofar as the
conduct of the latter would be a protected legislative act if
performed by the Member himself."). Moreover, legislative acts,
even informal ones, may never be introduced into evidence against
a protected defendant like Mr. James. See United States v.
Helstoski, 442 U.S. 477, 487 (1979) ("The Court's holdings . . .
leave no doubt that evidence of a legislative act of a Member may
not be introduced by the Government . . . .").

Discovery in this case is replete with evidence of the
government running afoul of this clear restriction. It includes
grand jury testimony from Mr. James' former senior advisor, an
employee and aid, as well as other employees of the legislature
whose job was, in part, to assist Mr. James. This type of evidence
is privileged under the immunity statute and should not have been
presented to the grand jury, much more at trial.

Similarly, the indictment was secured utilizing – and the
government intends to offer at trial – documents secured from the
legislature through subpoena and other means directly related to
Mr. James' legislative work, including emails sent to and from Mr.
James related to his legislative efforts. This, too, is improper.

The relationship between legislative immunity and the
procurement of documentary evidence is explained in Chang v. United
States, 512 F. Supp. 2d 62, 66 (D.D.C. 2007). The D.C. Speech or

Debate Clause, playing the same role as the Speech or Debate Clause in the U.S. Constitution, excludes "inquiry ... into the motivation for" acts "that occur in the regular course of the legislative process." Id.(quoting Helstoski, 442 U.S. at 487). In Chang, a subpoena was directed by the Metropolitan Police Department for documents in the possession of a former Special Counsel investigating the conduct of the District of Columbia's Committee on the Judiciary. Id. at 63. In quashing the subpoena, the District Court rightly concluded that the subpoenaed documents were "shielded from production pursuant to the legislative immunity accorded . . . under the District of Columbia Speech or Debate Clause." Id. This ruling came despite the fact that the documents targeted by the subpoena were in the personal possession of the subpoena's target well after her service as counsel was complete and despite the fact that the target had spoken publicly on the subject matter at issue in the targeted documents. Id. at 66. "To find otherwise," the district court held, "would severely undermine the purposes of legislative immunity." Id. The same result is warranted here.

In short, the prosecution of Mr. James is untenable absent rampant violations of the immunity afforded in 48 U.S.C. § 1572 (d). As such, all evidence secured in violation of its broad protection must be suppressed.

**WHEREFORE**, for the above stated reasons, counsel respectfully requests that this court grant his motion to dismiss the indictment or, in the alternative, to suppress all evidence obtained in violation of the legislative immunity granted by 48 U.S.C. § 1572 (d).

DATED: February 3, 2017

                              Respectfully submitted,

                              OMODARE B. JUPITER
                              FEDERAL PUBLIC DEFENDER

                              */s/ Omodare B. Jupiter*
                              OMODARE B. JUPITER
                              Federal Public Defender
                              1115 Strand Street
                              St. Croix, VI 00820
                              Tel (340) 773-3585
                              Fax (340) 773-3742
                              E-mail: Omodare_jupiter@fd.org

                              */s/ Brendan A. Hurson*
                              BRENDAN A. HURSON
                              Assistant Federal Public Defender
                              1336 Beltjen Rd., Suite 202
                              St. Thomas, VI 00802
                              Tel (340)774-4449
                              Fax (340)776-7683
                              E-mail: Brendan_Hurson@fd.org

## CERTIFICATE OF SERVICE

    I, HEREBY CERTIFY that on the 3rd day of February, 2017 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Ronald W. Sharpe
United States Attorney

Amanda R. Vaughn
Justin D. Weitz
Trial Attorneys
Public Integrity Section
U.S. Department of Justice
1400 New York Ave. NW, 12th Floor
Washington, D.C. 20005
(202) 616-4530 (office)
(202) 714-4232 (cell)
Amanda.vaughn@usdoj.gov
Justin.Weitz@usdoj.gov


                           */s/ Omodare B. Jupiter*

**TWENTY-EIGHT LEGISLATURE OF THE VIRGIN ISLANDS**
Territory of the Virgin Islands
REGULAR/SPECIAL SESSION _10_
ROLL CALL

| Bill No: | 28-0159 | Date: | 5 8 2010 |
|---|---|---|---|

*An Act amending title 1 Virgin Islands Code, chapter 11, section 171 commemorating laborers on Fireburn Day as a day to be revered and remembered in the Virgin Islands*

### LEGISLATIVE HISTORY

(a)  Introduced and sent to Committee on……………………………….Date………………………….
(b)  Reported from Committee and sent to Rules on…………………………… *Adopted*
(c)  Reported from Committee on Rules……………………………………… *as*
(d)  Recalled from Committee by Special Order………………………………………
(e)  Adopted on……………………………………………………………… *Amended*
(f)  Rejected on…………………………………………………………………

| MEMBERS | YEA | NAY | ABSENT | NOT VOTING |
|---|---|---|---|---|
| BARSHINGER, Craig W. | 1 | | | |
| ONSATORG, Adlah | 2 | | | |
| DOWE, Carlton | 3 | | | |
| HILL, Louis Patrick | 4 | | | |
| JAMES, Neville A. | 5 | | | |
| JAMES, Wayne | 6 | | | |
| MALONE, Shawn-Michael | 7 | | | |
| NELSON, Terrence | 8 | | | |
| O'REILLY, Nereida Rivera | 9 | | | |
| RICHARDS, Usie R. | 10 | | | |
| SANES, Sammuel | 11 | | | |
| SPRAUVE, Patrick, S. | 12 | | | |
| THURLAND, Michael | 13 | | | |
| WHITE, Celestino A. Sr. | 14 | | | |
| WILLIAMS, Alvin L. | 15 | | | |

**CERTIFIED TRUE AND CORRECT**

**APP.66**

**02/16/10-REPORTED OUT TO THE FLOOR**
**01/21/10-AMENDED AND REPORTED OUT TO THE COMMITTEE ON RULES AND JUDICIARY**
**12/07/09-NO ACTION TAKEN**

# BILL NO.  28-0159

# Twenty-Eighth Legislature of the Virgin Islands

### September 24, 2009

An Act amending title 1 Virgin Islands Code, chapter 11, section 171 commemorating laborers on Fireburn Day as a day to be revered and remembered in the Virgin Islands

**PROPOSED BY:**    Senator Terrence "Positive" Nelson

1    **WHEREAS,** after the emancipation of enslaved Africans within the Virgin

2    Islands, work continued on the plantations; and

3    **WHEREAS,** competition from European sugar-beet growers and other sugar

4    producing countries had a negative impact on the Virgin Islands' plantation-based

5    economy during the nineteenth century; and

6    **WHEREAS,** after the abolition of slavery and the emancipation of the slaves,

7    plantation growers employed contract immigrant laborers and former slaves.  To reduce

8    operating expenses and gain the competitive edge, employers began to exploit their

9    workers; and

10    **WHEREAS,** on January 26, 1849, the Danish Government issued a Labor Act

11    that restricted the bargaining power and mobility of plantation laborers by fixing their

1 wages and requiring that on October 1st they sign a contract to work on a particular

2 plantation for an entire year; and

3       **WHEREAS,** poor living conditions, low wages prevailed; and

4       **WHEREAS,** October 1st of each year ended a plantation laborer's contract, and

5 this gave the laborer the ability to contract on a neighboring plantation for the following

6 year; and

7       **WHEREAS,** on July 3, 1848, and every year after, employers promised increased

8 wages and better living and working conditions; and

9       **WHEREAS,** every year, the employers failed on all promises; and

10       **WHEREAS,** in 1878, after all peaceable attempts to demand a better quality of

11 life failed, women on St. Croix, known as Queens, Queen Mary Thomas, Queen Mathilde

12 Macbean, Queen Susanna "Bottom Belly" Abrahamson and Axeline "Queen Agnes"

13 Salomon, Rebecca Fredericks and others, together with men including: Joe Paris, James

14 de Silva, Joseph LaGrange, John Lewis, Thomas Graydon, Francis Leonard, William

15 Jones, William Arnold, and others organized a revolt to repeal the Labor Act of 1849,

16 demand comparable wages to that of St. Croix Central Factory workers, and obtain better

17 working and living conditions; and

18       **WHEREAS,** when their demands were not met, and lacking alternative means of

19 redressing their long-standing grievances, they burned down towns and sugar cane

20 plantations. By the end of the "Fireburn", which lasted one week, eight hundred seventy-

21 nine acres from Estate Prosperity to Peters Rest on St. Croix were burned, including 43 or

22 more sugar plantations; and

23       **WHEREAS,** the 1878 labor revolt contributed to the achievement of fair labor

24 standards, wage increases, a higher standard of living and quality of life for laborers on

25 St. Croix; and

1    **WHEREAS,** it is befitting to commemorate the struggles and sacrifices of early

2    laborers and labor leaders by designating October 1 as Fireburn Day; Now, Therefore,

3    *Be it enacted by the Legislature of the Virgin Islands:*

4    **SECTION 1.** Title 1 Virgin Islands Code, chapter 11, section 171, is amended in

5    subsection (a) after "(Labor Day)" by inserting "October 1 (Fireburn Day)".

6    <u>**BILL SUMMARY**</u>

7    The bill amends title 1, section 171 of the Virgin Islands Code to designate

8    October 1 of each year as Fireburn Day in commemoration of the sacrifices and struggles

9    made in the field of labor relations.

10

11   **BR09-0665/May 28, 2009/ revised 9/17/09**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Senator Dawson arrived No. 28-0159*

**TWENTY-EIGHT LEGISLATURE OF THE VIRGIN ISLANDS**
Territory of the Virgin Islands
REGULAR/SPECIAL SESSION _____
ROLL CALL

Bill No: 28-0159          Date:

**LEGISLATIVE HISTORY**

(a)   Introduced and sent to Committee on…………………………..Date……………………………………
(b)   Reported from Committee and sent to Rules on……………………………………………………………
(c)   Reported from Committee on Rules…………………………………………………………………………
(d)   Recalled from Committee by Special Order…………………………………………………………………
(e)   Adopted on……………………………………...…………………………………………………………
(f)   Rejected on…………………………………...….…………………………………………………………

| MEMBERS | YEA | NAY | ABSENT | NOT VOTING |
|---|---|---|---|---|
| BARSHINGER, Craig W. | 1 | | | |
| ONSATORG, Adlah | 2 | | | |
| DOWE, Carlton | 3 | | | |
| HILL, Louis Patrick | 4 | | | |
| JAMES, Neville A. | 5 | | | |
| JAMES, Wayne | 6 | | | |
| MALONE, Shawn-Michael | 7 | | | |
| NELSON, Terrence | 8 | | | |
| O'REILLY, Nereida Rivera | 9 | | | ✔ |
| RICHARDS, Usie R. | 10 | | | |
| SANES, Sammuel | 11 | | | |
| SPRAUVE, Patrick, S. | 12 | | | |
| THURLAND, Michael | 13 | | | |
| WHITE, Celestino A. Sr. | 14 | | | |
| WILLIAMS, Alvin L. | 15 | | | |

**CERTIFIED TRUE AND CORRECT**

_____

**APP.70**

TMH
Drafted or Reviewed
Legal Counsel

**AMENDMENT TO BILL NO. 28-_____**
**Offered by Senator Terrence "Positive" Nelson**

Bill No. 28-_____ is amended by adding two appropriately numbered sections to read:

"**SECTION** _____. Bill No. 28-0159 is amended by deleting Section 1 in its entirety and inserting a new Section 1 to read as follows:

'**SECTION 1**. On October 1 of each year, 'Fire Burn Day' shall be observed and recognized in the Virgin Islands. Appropriate ceremonies shall be held in all public schools in the Virgin Islands to reflect upon this most important day in the history of the Virgin Islands. The Commissioner of Education shall be responsible for the reproduction and dissemination of information about Fire Burn Day to all public, private and parochial schools.'."

Amendment No. 28-821/ March 5, 2010/ TMH

# ACT NO. 7158

### BILL NO. 28-0159

## TWENTY-EIGHTH LEGISLATURE OF THE VIRGIN ISLANDS

### Regular Session

### 2010

An Act commemorating laborers on Fireburn Day as a day to be revered and remembered in the Virgin Islands

---0---

**WHEREAS,** after the emancipation of enslaved Africans within the Virgin Islands, work continued on the plantations; and

**WHEREAS,** competition from European sugar-beet growers and other sugar producing countries had a negative impact on the Virgin Islands' plantation-based economy during the nineteenth century; and

**WHEREAS,** after the abolition of slavery and the emancipation of the slaves, plantation growers employed contract immigrant laborers and former slaves. To reduce operating expenses and gain the competitive edge, employers began to exploit their workers; and

**WHEREAS,** on January 26, 1849, the Danish Government issued a Labor Act that restricted the bargaining power and mobility of plantation laborers by fixing their wages and requiring that on October 1st they sign a contract to work on a particular plantation for an entire year; and

**WHEREAS,** poor living conditions, low wages prevailed; and

**WHEREAS,** October 1st of each year ended a plantation laborer's contract, and this gave the laborer the ability to contract on a neighboring plantation for the following year; and

**WHEREAS,** on July 3, 1848, and every year after, employers promised increased wages and better living and working conditions; and

**WHEREAS,** every year, the employers failed on all promises; and

**WHEREAS,** in 1878, after all peaceable attempts to demand a better quality of life failed, women on St. Croix, known as Queens, Queen Mary Thomas, Queen Mathilde Macbean, Queen Susanna "Bottom Belly" Abrahamson and Axeline "Queen Agnes" Salomon, Rebecca Fredericks and others, together with men, including Joe Paris, James de Silva, Joseph LaGrange, John Lewis,

**APP.72**

2

to repeal the Labor Act of 1849, demand comparable wages to those of St. Croix Central Factory workers, and obtain better working and living conditions; and

WHEREAS, when their demands were not met, and lacking alternative means of redressing their long-standing grievances, they burned down towns and sugar cane plantations. By the end of the "Fireburn", which lasted one week, eight hundred seventy-nine acres from Estate Prosperity to Peters Rest on St. Croix were burned, including forty-three or more sugar plantations; and

WHEREAS, the 1878 labor revolt contributed to the achievement of fair labor standards, wage increases, a higher standard of living and quality of life for laborers on St. Croix; and

WHEREAS, it is befitting to commemorate the struggles and sacrifices of early laborers and labor leaders by designating October 1 as Fireburn Day; Now, Therefore,

*Be it enacted by the Legislature of the Virgin Islands:*

SECTION 1. On October 1 of each year, "Fire Burn Day" shall be held in all public schools in the Virgin Islands. Appropriate ceremonies shall be held in all public schools in the Virgin Islands to reflect upon this most important day in the history of the Virgin Islands. The Commissioner of Education shall be responsible for the reproduction and dissemination of information about Fire Burn Day to all public, private and parochial schools.

Thus passed by the Legislature of the Virgin Islands on March 8, 2010.

Witnessed our Hands and Seal of the Legislature of the Virgin Islands this *23* Day of March, A.D., 2010.

Louis Patrick Hill
President

Sammuel Sanes
Legislative Secretary

Bill No. 28-0159 is hereby approved.

Witness my hand and the Seal of the Government of the United States Virgin Islands at Charlotte Amalie, St. Thomas, this 7th day of April, A.D., 2010.

John P. de Jongh, Jr.
Governor

APP.73

**From:** Wayne James ▇▇▇▇▇▇▇▇▇
**To:** Louis Hill ▇▇▇▇▇▇▇▇▇, Hortense Rowe ▇▇▇▇▇▇▇▇▇,
Tomas Alejandro ▇▇▇▇▇▇▇▇ >, WayneJames <▇▇▇▇▇▇ >
**Subject:** FW: Copies regarding 1878 "Fireburn"
**Received(Date):** Thu, 8 Oct 2009 15:57:31 +0000
CIMG0016.JPG
CIMG0017.JPG

Dear Senator Hill:

Described below is a portion of what was unearthed in my recent trip to the Danish Archives. I am also expected to receive a series of documents from the Justice Department as well as other departments that, based on the recent findings, were involved with documenting the insurrection. These documents serve a critical role in the research component of several bills I will introduce during the 28th Legislature. In addition, the information is invaluable to my Committee on Education, Youth, and Culture.

As indicated before, the recently uncovered documents are being translated so that our community can truly access the information.

I look forward to your full support of this initiative.

Thank you,
Wayne James
▇▇▇▇▇▇▇▇▇

---

▇▇▇▇▇▇▇▇▇

Date: Thu, 8 Oct 2009 14:33:47 +0200
Subject: Copies regarding 1878 "Fireburn"

Dear Mr. Wayne James,
Attached you will find photos showing the 16 boxes which, based on previous investigations, should relate to the "Fireburn" as demonstrated at your visit at the National Achives. On the basis of investigations made in relation to the proposition sent earlier, we assume that each box contain approximately 1000 pages. Consequently the proposition is:

16000 pages x Dkr. 8,75 = Dkr. **140.000**,- (US$ 27636.85)

Please let me know if any of the boxes *do not* have your immediate interest and I shall resend adjusted proposition to your office.
Based on your order for information from documents at Rigsarkivet, we hereby inform that all investigations performed for persons living in countries outside Denmark, will require payment in advance.
We kindly ask you to transfer the amount to:

Danske Bank
Holmens Kanal 2



**APP.74**

USDOJ002079

1          *It is a significant day for me, and it is one*

2     *that I treasure.  I am glad to see that there is also a*

3     *lot of research that is now being done -- contemporary*

4     *research that is being done.  And Mr. Chair has been one*

5     *of the people who have been devoted to carrying on a*

6     *significant part of that research from -- in the words*

7     *of my Majority Leader -- a "black man's perspective."*

8          *So here it is we have a measure that for many*

9     *years the information in the National Archives, in the*

10    *Police Courts -- because what a lot of people who have*

11    *never gone through the Danish Archives may not know, for*

12    *a long time, prior to the 1980s, many of these records*

13    *for the Fireburn and Emancipation were in the Police*

14    *Court Archives in Denmark.*

15         *Now where we have technology and the ability for*

16    *them to have been moved to different areas, where for*

17    *public consumption within the past 25 years, we can*

18    *adequately go up and review these documents, is not only*

19    *astounding, but is a credit to Denmark for them wanting*

20    *to learn their history.*

21         *As bad and as dark as part of their history is,*

22    *they have found this paternalistic way of saying well,*

23    *we -- and benevolent, in a sense -- because I'm pretty*

24    *sure, moving forward, as some have stated, we would like*

25    *to see Denmark play a role in giving some money to the*

| | |
|---|---|
| **From:** | Purkey, Jackson (SJ) (FBI) < ██████████████ > |
| **Sent:** | Monday, August 17, 2015 11:14 AM |
| **To:** | ████████████████ |
| **Subject:** | Interveiw |

Good Morning Mr. James,

My name is Jackson Purkey and I am a Special Agent with the Federal Bureau of Investigation stationed in the United States Virgin Islands.  We are currently looking into a number of matters concerning activities conducted in the Virgin Islands Legislature by several individuals during your tenure as a Senator.   I would like to schedule an interview with you if at all possible and as soon as possible if you are available.  Please let me know when and where you might be available.  You may reach me at my email address ██████████████, the main FBI telephone number in St. Thomas, █████████ or my cellular telephone ███████████.

Thank you in advance for you assistance in this matter.

Jackson Purkey

**APP.76**

"Know your culture. Build your future"

## Legislature of the Virgin Islands

**WAYNE A. G. JAMES**
Senator, 28th Legislature
Senate Liaison to the White House

COMMITTEES:

CHAIRMAN:
Education, Youth & Culture

VICE-CHAIRMAN:
Appropriations & Budget

MEMBER:
• Housing, Sports & Veterans Affairs
• Financial Services, Infrastructure & Consumer Affairs
• Public Safety, Homeland Security & Justice

TO: Ms. Shannie Mc Clean
FROM: Hortense M. Rowe, Special Advisor to the Senator Wayne A. G. James, Esq.
Chair, Committee on Education, Youth & Culture
28th Legislature of the Virgin Islands

RE: Archival Documents
DATE: May 1, 2010

Enclosed herewith are several documents pertaining to the ongoing request for archival material from the Danish National Archives. Said research material pertains to the 1878 Fireburn, the findings expected to be gleaned therefrom to be used for legislation.

Senator Wayne James will provide supplemental information for review and analysis by the Office of the Inspector General, U. S. Department of the Interior.

Please do not hesitate to contact me if additional information is needed.

Enclosure: Various documents

Cc: Mr. Michael Benjamin, Assistant Director, Office of Business & Financial Mnagement-28th Legislature of the Virgin Islands

USDOJ003372

# ACT NO. 7157

### BILL NO. 28-0143

## TWENTY-EIGHTH LEGISLATURE OF THE VIRGIN ISLANDS

### Regular Session

### 2010

An Act amending 3 V.I.C., chapter 19, establishing the Centennial Commission; amending 33 V.I.C., chapter 111 creating the Centennial Special Fund; and providing for other related purposes

---0---

*Be it enacted by the Legislature of the Virgin Islands:*

SECTION 1. Title 3 V.I.C., chapter 19, section 338, is amended by inserting subsections (a), (b), and (c) to read as follows:

"(a) There is established within the Office of the Commissioner of Tourism a special and temporary commission known as the Centennial Commission ("the Commission") for the purpose of formulating plans and making preparations to commemorate and celebrate in the year 2017 the 100th Anniversary of the transfer of the Virgin Islands from Denmark to the United States of America.

(b) The Commission is composed of five residents of St. Croix, five residents of St. Thomas and three members from St. John all of whom are appointed by the Governor. The Commission shall choose its own Chairman and each member shall be entitled to one vote; a quorum must be present to constitute a valid action by the Commission. All members of the Commission shall serve without compensation but shall be entitled to reimbursement for all reasonable travel and other expenses as may be authorized by the Commissioner of Tourism.

(c) The Commission shall exist until the earliest of the following occurs:

    (1) the Commission's purpose under subsection (a) has been accomplished;

    (2) the Commission is divested of its functions by law; or

    (3) the Commission is extinguished by law."

SECTION 2. Title 33, chapter 111, Virgin Islands Code is amended by adding an appropriately numbered new section to read as follows:

(a) (1) There is created within the Treasury of the Virgin Islands a separate and distinct fund known as the Centennial Special Fund, for the purpose of facilitating the formulation of plans and preparations to commemorate and celebrate in the year 2017 the 100th Anniversary of the transfer of the Virgin Islands from Denmark to the United States of America, of which the commemorative and

2

celebratory events shall commence on or before August 4, 2016, and terminate on December 31, 2017.

(2)  The Fund is administered by the Commissioner of the Department of Finance, and no amounts therein are available for expenditure except as provided in this section and when authorized by the Commissioner of the Department of Tourism.  The Commissioner of the Department of Tourism shall establish policies for the expenditures of monies contained in the Fund.

(b)  The Fund consists of all monies appropriated from time to time by the Legislature, all public or private grants, gifts, donations, bequests or devises to the Centennial Commission or any appropriation transfers to the fund.

**SECTION 3.**  The Centennial Commission established in Section 1 of this Act shall submit a detailed budget to the Legislature of the Virgin Islands between January 14, 2013, and January 28, 2013, for consideration of funding.

Thus passed by the Legislature of the Virgin Islands on March 9, 2010.

Witnessed our Hands and Seal of the Legislature of the Virgin Islands this *23* Day of March, A.D., 2010.



Louis Patrick Hill
President

Sammuel Sanes
Legislative Secretary

Bill No. 28-0143 is hereby approved.

Witness my hand and the Seal of the Government of the United States Virgin Islands at Charlotte Amalie, St. Thomas, this 7th day of April, A.D., 2010.

John P. de Jongh, Jr.
Governor

**APP.79**

**LEGISLATURE OF THE VIRGIN ISLANDS**
**Operating Account**
P.O. Box 1690
St. Thomas, VI 00804

Banco Popular de Puerto Rico
Main Office
Charlotte Amalie, VI
101-667/216

**16945**

NUMBER

10/19/2010    ************13,690.00

152  10  VI18307  181  10/19/2010    07:44
DATE    $13,690.00 DebitTransact.    Ein 3    **AMOUNT**

Thirteen thousand six hundred ninety and xx /-100 Dollars————

**PAY**

Wayne James
PO Box 2496
St. Croix, VI 00841
USA

**TO THE**
**ORDER**
**OF**

OCT 19 2010

**NOT VALID AFTER 60 DAYS**

USDOJ002106



USDOJ002107



**APP.81**

**BANCO POPULAR**

(advbpt9l)

Request ID: 2015081098000009
Item ID: 000032
Account: █████████

Amount: $16,255.00
Check: 16944

"El Banco Popular certifica que esta imagen es fiel representación del documento original".
"DOCUMENTO NO NEGOCIABLE"
"Banco Popular certifies that this image is a true representation of the original document".
"NOT NEGOTIABLE"





USDOJ002105

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS & ST. JOHN

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff | ) |
| | ) |
| V. | ) |
| | ) |
| | ) NO. 15-CR-42 |
| WAYNE A.G. JAMES | ) |
| | ) |
| Defendant. | ) |

## MOTION TO FILE SUPPLEMENT UNDER SEAL

Now comes the defendant, Wayne James, by and through his counsel, and hereby moves this Honorable Court for an Order to file a supplement to his Motion to Dismiss/Suppress (hereinafter the "Motion"). Mr. James has filed the Motion with redactions. Out of an abundance of caution, and to ensure compliance of all parties with Fed. R. of Crim. P. 6 (Grand Jury Secrecy), Mr. James redacted these portions of the Motion including reference to the witness' name and the quotes from his/her testimony.

The Proposed Sealed Document (to be filed) is an un-redacted copy of the Motion including those portions of the Motion redacted from the public view.

Respectfully submitted,

OMODARE B. JUPITER
FEDERAL PUBLIC DEFENDER

*/s/ Omodare B. Jupiter*
OMODARE B. JUPITER
Federal Public Defender
1115 Strand Street

St. Croix, VI 00820
Tel (340) 773-3585
Fax (340) 773-3742
E-mail: Omodare_jupiter@fd.org

*/s/ Brendan A. Hurson*
BRENDAN A. HURSON
Assistant Federal Public Defender
1336 Beltjen Rd., Suite 202
St. Thomas, VI 00802
Tel (340)774-4449
Fax (340)776-7683
E-mail: Brendan_Hurson@fd.org


### CERTIFICATE OF SERVICE

I, HEREBY CERTIFY that on the 3rd day of February, 2017 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Ronald W. Sharpe
United States Attorney

Amanda R. Vaughn
Justin D. Weitz
Trial Attorneys
Public Integrity Section
U.S. Department of Justice
1400 New York Ave. NW, 12th Floor
Washington, D.C. 20005
(202) 616-4530 (office)
(202) 714-4232 (cell)
Amanda.vaughn@usdoj.gov
Justin.Weitz@usdoj.gov


*/s/ Omodare B. Jupiter*

Dated:  February 3, 2017

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS & ST. JOHN

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| | )  NO. 15-CR-42 |
| WAYNE A.G. JAMES | ) |
| | ) |
| Defendant. | ) |

**[PROPOSED] ORDER ON MOTION TO SEAL SUPPLEMENT**

For the reasons contained in Wayne James' Motion to File Supplement Under Seal, it is HEREBY ORDERED that the Motion to File Supplement Under Seal is GRANTED.

_____
Honorable Curtis V. Gomez

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Criminal No. 15-42-CVG-RM |
| | ) | |
| WAYNE A.G. JAMES, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |

## UNITED STATES' PROPOSED JURY INSTRUCTIONS AND VERDICT FORM

COMES NOW the United States of America, by and through undersigned counsel, and respectfully submits the following proposed jury instructions and verdict form, pursuant to Federal Rule of Criminal Procedure 30. The Government requests leave to file any supplemental instructions if necessary and appropriate.

Respectfully submitted,

RONALD W. SHARPE
UNITED STATES ATTORNEY

RAYMOND HULSER
Chief, Public Integrity Section
Department of Justice, Criminal Division

Dated: February 3, 2017        By:  */s/ Amanda R. Vaughn*
                                    Justin D. Weitz
                                    Amanda R. Vaughn
                                    Trial Attorneys

                                    Delia Smith
                                    Assistant United States Attorney

**Proposed Instruction No. 1**

**Instruction During Trial: Foreign Language Testimony**

You are about to hear testimony of a witness who will be testifying in the Danish language. Witnesses who do not speak English or are more proficient in another language testify through an official court interpreter. Although some of you may know the Danish language, it is important that all jurors consider the same evidence. Therefore, you must accept the interpreter's translation of the witness's testimony. You must disregard any different meaning. You must not make any assumptions about a witness or a party based solely on the use of an interpreter to assist that witness or party.

9th Cir. Model Jury Inst. 2.8; *see also* 3d Cir. Model Jury Inst. 2.08.

**Proposed Instruction No. 2**

**Wire Fraud (18 U.S.C. § 1343) – Elements of the Offense**

Counts One and Two of the Indictment charge the defendant with wire fraud, which is a violation of federal law.

In order to find the defendant guilty of this offense, you must find that the government proved each of the following three elements beyond a reasonable doubt:

First: That the defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises;

Second: That the defendant acted with the intent to defraud; and

Third: That in advancing, furthering, or carrying out the scheme, the defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

3d Cir. Model Crim. Jury Inst. 6.18.1343

**Proposed Instruction No. 3**

**Wire Fraud – "Scheme to Defraud or to Obtain Money or Property" Defined**

The first element that the government must prove beyond a reasonable doubt is that the defendant knowingly devised a scheme to defraud the Government of the Virgin Islands of money or property by materially false or fraudulent pretenses, representations or promises.

A "scheme" is merely a plan for accomplishing an object.

"Fraud" is a general term which embraces all the various means by which one person can gain an advantage over another by false representations, suppression of the truth, or deliberate disregard for the truth.

Thus, a "scheme to defraud" is any plan, device, or course of action to deprive another of money or property by means of false or fraudulent pretenses, representations or promises reasonably calculated to deceive persons of average prudence.

In this case, the indictment alleges that the scheme to defraud was carried out by making false or fraudulent statements, representations, claims, and documents. The representations which the government charges were made as part of the scheme to defraud are set forth in the indictment. The government is not required to prove every misrepresentation charged in the indictment. It is sufficient if the government proves beyond a reasonable doubt that one or more of the alleged material misrepresentations were made in furtherance of the alleged scheme to defraud. However, you cannot convict the defendant unless all of you agree as to at least one of the material misrepresentations.

A statement, representation, claim or document is false if it is untrue when made and if the person making the statement, representation, claim or document or causing it to be made knew it was untrue at the time it was made.

A representation or statement is fraudulent if it was falsely made with the intention to deceive.

In addition, deceitful statements of half truths or the concealment of material facts or the expression of an opinion not honestly entertained may constitute false or fraudulent statements. The arrangement of the words, or the circumstances in which they are used may convey the false and deceptive appearance.

The deception need not be premised upon spoken or written words alone. If there is deception, the manner in which it is accomplished is immaterial.

The false or fraudulent representation must relate to a material fact or matter. A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision; in this case, to the decision by the Legislature to give the defendant money.

This means that if you find that a particular statement of fact was false, you must determine whether that statement was one that a reasonable person might have considered important in making his or her decision. The same principle applies to fraudulent half truths or omissions of material facts.

In order to establish a scheme to defraud, the government must also prove that the alleged scheme contemplated depriving another of money or property.

However, the government is not required to prove that the defendant himself originated the scheme to defraud. Furthermore, it is not necessary that the government prove that the defendant actually realized any gain from the scheme or that the intended victim actually suffered any loss. In this case, it so happens that the government does contend that the proof establishes that persons were defrauded and that the defendant profited. Although whether or not

5

the scheme actually succeeded is really not the question, you may consider whether it succeeded in determining whether the scheme existed.

If you find that the government has proved beyond a reasonable doubt that the scheme to defraud charged in the indictment did exist and that the defendant knowingly devised or participated in the scheme charged in the indictment, you should then consider the second element.

3d Cir. Model Crim. Jury Inst. 6.18.1341-1.

**Proposed Instruction No. 4**

**Wire Fraud – "Intent to Defraud" Defined**

The second element that the government must prove beyond a reasonable doubt is that the defendant acted with the specific intent to defraud.

To act with an "intent to defraud" means to act knowingly and with the intention or the purpose to deceive or to cheat.

In considering whether the defendant acted with an intent to defraud, you may consider, among other things, whether the defendant acted with a desire or purpose to bring about some gain or benefit to himself or someone else or with a desire or purpose to cause some loss to someone.

3d Cir. Model Jury Inst. 6.18.1341-4.

### Proposed Instruction No. 5

### Wire Fraud – "Transmits by means of wire, radio, or television communication in interstate commerce" - Defined

The third element that the government must prove beyond a reasonable doubt is that in advancing, furthering, or carrying out the scheme, the defendant transmitted a writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of a writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

The phrase "transmits by means of wire, radio, or television communication in interstate commerce" means to send from one state or territory to another by means of telephone or telegraph lines or by means of radio or television.  The phrase includes electronic signals sent from one state or territory to another, such as by fax or financial wire.

The government is not required to prove that the defendant actually used a wire communication in interstate commerce or that the defendant even intended that anything be transmitted in interstate commerce by means of a wire, radio, or television communication to further, or to advance, or to carry out the scheme or plan to defraud.

However, the government must prove beyond a reasonable doubt that a transmission by a wire, radio, or television communication facility in interstate commerce was, in fact, used in some manner to further, or to advance, or to carry out the scheme to defraud.  The government must also prove either that the defendant used wire, radio, or television communication in interstate commerce, or that the defendant knew the use of the wire, radio, or television communication in interstate commerce would follow in the ordinary course of business or events, or that the defendant should reasonably have anticipated that wire, radio, or television communication in interstate commerce would be used.

It is not necessary that the information transmitted by means of wire, radio, or television communication in interstate commerce itself was false or fraudulent or contained any false or fraudulent pretense, representation, or promise, or contained any request for money or thing of value.

However, the government must prove beyond a reasonable doubt that the use of the wire, radio, or television communication in interstate commerce furthered, or advanced, or carried out, in some way, the scheme.

3d Cir. Model Jury Inst. 6.18.1343-1.

**Proposed Instruction No. 6**

**Wire Fraud – Each Transmission by Wire Communication a Separate Offense**

Each transmission by wire communication in interstate commerce to advance, or to further, or to carry out the scheme or plan may be a separate violation of the wire fraud statute.

3d Cir. Model Jury Inst. 6.18.1343-2.

**Proposed Instruction No. 7**

**Theft Concerning a Program Receiving Federal Funds (18 U.S.C. § 666(a)(1)(A)) – Elements of the Offense**

Count Three of the indictment charges the defendant with embezzling money from a federally funded program, which is a violation of federal law.

In order to find the defendant guilty of this offense, you must find that the government proved each of the following five elements beyond a reasonable doubt:

First: That at the time alleged in the indictment, the defendant was an agent of the Government of the Virgin Islands;

Second: That in a one-year period, the Government of the Virgin Islands received federal benefits in excess of $10,000;

Third: That the defendant embezzled, stole, obtained by fraud, or otherwise without authority knowingly converted property;

Fourth: That the property stolen, embezzled, obtained by fraud, or without authority knowingly converted was in the care, custody or control of the Government of the Virgin Islands; and

Fifth: That the value of the property stolen, embezzled, obtained by fraud, or without authority knowingly converted was at least $5,000.

3d Cir. Model Jury Inst. 6.18.666A1A.

**Proposed Instruction No. 8**

**Theft Concerning a Program Receiving Federal Funds – Agent of Organization or Government Defined**

The first element the government must prove beyond a reasonable doubt is that at the time alleged in the indictment, the defendant was an agent of the Government of the Virgin Islands.

An "agent" is a person authorized to act on behalf of another person, organization or government. Employees, partners, directors, officers, managers, and representatives are all agents of the organization or government with which they are associated.

An agent does not necessarily have any control over the federal funds received by the Government of the Virgin Islands.

A person may be an agent of more than one government agency. An employee of one agency within a larger government department is an agent of that larger department as well.

Elected officials are agents of the government which they were elected to serve.

3d Cir. Model Jury Inst. 6.18.666A1A-1.

**Proposed Instruction No. 9**

**Theft Concerning a Program Receiving Federal Funds – Received Federal Funds Defined**

The second element the government must prove beyond a reasonable doubt is that in a one-year period, the Government of the Virgin Islands received federal benefits in excess of $10,000.

To prove this element, the government must establish that the Government of the Virgin Islands received, during a one-year period beginning on October 1, 2010, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or some other form of federal assistance.

The one-year period must begin no more than 12 months before the defendant began committing the offense and must end no more than 12 months after the defendant stopped committing the offense. The one-year period may include time both before and after the commission of the offense.

3d Cir. Model Jury Inst. 6.18.666A1A-2.

**Proposed Instruction No. 10**

**Theft Concerning a Program Receiving Federal Funds – Stole, Embezzled, Converted, and Misapplied Defined**

The third element the government must prove beyond a reasonable doubt is that the defendant stole, embezzled, obtained by fraud, or without authority knowingly converted property.

To steal money or property means to take someone else's money or property without the owner's consent with the intent to deprive the owner of the value of that money or property.

To embezzle money or property means to intentionally take or convert to one's own use money or property of another after that money or property lawfully came into the possession of the person taking it by virtue of some office, employment, or position of trust.

To obtain by fraud means to intentionally take something by false representations, suppression of the truth, or deliberate disregard for the truth.

To knowingly convert money or property means to knowingly appropriate or use such money or property without proper authority for the benefit of oneself or any other person who was not the rightful owner with the intent to deprive the rightful owner of the money or property.

3d Cir. Model Jury Inst. 6.18.666A1A-3.

**Proposed Instruction No. 11**

**Theft Concerning a Program Receiving Federal Funds – Belonging to and In the Care, Custody, or Control of Defined**

The fourth element the government must prove beyond a reasonable doubt is that the property stolen, embezzled, obtained by fraud, or knowingly converted was owned by, or was in the care, custody, or control of the Government of the Virgin Islands.

Although the words "care," "custody," and "control" have slightly different meanings, for the purposes of this element they express a similar idea. That is that the Government of the Virgin Islands had control over and responsibility for the property, even though it was not the actual owner of the property at the time of the defendant's actions.

3d Cir. Model Jury Inst. 6.18.666A1A-4.

15

**Proposed Instruction No. 12**

**Theft Concerning a Program Receiving Federal Funds – Determining Value of Property**

The fifth and final element the government must prove beyond a reasonable doubt is that the value of the property stolen, embezzled, obtained by fraud, or knowingly converted was at least $5,000.  The government is not required to prove the exact amount of money or the value of the property at issue, but the government must prove beyond a reasonable doubt that the value of the money or property was $5,000 or more.

 If you find that the defendant devised a scheme or plan to take sums of money or property from the Government of the Virgin Islands, on a recurring basis through a series of acts, you may aggregate or add up the value of property obtained from this series of acts by the defendant to meet this $5,000 requirement so long as those acts occur within the same one-year time period.

The government does not have to prove that the property stolen, embezzled, obtained by fraud, or knowingly converted by the defendant was received by the Government of the Virgin Islands as federal benefits or derived from the federal benefits received by the Government of the Virgin Islands.  What the government must prove beyond a reasonable doubt is that the defendant stole, embezzled, obtained by fraud, or knowingly converted from the Government of the Virgin Islands at the same time that the Government of the Virgin Islands received federal benefits in excess of $10,000 during a one-year period.  In other words, the government does not need to establish a connection between the criminal activity and the federal funds.

3d Cir. Model Jury Inst. 18.666A1A-5

**Proposed Instruction No. 13**

Summaries – Underlying Evidence Admitted

The government presented certain charts and summaries in order to help explain the facts disclosed by the documents and records which were admitted as evidence in the case. The charts and summaries are not themselves evidence or proof of any facts. If the charts and summaries do not correctly reflect the evidence in the case, you should disregard them and determine the facts from the underlying evidence.

3d Cir. Model Jury Inst. § 4.10

# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
|  | ) | |
| **Plaintiff** | ) | |
|  | ) | |
| **v.** | ) | **Criminal No. 15-42-CVG-RM** |
|  | ) | |
| **WAYNE A.G. JAMES,** | ) | |
|  | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## <u>VERDICT</u>

On Count **One** of the Indictment, we, the jury, find the defendant:

_____
"Guilty"        or        "Not Guilty"


On Count **Two** of the Indictment, we, the jury, find the defendant:

_____
"Guilty"        or        "Not Guilty"


On Count **Three** of the Indictment, we, the jury, find the defendant:

_____
"Guilty"        or        "Not Guilty"


_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____
Foreperson

Signed this _____ day of _____, 2017.

## Certificate of Service

    **I HEREBY CERTIFY** that on this 3rd day of February, 2017, I electronically filed the foregoing **United States' Requested Jury Instructions and Verdict Form** with the Clerk of the District Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Omodare B. Jupiter
Federal Public Defender
1115 Strand Street
St. Croix, VI 00820
Attorney for Defendant Wayne A.G. James

                              By:    /s/Amanda R. Vaughn
                                          Amanda R. Vaughn
                                          Trial Attorney
                                          Department of Justice
                                          Public Integrity Section
                                          1400 New York Ave NW
                                          Washington, DC 20005
                                          Phone – 202.514.1412
                                          Justin.weitz@usdoj.gov

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 15-42-CVG-RM** |
| | ) | |
| WAYNE A.G. JAMES, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Despite being arrested in June 2016 on an indictment that was returned in October 2015, and less than two days after his third motion to continue trial was denied, the defendant has now moved to dismiss the Indictment on the grounds that it violates his legislative privilege.   Dkt. No. 92.   The defendant's territorial legislative privilege does not protect him from federal prosecution for any acts, including legislative ones; in any event, the Indictment does not rest on proof of legislative acts.   The defendant's Motion should be denied, and trial should commence as scheduled on February 13, 2017.   Dkt. No. 86.[1]

## I.   Factual Background

The defendant is charged with engaging in a scheme to steal tens of thousands of dollars from the Legislature of the Virgin Islands by submitting fraudulent requests for cash advances. The defendant represented that he needed and would use the money to buy documents related to the 1878 Fireburn, and translations of those documents, from the Danish National Archives and

---

[1] The Government has filed this Opposition on the docket, in a redacted form, in accordance with the presumption of public access to judicial filings.   The Government will shortly file an unredacted version of this Opposition, with exhibits, under seal, due to sensitive grand jury and personal information contained therein.

other individuals, in order to bring the documents to the Virgin Islands. Instead, however, the defendant pocketed the money or spent it in pursuit of personal projects.

The Indictment against the defendant consists of three counts: two counts of wire fraud, 18 U.S.C. § 1343, and one count of embezzlement, 18 U.S.C. § 666. The wire fraud counts, Counts One and Two, allege a scheme to defraud, the purpose of which was "to enrich the defendant, WAYNE A.G. JAMES, by appropriating Legislature funds for JAMES's own personal use and benefit." Indictment ¶ 7. The manner and means by which the defendant is alleged to have carried out his scheme consist of the defendant "obtain[ing] cash advances ostensibly for payment to the Danish National Archives, but in fact only pa[ying] part of them," "double-bill[ing] the Legislature for expenses," "submitt[ing] invoices for research and translation work that was never done," and "submitt[ing] an invoice for translation work that was completed before his election to the Legislature." *Id.* ¶¶ 8-11. The charged wires stem from the defendant's cashing of two checks, in October 2010, that he received from the Legislature to pay fake invoices for claimed research and translation work the defendant submitted to the Legislature. *Id.* ¶ 12. Count Three charges the defendant with "obtaining at least $5,000 in Government of the Virgin Islands funds based on false representations that the money would be used to fund historical research." *Id.* ¶ 14.

Despite the defendant's representations that the money he obtained would be used "to obtain historical documents related to the Fireburn from the Danish National Archives" and "to obtain, translate, and distribute copies of the documents to institutions in the U.S. Virgin Islands," *Id.* ¶ 4, the Indictment alleges he did no such thing.

Prior to being sworn in as a senator in 2009, the defendant maintained an amateur interest in the history of the Danish West Indies. Mot. at 4-5. This hobby was not limited to the Fireburn;

2

it was motivated by whatever the defendant thought could bring him fame, notoriety, and fortune. And several of his requests for money from the Legislature stemmed from this pursuit of his pre-existing personal projects, although he never told anyone at the Legislature this, instead representing that he was conducting Fireburn research on behalf of the People of the Virgin Islands. For example, in September 2009, the defendant requested funds from the Legislature to pay an individual in Denmark named Brian Kalhøj for the translation of a book called "25 Aar I Vestindien," which was published in 1934 by N.A. Kjaer—translation work the defendant claimed was "relating to ongoing research of the 1878 Labor Insurrection (Fireburn)." (*See* Ex. 1.) Yet, the defendant had commissioned and Kalhøj had completed the work by late 2006, over two years before joining the Legislature, when the defendant was a private citizen acting in furtherance of his own personal interest. (*See* Ex. 2.) Despite having previously obtained the work, the defendant had not paid Kalhøj as of late 2006. (*See id.*) And the defendant did not pay him in 2007 and 2008. (*See* Ex. 3.) Rather, he waited until he was in the Legislature and had access to taxpayer dollars to pay for the work he had commissioned before his election. (*See* Ex. 4.) In his request for reimbursement from the Legislature, the defendant lied about this material fact: that the work was done well before he was elected. (Ex. 1.) In fact, the defendant asked Kalhøj to put a 2009 date on a new invoice. (Ex. 4.) The defendant also inflated the price of the work that Kalhøj had done, thus netting himself a personal financial benefit. (*Compare* Ex. 1 at 2 *with* Exs. 2 & 4.)

Not only did the defendant thus obtain the work he hired Kalhøj to do prior to entering the Legislature, but the defendant's true purpose in having the translation done was revealed in subsequent emails the defendant sent to other friends or acquaintances. These communications reveal that the use to which the defendant wished to put the translation of the Kjaer book, written

3

over fifty-five years after the 1878 Fireburn and memorializing a period after Fireburn occurred, was not to further any work he performed in the Legislature, but to write and sell a screenplay based on a love affair revealed in the book.  (*See* Exs. 5, 6, & 7.)  Like the fact that the work had been completed prior to his election to the Legislature, however, when seeking money from the Legislature to pay for the translation of the Kjaer book—and translation of subsequent research on the topic—the defendant never revealed the true purpose to which he wished to put the work paid for with taxpayer money.  (*See* Exs. 1 & 8.)

The defendant's requests for actual Fireburn research—not research into a 19th-century love affair—which he now claims were made in anticipation of legislation similarly were founded on projects the defendant pursued prior to his time as a senator.  (*Compare* Ex. 9 (requesting 10,131 Danish Kroner from the Legislature to pay the Danish National Archives) *with* Ex. 10 (email dated March 25, 2008, from a representative of the Danish National Archives quoting a price of 10,131 Danish Kroner for research related to the Fireburn).)  And contemporaneous emails reveal that the defendant, like with paying for the Kjaer translation, put off paying for the work he sought at the Danish National Archives for over a year—until he could request the money from the Legislature.  (*See* Exs. 10, 11, & 12.)  Moreover, in contemporaneous emails written in December 2007 and January 2008, the defendant revealed that the heretofore unseen documents related to the insurrection would be useful in writing a book and screenplay about the Fireburn. (*See* Ex. 13.)  The defendant even noted that he had been in contact with an Italian production company, Mediaset, about using documents which he was trying to obtain from the Danish National Archives for a movie.  (*See* Ex. 14.)  Like the Kjaer translation, therefore, the defendant wanted documents from the Danish National Archives about Fireburn long before he entered the

4

Legislature, and he wanted them to further his own personal gains. The defendant merely waited until he had access to taxpayer money to fund his project. (Ex. 9.)

In addition to obtaining Legislature funds to bankroll personal projects, the defendant also used the Fireburn to obtain money for his personal use. For example, in October 2009, the defendant submitted a request for $27,636.85 from the Legislature to purportedly pay the Danish National Archives for the copying of 16,000 pages of Fireburn documents. (Ex. 15); *see also* Mot. 6-7. The defendant submitted the request on October 9, 2009, can claimed he needed the money by October 13, 2009. (*See* Ex. 15.) What the defendant did not reveal, however, was that he was under a court-ordered deadline to post an $18,000 bond no later than October 14. (Ex. 16.) After cashing the $27,636.85 check he received from the Legislature, the defendant paid $18,000 to the District Court in St. Croix to meet his deadline the same day. (Exs. 17 & 18.) He only sent $9,000 to the Danish National Archives. (Ex. 19.)

The defendant's requests became less specific and more fraudulent throughout his term. In December 2009, the defendant requested over $13,000 from the Legislature to fund research into three subjects. One was the translation of a book called "St. Croix og Cuba," which was published in 1866—twelve years before the Fireburn. *See* Ex. 20 at 3-4. The rest of the money— over $10,000—was designated for "Fireburn documents" and research into court documents and newspaper articles. The defendant did not identify what these documents were, for one simple reason: he never actually attempted to have the translations done. In fact, in emails to the person he purported to be paying just days after the Legislature issued the defendant a check to pay the invoice (Ex. 21), the defendant makes absolutely no mention that he would be sending him $13,000, (Exs. 22 & 23.) This request was a complete fabrication, and thus unrelated to any Legislature business.

<div align="center">5</div>

The defendant's final two requests, submitted in October 2010, were for a total of nearly $30,000 to pay two invoices purportedly from Kalhøj and another individual performing research and translation services. (Exs. 24 & 25.) The checks the defendant received to pay these invoices serve as the basis for the wires charged in Counts One and Two, and as the money embezzled to reach the $5,000 threshold in Count Three.[2] The invoice submitted in Kalhøj's name, (Ex. 24), reflects work Kalhøj never did—and actually refused to do, (*see* Ex. 26), or did not respond to the defendant's requests to do, (*see* Ex. 27). The second invoice was submitted in the name of a person named Lise M. Johansen, (Ex. 25), but, in fact, there is no evidence the defendant ever communicated with such a person, and the work listed was completed, at least in part, by the defendant's contact at the Danish National Archives. They are sham invoices, invented by the defendant in order to defraud the Government of the Virgin Islands of close to $30,000. He never used them to further any legislative work, but to only line his own pockets. Moreover, as the defendant acknowledges, both of these requests were made after the bills and committee hearings the defendant touts as proving that these were done in *anticipation* of legislation. *See* Mot. at 20 (noting that the Legislature held a committee hearing on Fireburn "just a few months before the alleged illegal acts at issue in Counts 1 and 2"[3]).

A review of contemporaneous emails and other records demonstrates that, although the defendant colored his many Fireburn-related requests for money as necessary for the people of the Virgin Islands, they were not. The defendant never introduced, prepared, or discussed any

---

2     The defendant acknowledges that each check underlying the wire fraud charges "match[es] an invoice request," although he does not identify which requests.

3     The defendant also claims that the hearing occurred "in the midst of the allegations in Count 3, Mot. at 20, but Count Three alleges conduct between October 2010 and September 2011. The hearing in January 2010 occurred before the conduct charged in that count.

6

specific legislation related to any of the Fireburn documents he sought Legislature money to obtain. The defendant's research projects predated his term as a senator, and were spurred by his personal interest in the history of the Danish West Indies, his budding screenwriting career, and his intent to defraud the People of the Virgin Islands. They were not connected to any legislative activity.

## II. The Statutory Speech or Debate Clause in the Revised Organic Act of 1954 Does Not Apply to Federal Prosecutions of Territorial Legislators.

The Virgin Islands speech or debate clause, 48 U.S.C. § 1572(d), exists to protect members of the Legislature of the Virgin Islands from "intrusion by the Executive or Judiciary into the affairs of a coequal branch." *United States v. Gillock*, 445 U.S. 360, 369 (1980) (citing *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502-03 (1975)). It does not limit the power of the federal government to prosecute state and local corruption, or to provide members of the Legislature of the Virgin Islands with a super-immunity that knows no peer among state legislators. Since 48 U.S.C. § 1572(d) does not apply to federal investigations and prosecutions of Virgin Islands legislators, the defendant's Motion raises no colorable claim and should be denied.

"A court's primary purpose in statutory interpretation is to discern legislative intent." *Morgan v. Gay*, 466 F.3d 276, 277 (3d Cir. 2006). When "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters," *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989), courts "are obligated to construe statutes sensibly and avoid constructions which yield absurd or unjust results," *United States v. Fontaine*, 697 F.3d 221, 227-28 (3d Cir. 2012) (citations omitted).

Congress passed the Revised Organic Act of 1954, as amended, ("ROA") to establish a republican form of government within the Virgin Islands. This Court should not deprive the ROA

7

**APP.112**

and its subsequent revisions of their intent and purpose by interpreting § 1572(d) in a manner inconsistent with Congress' intentions.

The U.S. Constitution's Speech or Debate Clause protects only federal legislators, Art I., § 6, cl. 1, and does not protect state legislators. *See Gillock*, 445 U.S. at 374. State constitutions' individual speech or debate clauses cannot protect the conduct of state legislators from federal inquiry. *Id*. This is because a "central purpose of the clause is 'to preserve the constitutional structure of separate, coequal, and independent branches of government.'" *Id*. at 369 (quoting *United States v. Helstoski*, 442 U.S. 477, 491 (1979)). This separation of powers rationale suggests that 48 U.S.C. § 1572(d), understood in the context in which it was created, does not exist to check the United States Government's ability to prosecute members of the Legislature of the Virgin Islands for violations of federal law; rather, it exists to check the Executive Branch of the Government of the Virgin Islands' ability to intrude on legislative conduct and interfere with legislative independence. Restricting the federal government's ability to undertake prosecutions based on violations of federal law serves no rational separation of powers purpose.

In 1954, Congress passed the ROA to give the People of the Virgin Islands the powers of self-government. The ROA "functions as the Virgin Islands' constitution." *Brown v. Hansen*, 973 F.2d 1118, 1120 (3d Cir. 1992). The ROA established a system of government in which three coequal branches shared responsibilities: this familiar system is rooted in the principles of separation of powers and checks and balances. Indeed, "a primary concern of the 1954 Act was to advance the Islands' self sufficiency and local autonomy[.]" *Virgin Islands v. Blumenthal*, 642 F.2d 641, 650 (D.C. Cir. 1980) (citing S. Rep. No. 1271, 83d Cong., 2d Sess. 4-5 (1954)). The ROA "vests the power of the Government of the Virgin Islands in three coequal branches: the legislative, the executive, and the judicial. These three branches constitute one territorial entity."

8

*United States v. Willis*, 844 F.3d 156, 165 (3d Cir. 2016). As this Court has noted, "the Revised Organic Act [] incorporates separation of powers principles." *Dunston v. Mapp*, 2016 WL 3976642, at *5 (D.V.I. July 22, 2016) (citing *Smith v. Magras*, 124 F.3d 457, 465 (3d Cir. 1997)).[4]

Acts of Congress which followed the ROA, such as the Virgin Islands Elected Governor Act of 1968 ("EGA"), Pub. L. 90-496, 82 Stat. 837, sought to further empower the territorial government. The EGA vested the governorship with powers and responsibilities similar to every other governor in the United States, and guaranteed that the governor would be popularly elected by the People of the Virgin Islands. The Governor of the Virgin Islands has familiar powers: the ability to veto legislation, appoint and remove inferior officers, and impose martial law, among others. 48 U.S.C. § 1591. Above all, the Governor is required to execute the laws of the Virgin Islands. *Id.* The EGA was designed, in large part, "to give the people of the Virgin Islands the right to elect their own chief executive, as do all other citizens in their respective States." 113 Cong. Rec. 19191 (July 18, 1967) (statement of Sen. Jackson).

The substantial power vested in the Executive is checked by the powers vested in the Legislative and Judicial branches of the Government of the Virgin Islands. The ROA provides that the Legislature "shall have and exercise all the authority and attributes, inherent in legislative assemblies . . . ." 18 U.S.C. § 1572(g). Congress' purpose in establishing the Government of the Virgin Islands was clear: to create a functional government similar to that of a state. *See Harris v. Boreham*, 233 F.3d 110, 113 (3d Cir. 1956) ("The aim of Congress [in its relations with the Virgin Islands] is to give the territory full power of local self-determination.").

---

4　In its debate over the ROA, Congress did not discuss the specifics of the "speech or debate" language or the reasons for its enactment. Section 1572(d) was folded into a series of cl ordinarily found into state constitutions, including everything from the right to peaceably assemble to the procedures for electing legislators.

9

The ROA is thus no different from a state constitution, and the Virgin Islands is to be treated the same as a state. Rights guaranteed by the ROA are to be interpreted analogously to similar privileges in state constitutions. *Virgin Islands v. Velasquez*, 60 V.I. 22, 33-34 (VI Super. Ct. 2014); *see also Bryan v. Fawkes*, 61 V.I. 201, 215 (interpreting ROA in light of similar state constitutional privileges). This Court should thus interpret the ROA's speech or debate protections as it would those found in state constitutions. Indeed, "the Virgin Islands, although still a territory of the United States, has been exercising all the rights and responsibilities of government in a similar manner as the 50 states, at least since Congress passed our Revised Organic Act in 1954 and we, of course, began electing our own Governors in 1970." Testimony of Congresswoman Donna Christensen, S. H'rg 109-29 before Comm. on Energy and Natural Resources, Oct. 25, 2005. A proper reading of the ROA's speech or debate protections would comport with this reality, and apply them analogously to state constitutions' similar protections. Under *Gillock*, these protections do not extend to federal prosecutions of state or territorial legislators.[5]

---

[5] That the Virgin Islands is technically not a "separate sovereign" from the United States has no bearing on this issue. *United States v. Gumbs*, 283 F.3d 128, 132 (3d Cir. 2002) ("the [Government of the Virgin Islands] ... is neither a 'person or officer in the civil, military, or naval service of the United States,' nor a 'department or agency' of the United States .... "); *see also In re Estate of Hooper*, 359 F.2d 569, 578 (3d Cir. 1996) ("While not sovereign, in the true sense of that term, the Revised Organic Act has conferred upon [the Virgin Islands] attributes of autonomy similar to those of a sovereign government or a state."); *Harris*, 233 F.2d at 114 (describing territorial government as having "autonomy similar to that of the states"); *Jackson v. W. Indian Co.*, 944 F. Supp. 423, 428–29 (D.V.I. 1996) (concluding that "because the Virgin Islands enjoys many of the 'trappings of a sovereign governmental entity,' even if that sovereignty is a creation of Congress, the Virgin Islands should be treated in the same way as a state when analyzing the applicability of antitrust laws"); 18 U.S.C. § 666(d) (defining "State" to include territories of the United States). Since 1954, Congress and the Government of the Virgin Islands have consistently differentiated federal and territorial powers. *See, e.g.*, *Edwards v. Hovensa, LLC*, 497 F.3d 355, 359 (3d Cir. 2007) (noting that the District Court of the Virgin Islands no longer "remains vested with the 'judicial power of the territory'").

The defendant's proposed reading of § 1572(d) would ignore Congress' intent and decades of governance in the Virgin Islands by reading into the statute a meaning that Congress never intended:  to insulate territorial legislators' speech or debate from federal oversight.   During the Congressional debates surrounding the ROA, no Member of Congress expressed the view that § 1572(d) was designed to check the power of the federal government as to the Legislature of the Virgin Islands.   Rather, the ROA's speech or debate protections were "designed to protect the integrity of the legislative process by insuring the independence of individual legislators" from the executive branch.   *Gov't of the Virgin Islands v. Lee*, 775 F.2d 514, 520 (3d Cir. 1985); *see also Hamlet v. Charfauros*, 1999 Guam 18, 1999 WL 359191, at *3-4 (Organic Act of Guam applies speech or debate protections to relations between the Guam executive and legislative branches). Section 1572(d) acts to check the executive branch, which is situated in Government House in St. Thomas, not the White House in Washington, D.C.

Indeed, *Lee*—the Third Circuit case interpreting 48 U.S.C. § 1572(d) relied on by the defendant—is situated differently from the instant set of facts.   *Lee* did not concern a prosecution for violations of federal criminal law; rather, *Lee* addressed a prosecution by the Government of the Virgin Islands—*i.e.*, the Executive Branch—for crimes committed under the Virgin Islands Code.   *Lee* stands for the proposition that the ROA's speech or debate protections limit inquiry into legislative acts by the Executive Branch.   Nowhere does *Lee* suggest that 48 U.S.C. § 1572(d) acts as a check on the ability of the federal government to inquire into territorial legislative activity for the purpose of investigating violations of federal criminal law.   *See also United States v. Gonzalez de Modesti*, 145 F. Supp. 2d 171 (D.P.R. 2001) (finding that Puerto Rico legislators are not entitled to speech or debate protections in federal investigations).

11

**APP.116**

Moreover, the defendant's strained reading of § 1572(d) is further undermined by the fact that while the federal government has vested significant power in the Government of the Virgin Islands, it has also retained some oversight power for itself. *See* 48 U.S.C. § 1541(c) (committing administrative oversight to the Secretary of the Interior). But this oversight would be handicapped if the Secretary of the Interior, part of the federal executive branch, were precluded from inquiring into the "speech or debate" of territorial legislators. Congress could not have intended to write a "speech or debate" clause that would severely limit the oversight powers of the federal government in this area. If it had so intended, Congress presumably would have extended this "speech or debate" privilege to other branches of the territorial government, but it did not.

Notably, much of the defendant's conduct was initially exposed by an audit of the Legislature's functions conducted by the Department of the Interior's Office of Inspector General. Such an audit, which delved into a range of potentially legislative acts, would have been frustrated by the defendant's preferred reading of the "speech or debate" language. Indeed, if the defendant's reading of this clause were to be adopted, federal oversight of the Legislature of the Virgin Islands—including efforts to protect the use of federal funds—would be severely limited, and past criminal and civil cases would be open to relitigation on this point. *See, e.g.*, *United States v. Alvin Williams Jr. et al.*, 12-CR-33 (D.V.I.).

What the defendant asks would command an absurd result: that the federal government has conferred speech or debate immunity upon legislators in the Virgin Islands alone, protecting them from inquiry by federal courts and prosecutors. No state legislator in any of the fifty states or Puerto Rico enjoys such protections. "Congress might have provided that a state legislator prosecuted under the federal law should be accorded the same evidentiary privileges as a Member of Congress," but Congress has not chosen that course. *Gillock*, 445 U.S. at 374. It is

12

inconceivable that Congress would choose this course for the Virgin Islands alone. "Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion." *Fontaine*, 697 F.3d at 228 (quoting *In re Chapman*, 166 U.S. 661, 667 (1897)). This Court should adopt the only logical interpretation of the ROA's speech or debate language: that it is meant as a check on the Executive Branch of the Government of the Virgin Islands, not the federal government. Since the ROA's speech or debate clause is inapplicable here, this Court should deny the defendant's Motion in full.

### III. Submitting Fraudulent Requests for Cash Advances and Receiving Cash from the Legislature Based on Those Fraudulent Requests is Not a Legislative Act.

Even if the court finds that the ROA's speech or debate provision applies to prosecutions for violations of federal law, the defendant has failed to meet his burden to demonstrate that he has immunity from prosecution under the Indictment in this case. He is charged with obtaining money from the Legislature under the false pretense that he would buy historical documents for the People of the Virgin Islands. Courts are clear that legislative immunity does not extend to requests for reimbursements or the submission of vouchers. And the Indictment's charges are based on the lack of any work at all, let alone protected legislative acts.

#### A. The Revised Organic Act's Legislative Immunity Clause Does Not Protect All of a Senator's Conduct While in Office.

The Supreme Court, in interpreting the U.S. Constitution's Speech or Debate Clause's application to members of Congress,[6] has made clear that legislative immunity does not extend

---

6    "[T]he interpretation given to the Speech or Debate Clause of the Federal Constitution, while not dispositive as to the meaning of the legislative immunity provision for the Virgin Islands, is, nevertheless, highly instructive." *Government of the Virgin Islands v. Lee*, 775 F.2d 514, 520 (3d Cir. 1985); *compare* U.S. CONST. art. I, § 6, cl. 1 ("[F]or any Speech or Debate in either House,

13

"to include all things in any way related to the legislative process." *United States v. Brewster*, 408 U.S. 501, 516 (1972) ("Given such a sweeping reading, we have no doubt that there are few activities in which a legislator engages that he would be unable somehow to 'relate' to the legislative process."). Instead, to effectuate its purpose of maintaining an independent legislative branch, *see id.*, courts have limited such immunity only to "speech or debate" in the legislature and other acts that fall squarely within the "legislative sphere," *Gravel v. United States*, 408 U.S. 606, 624-25 (1972). Accordingly, the key to whether legislative immunity applies is whether the acts in question constitute "legislative activity." *See id.* at 625.

"A legislative act has consistently been defined as an act generally done in Congress in relation to the business before it." *Brewster*, 408 U.S. at 512. This does not include all activities that legislators conduct in their official capacity. *Gravel*, 408 U.S. at 625 ("That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature."); *United States v. McDade*, 28 F.3d 283, 295 (3d Cir. 1994) ("The Speech or Debate Clause does not immunize every official act performed by a member of Congress."). And it does not protect "inquiry into a legislature's activities simply because the activities have 'some nexus to the legislative functions' or 'casually or incidentally relate to legislative affairs.'" *Brewster*, 408 U.S. at 528. Rather, speech or debate protections extend only to activities that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution

---

[Senators and Representatives] shall not be questioned in any other Place.") *with* 48 U.S.C. § 1572(d) ("No member of the legislature shall be held to answer before any tribunal other than the legislature for any speech or debate in the legislature.").

places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625. In other words, the protection applies only to "acts generally done in the course of the process of *enacting legislation*." *Brewster*, 408 U.S. at 514 (emphasis added). "Admittedly, the Speech or Debate Clause must be read broadly to effectuate its purpose of protecting the independence of the Legislative Branch, but no more than the statutes we apply, was its purpose to make Members of Congress super-citizens, immune from criminal responsibility." *Brewster*, 408 U.S at 516; *see also United States v. Menendez*, 831 F.3d 155, 165 (3d Cir. 2016) ("[B]ecause the privilege 'was designed to preserve legislative independence, not supremacy,' invocations of it that go 'beyond what is needed to protect legislative independence' must be 'closely scrutinized.'" (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 126-27 (1979))).

Moreover, the immunity extends only to historical, completed legislative acts. It does not protect future legislative acts—whether promised, imagined, or contemplated. *See, e.g.*, *United States v. Renzi*, 651 F.3d 1012, 1022 (9th Cir. 2011) ("Completed 'legislative acts' are protected; promises of future acts are not."). Although core legislative acts like introducing or voting on a bill are protected Speech or Debate activity, the promise to perform a legislative act in the future is unprotected. *See Brewster*, 408 U.S. at 528-29 (holding that a Member of Congress may be prosecuted for accepting a bribe in exchange for a promised vote on legislation). Therefore, an act that is merely a precursor to a legislative act is not itself a legislative act. *See Helstoski*, 442 U.S. at 490 ("But it is clear from the language of the Clause that protection extends only to an act that has already been performed. A promise to deliver a speech, to vote, or to solicit other votes at some future date is not 'speech or debate.' Likewise, a *promise* to introduce a bill is not a legislative act." (emphasis in original)). Similarly, a precondition for the performance of a legislative act is not protected. *McDade*, 28 F.3d at 299 (finding that although travel to and from

15

a location where legislative acts are performed is a "precondition for the performance of these acts," they are "not an integral part of Congress's deliberative and communicative processes").

**B.     The Burden Falls on the Defendant to Establish the Privilege Applies in Fact.**

Because the defendant is asserting a legislative privilege, "the burden of establishing the applicability of legislative immunity, by a preponderance of the evidence, rests with him." *Lee*, 775 F.2d at 524 (citing *In re Grand Jury*, 587 F.2d 489, 597 (3d Cir. 1978)).   To meet his burden, the defendant must identify the specific allegations in the Indictment which he claims require the introduction or reliance on evidence of legislative acts. *See Brewster*, 408 U.S at 525 (examining the face of the indictment to determine whether "inquiry into legislative acts or motivation for legislative acts is necessary . . . to make out a prima facie case").   The court must then determine if the alleged conduct the defendant challenges is manifestly legislative—such as introducing a bill or participating in committee meetings, manifestly non-legislative—such as constituent services or accepting a bribe in exchange for official acts, or ambiguously legislative. *Menendez*, 831 F.3d at 166.

If an act is not manifestly legislative, the defendant cannot rest on his own characterization of the act. *Menendez*, 831 F.3d at 172 ("[T]he way [the legislator] chooses to characterize his actions does not resolve the Speech-or-Debate-Clause question."); *Lee*, 775 F.2d at 522 (rejecting that the privilege protects acts which are merely "*purportedly* or *apparently* legislative in nature" (emphasis in original)).[7]   Instead, he must prove that the conduct for which he is criminally

---

[7]     To argue otherwise, the defendant extensively cites the Fourth Circuit's opinion in *United States v. Dowdy*, 479 F.2d 213 (4th Cir. 1973).   Mot. at 16-18.   The defendant's reading of *Dowdy*, however, directly contradicts the Third Circuit's "narrow reading" of that case, as articulated in *Lee*.   775 F.2d at 524.   Indeed, in *Lee*, the Third Circuit expressly "decline[d] to follow" *Dowdy*. *Id.*

charged is legislative "in fact." *Menendez*, 831 F.3d at 167 ("Only after we conclude that t is in fact legislative must we refrain from inquiring into a legislator's purpose or motive."); *Lee*, 775 F.2d at 522, 524 (remanding for further findings where the district court concluded the defendant was charged for engaging in legislative acts "without making any specific factual findings concerning the legislative nature of these activities"). The Court, therefore, which can consider extrinsic evidence to determine applicability of the privilege, *Menendez*, 831 F.3d at 164, must then consider the content and purpose of the act to determine if it is legislative, *id.* at 166.

C.     **The Defendant has Failed to Establish by a Preponderance that the Indictment's Allegations Rest on Legislative Acts.**

Where "no inquiry into legislative acts or motivation for legislative acts is necessary for the Government to make out a prima facie case" of the crimes charged, dismissal of the indictment under the Speech or Debate Clause is unwarranted. *Brewster*, 408 U.S. at 525. Throughout his Motion, the defendant repeatedly claims that the Indictment charges him with engaging in legislative fact-finding in preparation for various bills or committee hearings. That is not the case. In fact, the Indictment's charges are based on the defendant's failure to engage in any official work, let alone legislative acts. Instead, he is charged with obtaining money from the Legislature under the *pretense* of using it for the benefit of the People of the Virgin Islands but instead converting it to his own use. Indictment ¶¶ 8-11. It is only action within the "legitimate legislative sphere" that is protected by legislative immunity. *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975). Submitting fake requests and stealing Legislature funds for personal use can hardly be said to relate to the legislative function.

Despite the clear allegations in the Indictment, the defendant misapplies the law and mischaracterizes the Indictment in an attempt to hide behind the protective veil of legislative

immunity.   First, he claims that the Indictment must be dismissed because it alleges conduct that occurred while he was a senator and its allegations "relate[] to his actions as a legislator."   Mot. at 2 (claiming "[t]hese admissions are fatal to the government's attempt to prosecute Mr. James"); *see also* Mot. at 7 (noting that "the government alleges that the funds utilized to secure and translate Fireburn documents were available to Mr. James solely because he was a member of the senate and therefore had access to 'legislative funds'"); Mot. at 9 (citing, as evidence of legislative acts, grand jury testimony by the defendant's former chief of staff that the money the defendant received from the Legislature was to come from funds allotted for "senatorial purposes").   But, as discussed above, the Supreme Court has unequivocally held that the mere fact that a defendant was a legislator when he committed his crimes does not bar prosecution, *Gravel*, 408 U.S. at 625, and not every action taken by a legislator in his official capacity is a protected legislative act, *McDade*, 28 F.3d at 295.

Second, the defendant claims that, because he represented that his requests were for legislation, they and any subsequent financial transaction in which he obtained the money are protected.   *See, e.g.*, Mot. at 6-7 (citing, as evidence that his requests for money were based on legislative acts, an email to the Senate President claiming the documents from Denmark are related to several bills the defendant "will introduce during the 28th Legislature"); *id.* at 6 (citing the Indictment for the proposition that the defendant "received funds from the Virgin Islands legislature to further his legislative goals and priorities."); *id.* at 21 (claiming "the process of seeking the advancement of funds from the Virgin Islands' Legislature, and the use of wire transfers and deposits to facilitate translation and document production were, at minimum, informal legislative acts").

The Third Circuit in *Lee* made clear, however, that a request for legislature funds is not a

18

legislative act and that this is so even if the request purports to need funds for legislative acts. , 775 F.2d at 517, 524 (noting that "[c]learly the request [for reimbursement for travel expenses] in itself is not legislative" where the request was alleged to have misrepresented the trip as involving meetings for legislative purposes). In addition, the act of paying the defendant is not sufficiently integral to the enactment of legislation to constitute a legislative act. *U.S. ex rel. Hollander v. Clay*, 420 F. Supp. 853, 856 (D.D.C. 1976) (rejecting the claim that the act of being paid for travel between Washington, D.C. and a Congressman's home district was protected because "of the pay function's dubious connection with the deliberative and communicative processes that make up protected legislative activities"). Further, the statements tying his requests for cash to future legislation is nothing more than a promise of future legislative acts, which, as discussed above is not protected by legislative immunity. *Helstoski*, 442 U.S. at 490. Moreover, that the defendant was aware his expenditures of Legislature money only could be for legislative purposes is proper evidence of his intent, not evidence of a legislative act. *Cf. United States v. Diggs*, 613 F.2d 988, 1001 (D.C. Cir. 1979) (finding that the Rulemaking Clause, U.S. CONST. art. I, § 5, did not bar prosecution of a Congressman for fraudulently inflating his staff members' salaries to have them pay for his personal expenses, even where the prosecution included entering evidence of an advisory opinion barring the practice to show the defendant's intent).

Finally, the defendant makes broad claims that the Indictment charges him with some kind of protected legislative fact-finding in preparation for legislation. *See, e.g.*, Mot. at 20 (arguing that the privilege applies because the "collection, translation, and retention of Fireburn documents was done for the express purpose of crafting and debating legislation related to Fireburn commemoration"). But, as already noted several times, the Indictment nowhere references the actual collection, translation, and retention of Fireburn documents. It charges the defendant for

<div align="center">19</div>

<div align="center">**APP.124**</div>

the absence of any such conduct, with the Indictment's allegations centering only on the defendant's entirely fraudulent proposals, in October 2010, for the use of the money and representations about what he would use the money for. *See* Indictment ¶¶ 8-11. Resolving the Indictment's charges does not require improper consideration of legislative acts.

Moreover, even if the Indictment included allegations that the defendant obtained documents from Denmark, he has failed to meet his burden to establish that such conduct constitutes a legislative act. As the defendant recognizes, Mot. at 13-14, the Third Circuit has found that "fact-finding, information gathering, and investigative activities" are legislative acts where they are "prerequisites to the drafting of bills and the enlightened debate over proposed legislation." *Lee*, 775 F.2d at 521; *see also id.* (noting, in discussing why fact-finding is important, that "[l]egislators must feel uninhibited in their pursuit of information, for '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change'" (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927))). With this in mind, it is clear that fact-finding for any purpose at all, untethered from preparing for legislation, is not protected, even if done while a legislator. Any other result would contravene the Supreme Court's well-established principle that legislative immunity is intended to protect only those acts that are an "integral part of the deliberative and communicative processes" of the legislature "with respect to the consideration and passage or rejection of proposed legislation." *Gravel*, 408 U.S. at 625. The purpose of legislative immunity is to "protect the legislative process," *Brewster*, 408 U.S. at 507, not individual legislators.

Given this standard, obtaining documents from Denmark on its own is not manifestly legislative in nature. This is best demonstrated by the fact that the defendant began obtaining documents from Denmark in support of a Fireburn research project *before* he became a legislator.

<div align="center">20</div>

Instead, the Court must examine the content and purpose of the defendant's efforts and communications to obtain the documents to determine if they are legislative, in fact. *Menendez*, 831 F.3d at 166-67. In other words, because the defendant carries the burden by invoking the privilege, he must offer proof by a preponderance that he was engaging in bona fide legislative fact-finding. He has not done so.

The only evidence the defendant offers to demonstrate that obtaining documents from Denmark constituted legislative fact-finding in furtherance of the legislative process are his own claims that he intended to get the documents for this purpose, and the existence of bills and committee hearings during the session of the Legislature in which he served related to Denmark and Fireburn. Mot. at 5-7.[8]

With respect to his cited bills and committee hearings, the defendant relies on nothing more than that they address items of historical interest related to the Danish West Indies to advance the specious claim that obtaining Fireburn documents from Denmark was a part of the deliberative and communicative processes of the Legislature. *See, e.g.*, Mot. at 20 (citing a committee hearing related to passing a bill for "commemorating laborers on Fireburn Day as a day to be revered and remembered in the Virgin Islands"); *id.* (citing a committee organized and bill advanced to plan the 2017 Centennial Celebration of the transfer of the Virgin Islands to the U.S.). Legislation to recognize the Fireburn and Transfer Day has nothing to do with his purported historical research project, and acts "casually or incidentally relate[d] to legislative affairs" are not protected. *Brewster*, 408 U.S. at 528.

---

[8]    None of the bills or hearings the defendant cites are referenced in the indictment. Moreover, the Government did not obtain copies of the bills or hearing transcripts during its investigation. The Government also has no intention of introducing evidence of these bills or hearings during its case-in-chief.

21

Further, in arguing that his obtaining of documents from Denmark is legislative because the Legislature considered bills or held committee hearings on similar topics while he was in office, the defendant advocates for a definition of legislative acts with no limiting principle.  Under such a rule, a senator could claim legislative immunity for almost everything he does, as long as he can link it back to some issue the Legislature has, in some oblique way, considered.  Such a rule would eviscerate the carefully defined limits the Supreme Court has articulated for the legislative privilege, and render every incidental action by a legislator, however distant from actual "speech or debate," immune from inquiry.

Moreover, the only contemporaneous claims that the documents were for legislation that the defendant cites were made in his efforts to obtain approval of getting the money—the very fraudulent requests for which he is charged.  And these claims are belied by his own contemporaneous communications with individuals other than those from whom he is seeking authorization to spend taxpayer dollars.  As the defendant's email communications demonstrate, where he did commission real work—which, as the Indictment alleges, was rare—he started the process of doing so prior to his term as a senator, (Exs. 2, 3, 13, 14, 28 & 29), only finally completing the transactions while in the Legislature because he did not have the money to do so earlier—i.e., before he had access to the Legislature cash flow, (see Exs. 2-4, 10-12).  And this work was all toward his efforts to write books and screenplays he could hawk at the Cannes Film Festival in France.  (Exs. 5-7, 13, 14.)  There is likely nothing further removed from the legislative process.

The Indictment does not charge the defendant with obtaining historical documents from Denmark; it charges him with lying about doing so in order to steal Legislature funds.  However, even if this Court were to construe the Indictment as charging the defendant with obtaining

22

documents from Denmark, the defendant has failed to carry his burden to demonstrate that such conduct is a legislative act.[9]

## IV. There is No Basis to Dismiss the Indictment on the Grounds that Privileged Material was Presented to the Grand Jury.

The defendant also appears to argue that the Indictment must be dismissed because, he claims, the Government introduced evidence of legislative acts to the grand jury. Mot. at 23.



Although immunized from testifying about legislative acts, neither a legislator nor his staff is immunized from testifying about matters that do not concern legislative acts. *Gravel*, 408 U.S.

---

[9] To the extent the defendant claims the indictment must be dismissed because he will need to introduce evidence of his own legislative acts to rebut the allegations, courts are clear that this is not a bar to prosecution. A legislative immunity privilege "does not prevent [a legislator] from offering such acts in his own defense, even though he thereby subjects himself to cross-examination." *McDade*, 28 F.3d at 295; *see also United States v. Renzi*, 769 F.3d 731, 746-47 (9th Cir. 2014) ("[I]f a member of Congress offers evidence of his own legislative acts at trial, the government is entitled to introduce rebuttal evidence narrowly confined to the same legislative acts, and such rebuttal evidence does not constitute questioning the member of Congress in violation of the Clause."); *United States v. Rostenkowski*, 59 F.3d 1291, 1303 (D.C. Cir. 1995) (rejecting that an indictment must be dismissed because a legislator's "prosecution would require him to offer proof of his legislative acts to defend himself" (internal quotation marks omitted)).



23

at 622.   Further, even where privileged testimony is presented to the grand jury, it is only fatal where "the infection cannot be excised."   *United States v. Helstoski*, 635 F.2d 200, 205 (3d Cir. 1980).   Where the returning of an indictment did not depend on evidence presented in violation of a legislative immunity, dismissal is unwarranted.   *Renzi*, 651 F.3d at 1028-29; *United States v. Swindall*, 971 F.2d 1531, 1548 (11th Cir. 1992).   This accords with the Supreme Court's prior decisions in which it held that, despite references to legislative acts in an indictment, the prosecution can proceed if the government can make a prima facie case without introducing evidence of such acts.   *See Brewster*, 408 U.S. at 526-27; *United States v. Johnson*, 383 U.S. 169, 185 (1966) (holding that the government could proceed on the indictment where it was "wholly purged of elements offensive to the Speech or Debate Clause.").

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  Discussion of planned legislative acts is not evidence of legislative acts.   *Helstoski*, 442 U.S. at 490.   Eliciting the testimony about which the defendant complains was entirely proper.

**V.    The Privilege Does Not Bar the Government from Obtaining Evidence About Legislative Acts.**

24

Citing an out-of-circuit district court case, the defendant claims that "all evidence obtained in violation of the [legislative] immunity . . . must be suppressed," Mot. at 22-23; *see also id.* at 24 (arguing that "all evidence secured in violation of its broad protection must be suppressed"). This position is entirely meritless. As the Third Circuit recently emphasized, "this Court has decisively settled the issue" of whether legislative immunity provides a non-disclosure privilege. *In the Matter of the Search of Electronic Communications*, 802 F.3d 516, 525 (3d Cir. 2015). It does not. Legislative immunity only confers a privilege of non-use. "That is, while the privilege prohibits evidentiary 'use' of records, it does not prohibit disclosure of records to the Government in the course of an investigation." *Id.*; *see also Helstoski*, 635 F.2d at 203 ("The privilege is not one of nondisclosure but of evidentiary use."). Accordingly, the Government is not barred from obtaining evidence of legislative acts.

To the extent the defendant is asking this court to preclude the Government from using certain evidence at trial, wholesale suppression is not the proper procedure. Instead, the defendant must identify those specific pieces of evidence he wishes to preclude and prove by a preponderance that they reflect legislative acts. *See Lee*, 775 F.2d at 525; *see also Renzi*, 651 F.3d at 1030 ("[W]e think it incumbent on [former Congressman] Renzi to bring to our attention those specific exhibits that cause him concern [regarding the Speech or Debate Clause].").  Further, even if this court finds that a document, communication, or other item of evidence includes reference to a legislative act, exclusion of the entire document or communication is not appropriate. Instead, the court must examine it and excise only those parts that reflect legislative acts. *Helstoski*, 442 U.S. at 488 n.7 ("Nothing in our opinion, by any conceivable reading, prohibits excising references to legislative acts, so that the remainder of the evidence would be admissible.").

**VI.    Conclusion**

25

The defendant presents no colorable speech or debate claim in his last-ditch attempt to delay his trial.   Accordingly, this Court should deny his Motion, and proceed to trial as scheduled on February 13, 2017.

<div style="margin-left:40%">

Respectfully submitted,

Ronald W. Sharpe
United States Attorney

Raymond Hulser
Chief, Public Integrity Section

</div>

Dated: February 6, 2017                    By:   ____/s/ Justin D. Weitz_____

<div style="margin-left:40%">

Justin D. Weitz
Amanda R. Vaughn
Trial Attorneys

Delia Smith
Assistant United States Attorney

</div>

<u>**Certificate of Service**</u>

**I HEREBY CERTIFY** that on this 6th day of February, 2017, I electronically filed the foregoing **United States' Opposition to Defendant's Motion to Dismiss** with the Clerk of the District Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Omodare B. Jupiter
Federal Public Defender
1115 Strand Street
St. Croix, VI 00820
**Attorney for Defendant Wayne A.G. James**


By:     /s/Justin D. Weitz
        Justin D. Weitz
        Trial Attorney
        Department of Justice
        Public Integrity Section
        1400 New York Ave NW
        Washington, DC 20005
        Phone – 202.514.1412
        Justin.weitz@usdoj.gov

27

**APP.132**

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

---

```
UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
vs.                                )   CRIM. NO. 2015-42
                                   )
WAYNE JAMES,                       )
                Defendant.         )
_____     )
```

REPORTER'S TRANSCRIPT

<u>OMNIBUS HEARING</u>

Tuesday, February 7, 2017

---

```
BEFORE:       THE HONORABLE CURTIS V. GOMEZ
              District Judge

APPEARANCES:  OFFICE OF THE UNITED STATES ATTORNEY
              BY:  JUSTIN D. WEITZ, Trial Atty
                   AMANDA VAUGHN, Trial Atty
                   DELIA SMITH, AUSA
              5500 Veterans Drive, Suite 260
              St. Thomas, VI 00802

                   For the Government

              FEDERAL PUBLIC DEFENDER'S OFFICE
              BY:  BRENDAN HURSON, AFPD
                   OMODARE JUPITER, FPD
              1803 Kongens Gade 51B
              St. Thomas, VI 00802

                   For the Defendant
```

---

```
COURT REPORTER:   CHANDRA R. KEAN, RMR
                  Official Court Reporter
                  Virgin Islands District Court
                  St. Thomas, Virgin Islands
```

2

1                              <u>INDEX</u>

2

3    ARGUMENT BY THE DEFENDANT                      9

4    ARGUMENT BY THE GOVERNMENT                    30

5    ARGUMENT BY THE DEFENDANT                     66

6    ARGUMENT BY THE GOVERNMENT                    72

7    ARGUMENT BY THE DEFENDANT                     77

8    RULING BY THE COURT                           90

9

10        (Court recessed)

11                             ---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| | 1 |
| | 2 |
| 09:16:21 | 3 |
| 10:35:30 | 4 |
| 10:35:31 | 5 |
| 10:35:34 | 6 |
| 10:35:41 | 7 |
| 10:35:44 | 8 |
| 10:35:45 | 9 |
| 10:35:46 | 10 |
| 10:35:48 | 11 |
| 10:35:51 | 12 |
| 10:35:51 | 13 |
| 10:35:54 | 14 |
| 10:36:05 | 15 |
| 10:36:06 | 16 |
| 10:36:06 | 17 |
| 10:36:08 | 18 |
| 10:36:10 | 19 |
| 10:36:11 | 20 |
| 10:36:14 | 21 |
| 10:36:19 | 22 |
| 10:36:19 | 23 |
| 10:36:21 | 24 |
| 10:36:24 | 25 |

PROCEEDINGS


     (Court called to order at 10:35 a.m.)

          THE CLERK:  United States of America versus

Wayne James.

          MR. WEITZ:  Good morning, Your Honor.  Justin

Weitz and Amanda Vaughn and Delia Smith on behalf of the

United States.

          THE COURT:  Good morning, Counsel.

          MR. HURSON:  Good morning, Your Honor.  Brendan

Hurson and Omodare Jupiter on behalf of Mr. James.  Good

morning.

          THE COURT:  Okay.  Good morning.

     Okay.  We're here on defense motion.  So who is

speaking for the defense?

          MR. HURSON:  I am, Your Honor.

          THE COURT:  Tell us what your motion is and the

thing you're seeking to suppress.

          MR. HURSON:  Thank you, Your Honor.

     I think it's probably best to first address

document number 92, which is a motion to dismiss and/or

suppress.

     And, I mean, in reality it is a motion to dismiss

the indictment.  If Your Honor declines to dismiss the

indictment, then it is to be construed as a motion to

| | | |
|---|---|---|
| 10:36:26 | 1 | suppress particular pieces of evidence. |
| 10:36:29 | 2 | For the record, it was filed under seal because |
| 10:36:31 | 3 | it -- portions of it were redacted because they made |
| 10:36:34 | 4 | reference to grand jury transcripts.  We submitted as a |
| 10:36:38 | 5 | sealed document -- |
| 10:36:40 | 6 | THE COURT:  Attorney Hurson, you filed two |
| 10:36:44 | 7 | motions, correct? |
| 10:36:46 | 8 | MR. HURSON:  That's correct.  We -- |
| 10:36:47 | 9 | THE COURT:  All right.  One of the motions is |
| 10:36:49 | 10 | to suppress evidence obtained pursuant to a warrant? |
| 10:36:55 | 11 | MR. HURSON:  That's correct, Your Honor. |
| 10:36:57 | 12 | THE COURT:  All right.  Now was that what you |
| 10:36:58 | 13 | were referring to or not? |
| 10:37:00 | 14 | MR. HURSON:  Actually, I was first referring |
| 10:37:02 | 15 | to -- |
| 10:37:02 | 16 | THE COURT:  Is that what you were referring to? |
| 10:37:03 | 17 | MR. HURSON:  No, it was not. |
| 10:37:05 | 18 | THE COURT:  Okay.  Good.  All right. |
| 10:37:06 | 19 | And is it your position that we cannot or should |
| 10:37:12 | 20 | not deal with that one first? |
| 10:37:15 | 21 | MR. HURSON:  I think, in fairness, the |
| 10:37:17 | 22 | government should have an opportunity to respond to that |
| 10:37:21 | 23 | motion. |
| 10:37:21 | 24 | However, I think it is a motion that does not |
| 10:37:24 | 25 | require testimony.  It should be evaluated on the four |

10:37:27  1   corners of the affidavit, attaching each of the two

10:37:32  2   warrants.  Therefore, we could deal with it.

10:37:34  3          THE COURT:  So you're willing to concede

10:37:35  4   certain things, then?

10:37:36  5          MR. HURSON:  I am willing to concede only that

10:37:39  6   the government has not had an opportunity to file a

10:37:42  7   written response.

10:37:44  8          THE COURT:  All right.  With respect to things

10:37:46  9   that you would typically inquire into on a search

10:37:49  10  warrant, like probable cause, are you conceding that?

10:37:52  11         MR. HURSON:  I am not conceding that there's

10:37:54  12  probable cause, no, Your Honor.

10:37:55  13         THE COURT:  Okay.  So you're not conceding any

10:37:57  14  of the elemental requirements for a search warrant?

10:38:00  15         MR. HURSON:  That is correct.

10:38:01  16         THE COURT:  All right.

10:38:03  17    Attorney Weitz?  You had two motions, received late

10:38:14  18  in the day.  One deals with a, with the evidence

10:38:19  19  obtained pursuant to a search warrant.

10:38:24  20    As I understand it, nothing is conceded or nothing

10:38:27  21  elemental to an inquiry of the validity of the search

10:38:30  22  warrant is conceded.  Is there any reason why we

10:38:35  23  shouldn't deal with that now?

10:38:38  24         MR. WEITZ:  Your Honor, the government

10:38:39  25  received --

```
10:38:39   1              THE COURT:  Is there a reason why we shouldn't

10:38:41   2     deal with it now?

10:38:42   3              MR. WEITZ:  The government is prepared to go

10:38:44   4     forward on this right now.

10:38:45   5              THE COURT:  Okay.  My question is a "should"

10:38:47   6     question.  Should we deal with it now?  Yes or no.

10:38:50   7              MR. WEITZ:  No, Your Honor.  The government

10:38:51   8     should have at least a day to file a written response.

10:38:54   9         However, because we believe that the motion to

10:38:56   10    suppress that was filed yesterday, yesterday afternoon,

10:39:00   11    happens to be so baseless and out of, out of merit that,

10:39:06   12    frankly, the Court could rule on it today.

10:39:09   13        The motion asks for a search warrant which was duly

10:39:11   14    granted by a magistrate judge, based on a finding of

10:39:14   15    probable cause after a lengthy and detailed affidavit --

10:39:17   16             THE COURT:  I don't want you to argue it now.

10:39:19   17    I'm just trying to get a sense, the lay of the land

10:39:22   18    here.  As I understand, there are two things, and you're

10:39:24   19    prepared to go forward with respect to the motion to

10:39:27   20    suppress the search warrant.

10:39:29   21        Then there's another motion, then, that deals with

10:39:38   22    a broader issue.  Is the government prepared to go

10:39:40   23    forward on that?

10:39:42   24             MR. WEITZ:  Yes, Your Honor.  As to the motion

10:39:43   25    to dismiss and suppress, the government is prepared to
```

| | | |
|---|---|---|
| 10:39:46 | 1 | go forward. |
| 10:39:47 | 2 | THE COURT:  Do you have a preference in which |
| 10:39:49 | 3 | order the Court should take them? |
| 10:39:51 | 4 | MR. WEITZ:  Yes, Your Honor.  The government |
| 10:39:52 | 5 | would prefer we take the motion to dismiss document |
| 10:39:54 | 6 | number 92 first, and then we can deal with the motion to |
| 10:39:57 | 7 | suppress based on the search warrant at either a later |
| 10:40:01 | 8 | opportunity, when the government has had a chance to |
| 10:40:03 | 9 | flesh out the record with a written filing, or we can |
| 10:40:06 | 10 | deal with it today if the government is given a chance |
| 10:40:08 | 11 | to simply argue on the merits of that warrant. |
| 10:40:12 | 12 | THE COURT:  Well, this is an omnibus hearing, |
| 10:40:14 | 13 | and so we'll deal with everything today. |
| 10:40:18 | 14 | All right.  Attorney Hurson, do you have a |
| 10:40:21 | 15 | preference for order? |
| 10:40:24 | 16 | MR. HURSON:  I agree with the government's |
| 10:40:26 | 17 | preference, Your Honor. |
| 10:40:27 | 18 | THE COURT:  All right.  Very good.  I don't |
| 10:40:29 | 19 | recall, Attorney Hurson, whether you said if your client |
| 10:40:58 | 20 | is here. |
| 10:40:59 | 21 | MR. HURSON:  I don't know that I did, but I |
| 10:41:01 | 22 | will say for the record Mr. James is seated to my right. |
| 10:41:04 | 23 | THE COURT:  Okay.  Good. |
| 10:41:05 | 24 | Yes, Attorney Weitz. |
| 10:41:07 | 25 | MR. WEITZ:  I'm at your -- |

| | | |
|---|---|---|
| 10:41:08 | 1 | THE COURT:  Okay.  That's the order in which |
| 10:41:09 | 2 | we'll take it, then.  Both parties agree we will take, |
| 10:41:13 | 3 | well, the motion to dismiss first.  So we'll deal with |
| 10:41:14 | 4 | that issue. |
| 10:41:15 | 5 | Is it the case that the defense has the burden |
| 10:41:19 | 6 | there? |
| 10:41:19 | 7 | Who has the burden? |
| 10:41:21 | 8 | MR. WEITZ:  Yes, Your Honor.  The defense has |
| 10:41:22 | 9 | the burden on the motion to dismiss.  Although it is |
| 10:41:25 | 10 | styled as a motion to suppress, this isn't a -- |
| 10:41:28 | 11 | THE COURT:  It's an immunity question. |
| 10:41:31 | 12 | MR. WEITZ:  It's an immunity question.  And |
| 10:41:33 | 13 | there, the defense has the burden by a preponderance of |
| 10:41:35 | 14 | the evidence. |
| 10:41:35 | 15 | THE COURT:  Attorney Hurson, do you agree? |
| 10:41:38 | 16 | MR. HURSON:  The case law appears to back that |
| 10:41:40 | 17 | up, Your Honor. |
| 10:41:41 | 18 | THE COURT:  All right.  You're ready to |
| 10:41:42 | 19 | proceed.  Go right ahead. |
| 10:41:44 | 20 | MR. HURSON:  Thank you. |
| 10:41:45 | 21 | THE COURT:  First, do you have any evidence |
| 10:41:46 | 22 | that you wish to present? |
| 10:41:48 | 23 | MR. HURSON:  The evidence that I wish to |
| 10:41:50 | 24 | present was attached as exhibits to the motion itself. |
| 10:41:54 | 25 | I, in answer to Your Honor's question, will say that I |

| | |
|---|---|
| 10:41:58 | 1 |
| 10:42:00 | 2 |
| 10:42:04 | 3 |
| 10:42:07 | 4 |
| 10:42:08 | 5 |
| 10:42:12 | 6 |
| 10:42:15 | 7 |
| 10:42:18 | 8 |
| 10:42:20 | 9 |
| 10:42:27 | 10 |
| 10:42:27 | 11 |
| 10:42:27 | 12 |
| 10:42:31 | 13 |
| 10:42:31 | 14 |
| 10:42:33 | 15 |
| 10:42:36 | 16 |
| 10:42:38 | 17 |
| 10:42:44 | 18 |
| 10:42:49 | 19 |
| 10:42:53 | 20 |
| 10:42:55 | 21 |
| 10:42:57 | 22 |
| 10:43:00 | 23 |
| 10:43:02 | 24 |
| 10:43:05 | 25 |

have on information and belief an understanding that

there may be an additional piece of evidence that may be

relevant to the motion -- actually is relevant to the

motion.

   I do not have that in hand today.  We are working

diligently to secure that.  And it may come today.  It

may come soon.  And I'll describe it in the course of my

discussion here.

   But everything else appears to be attached to the

government's motion that was filed in response to my

motion.

            THE COURT:  All right.  Okay.

               ARGUMENT BY THE DEFENDANT

            MR. HURSON:  In keeping with Your Honor's

preference to simply not repeat what's written, I will

cut to the chase, which is there is an immunity clause

in the Revised Organic Act that exempts from

prosecution, it exempts from search warrant, it exempts

from questioning, anything that falls legitimately

within the legislative sphere.

            THE COURT:  What am I supposed to look at to

assess whether your client is entitled to that

protection?

            MR. HURSON:  Well, what you need to look at is,

one, the indictment.  You can't stop there, though.  I

10:43:07   1    think the government's response addresses the indictment

10:43:10   2    and says, essentially, "Well, we don't actually allege

10:43:12   3    any specific legislative behavior; therefore, this

10:43:16   4    doesn't apply."

10:43:17   5        That is a narrow and incorrect reading of what the

10:43:21   6    speech or debate immunity stands for.

10:43:25   7        Your Honor needs to look not only to what is

10:43:27   8    charged, but needs to look at what underlies those

10:43:29   9    charges.  Your Honor needs to look at what will be

10:43:32  10    proven or not proven, but what will be alleged here in

10:43:36  11    the courtroom.

10:43:37  12        Your Honor needs to look at what was presented to

10:43:40  13    the grand jury.  And when you do that, it is clear in

10:43:42  14    this case that the government trampled upon the

10:43:46  15    legislative immunity provisions, perhaps thinking they

10:43:48  16    didn't apply, which was an issue they raised in their

10:43:51  17    response.

10:43:51  18        But what's clear is that throughout the course of

10:43:53  19    the investigation of this case and throughout the trial

10:43:56  20    of Mr. James, the government will be referencing

10:44:00  21    numerous actions, activities, requests, correspondence,

10:44:05  22    conversations, that infringe on the legislative sphere.

10:44:11  23        Specifically, what they already elicited was, for

10:44:16  24    example -- and, Your Honor, I don't know how to proceed

10:44:19  25    on the question of certain things that were raised

10:44:21   1   before the grand jury --

10:44:22   2           THE COURT:  Well, let's deal first with whether

10:44:26   3   immunity applies here.  Because you point out something

10:44:29   4   that the government has raised in one of its filings,

10:44:31   5   that there is no protection here because the, it is a

10:44:38   6   state legislator that's involved.

10:44:41   7       So go ahead.

10:44:42   8           MR. HURSON:  That is something the government

10:44:43   9   raises, but they have no support for that.  First, it is

10:44:47   10  a direct federal statute on point.  There is no opt-out.

10:44:51   11          THE COURT:  Well, is it not the government's

10:44:53   12  position that because the Organic Act serves as the

10:44:56   13  local constitution, that eventually means that you would

10:45:02   14  be -- let's say we were in, I don't know, Tennessee.

10:45:08   15      If a, the Tennessee Constitution provided that

10:45:12   16  there is some privilege that applies, that wouldn't

10:45:15   17  preclude the federal government from proceeding on

10:45:18   18  federal charges, and I think arguably there would be no

10:45:23   19  protection with respect to any acts undertaken.

10:45:27   20      Do you agree with that?

10:45:28   21          MR. HURSON:  I agree that at the state level

10:45:30   22  that may be the case, and there is case law to support

10:45:33   23  that.

10:45:33   24      But we are not a state.  This is, as Your Honor

10:45:35   25  knows, a territory, and therefore it is a completely

10:45:39  1    different inquiry.

10:45:40  2         I respect that's the government's position, but it

10:45:42  3    is not supported by the law and is not supported by the

10:45:45  4    case law.

10:45:47  5         First and foremost, the Lee case --

10:45:49  6         THE COURT:  Should I treat the Revised Organic

10:45:53  7    Act as a state constitution?  Yes or no.

10:45:56  8         MR. HURSON:  I think the answer has to be no,

10:45:58  9    because it's not.  I think that there are certain

10:46:00  10   provisions of it that --

10:46:01  11        THE COURT:  Doesn't the circuit say that it is

10:46:03  12   the equivalent of a state constitution?

10:46:06  13        MR. HURSON:  I believe that --

10:46:07  14        THE COURT:  Where it creates the system of

10:46:09  15   government for the Virgin Islands, sets up the three

10:46:13  16   branches?

10:46:13  17        MR. HURSON:  Issue by issue, that's correct.

10:46:15  18        THE COURT:  And it's called an Organic Act

10:46:17  19   because it sets up the organism, the organic structure

10:46:20  20   of the government.

10:46:22  21        MR. HURSON:  On an issue-by-issue basis, that

10:46:25  22   has been interpreted under certain circumstances as the

10:46:27  23   Government of the Virgin Islands has evolved to the --

10:46:32  24        THE COURT:  Well, as recently in Dunston v

10:46:35  25   Mapp, and the cases before that originating in this

10:46:39  1    court, and working their way through the Third Circuit,

10:46:41  2    hasn't the Third Circuit repeatedly said the Organic Act

10:46:44  3    is the Constitution of the Virgin Islands?  And given

10:46:46  4    the federal-state relationship that's developed, it

10:46:50  5    should be regarded as the constitution.

10:46:53  6            MR. HURSON:  And in that instance it could have

10:46:55  7    been revised to provide for exactly what the government

10:46:58  8    is claiming it does.  It could have been revised to

10:47:00  9    exempt federal prosecution.

10:47:02  10           But one thing that I think is critical to note is

10:47:04  11   that we stand in this courthouse in a different position

10:47:07  12   than almost, I think, any other state, certainly, and

10:47:10  13   probably other territories, in that the federal

10:47:14  14   government in the Virgin Islands is authorized to bring

10:47:16  15   local charges.

10:47:18  16           This Court, as you know, has numerous cases that

10:47:21  17   have both federal charges and, quote, unquote, state

10:47:25  18   charges.  That is a wildly different scenario than what

10:47:31  19   every other state enjoys.

10:47:32  20           I think what's clear -- I know what's clear is that

10:47:35  21   in Lee you have the Government of the United States of

10:47:40  22   America prosecuting a case in -- maybe this courthouse

10:47:43  23   wasn't built yet, but in Federal Court with U.S.

10:47:47  24   attorneys prosecuting the case.  And there was no

10:47:50  25   question whatsoever that the Organic Act's Speech or

10:47:55    1    Debate Clause somehow didn't apply.

10:47:56    2         I think it's pretty clear that there have been

10:47:59    3    numerous opportunities for the Congress to exempt these

10:48:06    4    types of prosecutions, and they've chosen not to do

10:48:09    5    that.  And ultimately that decision shows that their

10:48:14    6    intention was not to do that.

10:48:15    7              THE COURT:  Okay.  Assuming that it's to be

10:48:19    8    treated -- "it" being the ROA -- is to be treated like

10:48:27    9    a, less a state constitution and more a federal act,

10:48:30    10   what's your position after that, then?

10:48:32    11             MR. HURSON:  If it is to be treated like a

10:48:34    12   federal --

10:48:34    13             THE COURT:  That is, assume the government

10:48:36    14   doesn't prevail on that point.  What's --

10:48:39    15             MR. HURSON:  If it is to be treated as a piece

10:48:40    16   of federal legislation, then it is clear that immunity

10:48:45    17   attaches to this proceeding -- or the immunity argument

10:48:49    18   at least is valid in this proceeding, and the Speech or

10:48:51    19   Debate Clause can protect people, if applicable, in

10:48:53    20   Mr. James's situation.  And I think that's clear from

10:48:57    21   the plain wording of the statute.

10:48:59    22        Now the government asks Your Honor to go to

10:49:02    23   legislative intent, to go back behind the plain words of

10:49:06    24   the statute.

10:49:07    25        But the case law is clear:  When you go behind the

10:49:10   1   plain words of the statute, it is for those rare, rare

10:49:14   2   circumstances where a flat, honest and truthful

10:49:17   3   interpretation of the words would lead to some sort of

10:49:21   4   absurd result.

10:49:23   5       And here, the result is not absurd --

10:49:26   6           THE COURT:  What is the legislative act at

10:49:27   7   issue?

10:49:28   8           MR. HURSON:  The legislative act at issue --

10:49:30   9           THE COURT:  That you say gives body to the

10:49:32   10   Speech or Debate Clause protection.

10:49:35   11           MR. HURSON:  48 USC 1572(b) states "Immunity of

10:49:42   12   Members.  No member of the Legislature be shall be held

10:49:44   13   to answer for any tribunal other than the Legislature

10:49:48   14   for any speech or debate in the Legislature," and then

10:49:51   15   goes on to forbid an actual arrest going to or from the

10:49:56   16   Legislature.

10:49:56   17           THE COURT:  So what is the legislative act

10:49:58   18   here?

10:49:58   19           MR. HURSON:  The legislative act here is --

10:50:00   20   there are numerous legislative acts here.

10:50:04   21       One are the actual requests and the back and forth

10:50:07   22   between Mr. James and those individuals at the

10:50:11   23   legislative business office and in the Legislature to

10:50:15   24   secure the funding for the translation and procurement

10:50:19   25   of documents.

10:50:20  1           It is not simply the request, it is the

10:50:22  2      conversation and the back and forth that ensues between

10:50:26  3      all these parties to get the funding.

10:50:28  4           The legislative acts are the requests for

10:50:31  5      documents, both locally and abroad, to bring those

10:50:34  6      documents to the Virgin Islands.

10:50:35  7           The legislative acts are the conversations that are

10:50:38  8      had with individuals in Danish National Archives.

10:50:42  9           It is the conversations that are had with private

10:50:45  10     individuals who are to translate these documents.

10:50:46  11          The legislative acts are the conversations with

10:50:49  12     legislative assistants, like Ms. Rowe, about what is

10:50:54  13     happening --

10:50:55  14          THE COURT:  You would agree that having a

10:50:57  15     conversation with a legislative assistant to say, "Let's

10:51:02  16     work on this constituent matter," is that a protective

10:51:07  17     legislative act?  Yes or no.

10:51:08  18          MR. HURSON:  In and of itself, the answer would

10:51:10  19     probably be no.  If it's simply a constituent --

10:51:12  20          THE COURT:  So it's not just having a

10:51:14  21     conversation with a legislative assistant that makes it

10:51:17  22     a legislative act, is it?

10:51:19  23          MR. HURSON:  I think Lee makes that point

10:51:20  24     clear, Your Honor, that it's not simply the conversation

10:51:22  25     that makes it a legislative act.

10:51:25  1        THE COURT:  Okay.  So when you refer to the

10:51:26  2   conversations between legislative assistants, you're not

10:51:29  3   saying that that's what makes it a protected legislative

10:51:32  4   act?

10:51:33  5        MR. HURSON:  I'm saying that the -- no.  I'm

10:51:34  6   saying that the --

10:51:35  7        THE COURT:  So tell me what does make it a

10:51:37  8   legislative act.

10:51:38  9        MR. HURSON:  What makes it a legislative act is

10:51:40  10  when the content of those conversations is how they are

10:51:42  11  going to procure documents necessary for the drafting of

10:51:46  12  legislation, how they're going to procure documents and

10:51:49  13  what they're going to procure, that is critical to the

10:51:52  14  debate in the committee that Mr. James chaired on the

10:51:55  15  legislation that wasn't just pending, but legislation

10:51:57  16  that was before the committee, legislation that was

10:52:00  17  being drafted and submitted.

10:52:02  18      That is, by the way, the piece of evidence that I

10:52:04  19  referenced earlier.

10:52:06  20      On information and belief, I have an understanding

10:52:08  21  that there was another piece of Fire Burn-related

10:52:14  22  legislation that had been submitted to the legal

10:52:16  23  department for its review, and had not yet been sent

10:52:20  24  back to committee, so to speak, from that review, that

10:52:24  25  dealt directly with the Fire --

10:52:25  1        THE COURT:  Well, rather than proceeding on

10:52:27  2   information and belief, what is it that you have?

10:52:31  3        MR. HURSON:  On that particular issue, I have

10:52:35  4   no documentary evidence.  But it is, I will say, being

10:52:38  5   worked on at the moment.  We have made a request to the

10:52:41  6   Legislature to produce all the bills that were submitted

10:52:43  7   to the legal department for drafting.

10:52:45  8        But I will say, I don't believe that it's necessary

10:52:47  9   for me to produce that in order to prevail on the

10:52:49  10  motion, because it's clear there were numerous bills

10:52:51  11  before the Legislature that were discussed, debated and

10:52:54  12  indeed passed in the 28th Legislature, that I've

10:52:58  13  attached to the motion.

10:53:00  14       Specifically Senator's Nelson's commemoration of

10:53:05  15  the Fire Burn, that's one bill that was not only

10:53:08  16  presented, debated in committee and passed, but more

10:53:10  17  importantly, perhaps, for our purposes, is the

10:53:13  18  centennial celebration bill that was prepared by Senator

10:53:19  19  James, debated in the committee and passed.

10:53:21  20       I think, more importantly --

10:53:21  21       THE COURT:  But why does a centennial bill make

10:53:27  22  what is, I guess what the conduct here a legislative

10:53:31  23  act?

10:53:33  24       MR. HURSON:  The -- well --

10:53:34  25       THE COURT:  That is, you agree that you can't

10:53:36   1   have some posthoc rationalization and then link things

10:53:42   2   up to have it satisfy what your, what your, what you

10:53:45   3   would need the Court to find?

10:53:46   4        MR. HURSON:   I would agree that the case law is

10:53:48   5   clear that you can't dream up some unconnected musings

10:53:52   6   after the fact to protect yourself from prosecution.   I

10:53:56   7   think that comes straight from the Supreme Court, when

10:53:59   8   they mention that you can't just walk in and say, "Well,

10:54:01   9   this was for that."

10:54:02  10        But we don't have to do that here, because it's

10:54:04  11   clear from the debates in the Centennial Commission that

10:54:07  12   I've attached to my filing that, one, the centennial

10:54:12  13   bill was to encompass numerous future events, activities

10:54:17  14   and research related to the Fire Burn.

10:54:20  15        It was not the end of the discussion.   It was, in

10:54:23  16   fact, a generic, if you will, bill to celebrate the

10:54:27  17   centennial, but indeed envisioned explicitly that there

10:54:31  18   will be additional bills related to what the centennial

10:54:34  19   celebrations would entail, including a celebration of

10:54:37  20   the Fire Burn.

10:54:38  21        Second, you see in the actual text of the debate,

10:54:42  22   discussions of the Fire Burn, and specifically

10:54:44  23   referenced to Mr. James' research into the Fire Burn,

10:54:48  24   that directly relates it to the legislation.

10:54:51  25        This isn't fanciful, this isn't backwards, posthoc

| | | |
|---|---|---|
| 10:54:57 | 1 | rationalization.  This is actual work being done. |
| 10:54:59 | 2 | And I think what is critical, sort of the elephant |
| 10:55:01 | 3 | in the room, with all of this, which is -- and the |
| 10:55:04 | 4 | government seems to concede this point -- which is |
| 10:55:06 | 5 | Mr. James couldn't have had access to this money if it |
| 10:55:10 | 6 | was not related to a legitimate legislative means. |
| 10:55:14 | 7 | This is a situation where these requests that are |
| 10:55:16 | 8 | going to the Budget Office for funds have to be tied |
| 10:55:19 | 9 | into legislation, or else he would have no right to |
| 10:55:22 | 10 | receive them. |
| 10:55:23 | 11 | THE COURT:  Are you saying that if the |
| 10:55:26 | 12 | Legislature does something that's supportive of, I don't |
| 10:55:30 | 13 | know, community outreach, constituent services, that |
| 10:55:36 | 14 | that means that it's protected legislative activity |
| 10:55:39 | 15 | because they afford funding for that? |
| 10:55:42 | 16 | MR. HURSON:  Not always.  I think the case law |
| 10:55:43 | 17 | is clear -- |
| 10:55:44 | 18 | THE COURT:  So, so why is it that you're |
| 10:55:46 | 19 | suggesting that because the Legislature offers funding, |
| 10:55:50 | 20 | you're -- it sounds like what you're saying is that that |
| 10:55:52 | 21 | legitimizes it as legislative act. |
| 10:55:56 | 22 | MR. HURSON:  I think in this circumstance it |
| 10:55:58 | 23 | absolutely does.  Because the request -- |
| 10:56:00 | 24 | THE COURT:  You're not saying just generally |
| 10:56:01 | 25 | because the Legislature offers funding, that somehow it |

10:56:04  1    is a legislative act.

10:56:05  2         MR. HURSON:  I think I'm constrained to answer

10:56:07  3    your question with a no, I'm not saying that.

10:56:09  4         And I say that because the case law is clear that

10:56:11  5    there can be circumstances where legislators are acting

10:56:14  6    on behalf of individual constituents, not in fact

10:56:19  7    engaging in the fact-finding and document collection

10:56:22  8    that is related to bill passing.

10:56:24  9         THE COURT:  Well, what if the Legislature says,

10:56:26 10    "You know what?  We're going to fund the travel and

10:56:29 11    expenses for any legislator to go to a centennial event

10:56:35 12    that's being celebrated in the year 2017."  Is that a

10:56:39 13    legislative act?

10:56:41 14         MR. HURSON:  It could be.  It could be.  I

10:56:42 15    think more facts need to be elicited as to what's going

10:56:45 16    to happen there, what's their role there, what's their

10:56:49 17    purpose there.

10:56:49 18         I agree that every time you make a request for a

10:56:51 19    stapler or a water cooler for your office, and that's

10:56:55 20    paid for by legislative funds, that that would not fall

10:56:57 21    within the umbrella of legitimate legislative activity.

10:57:02 22         THE COURT:  So you would have to connect

10:57:03 23    whatever it is here, whatever the funding is, to some

10:57:05 24    legitimate legislative undertaking, correct?

10:57:09 25         MR. HURSON:  Correct.

10:57:10  1          THE COURT:  What's the legislative undertaking

10:57:12  2     that you connect this up to --

10:57:14  3          MR. HURSON:  The legislative --

10:57:15  4          THE COURT:  -- that was either apparent or

10:57:19  5     evident before the request was made?

10:57:21  6          MR. HURSON:  The desire to commemorate

10:57:25  7     legislatively the Fire Burn through days of remembrance,

10:57:29  8     holidays --

10:57:31  9          THE COURT:  My question is:  What was the

10:57:34  10    evidence or the undertaking that occurred before the

10:57:39  11    request for funding?

10:57:40  12         MR. HURSON:  Well, prior to the request for

10:57:41  13    funding there were discussions and conversations between

10:57:44  14    Mr. James and his staff, and I believe between Mr. James

10:57:49  15    and the Senate president, between Mr. James and other

10:57:53  16    senators about his desire to enact legislation to

10:57:55  17    commemorate the Fire Burn, but his desire to not let

10:57:59  18    this event pass without being formally recognized in the

10:58:03  19    Virgin Islands Code.

10:58:04  20         THE COURT:  So you're saying there is evidence.

10:58:06  21         MR. HURSON:  There is evidence of that in the

10:58:08  22    attachments I provided to Your Honor.

10:58:09  23       There is evidence of that in Ms. -- again, I'm

10:58:12  24    treading lightly with respect to grand jury testimony,

10:58:14  25    but I will say, without identifying the speaker, that

10:58:17  1    there was grand jury testimony elicited that that was,

10:58:21  2    in fact, Mr. James's intention when he became a

10:58:25  3    legislator, to take this interest and turn it into

10:58:30  4    legislation.

10:58:31  5        And, in fact, I believe I attached an e-mail from

10:58:33  6    the FBI to Mr. James, essentially saying, "We're looking

10:58:37  7    into acts taken when you were a senator related to this

10:58:40  8    particular topic."

10:58:41  9        So now the government wants to try to separate this

10:58:44  10   and turn it into some sort of personal folly or, you

10:58:50  11   know, personal interest in something.  But the reality

10:58:52  12   is there is solid evidence attached to the pleading that

10:58:56  13   what Mr. James is seeking and translating in efforts to

10:59:02  14   secure Fire Burn documentation was related to

10:59:05  15   legislation.

10:59:09  16       Now I will say --

10:59:10  17       THE COURT:  You would agree that the Speech or

10:59:12  18   Debate Clause doesn't protect bribery or fraud?

10:59:16  19       MR. HURSON:  Well, that's a tough question to

10:59:18  20   say yes or no to.  I think that on its --

10:59:22  21       THE COURT:  That is, if a legislator undertook

10:59:24  22   a fraudulent scheme to obtain money by false pretenses,

10:59:32  23   would that be something that's protected?

10:59:35  24       MR. HURSON:  It could be.  And I'll say the

10:59:38  25   reason for that is clear in the case law.  The purpose

10:59:40  1   and motivation for the legislative acts is not to be

10:59:45  2   probed, not to be explored.

10:59:48  3        In fact, I think the government's response makes my

10:59:50  4   point.  They spent seven pages essentially laying out

10:59:54  5   their theory as to why Mr. James is engaged in these

10:59:58  6   requests, what Mr. James was actually doing.

11:00:00  7        That's precisely the type of conduct that the

11:00:02  8   Speech or Debate Clause immunizes against.  Legislators

11:00:07  9   are not to be second-guessed by government attorneys as

11:00:10  10  to why they were doing something, what they were doing.

11:00:13  11       It may be, ultimately, as the Supreme Court

11:00:15  12  recognized in numerous case -- and circuit courts,

11:00:19  13  including Lee, recognized it -- could be that the

11:00:21  14  motivation is actually fraudulent.  It may be that the

11:00:24  15  true purpose, even though it is connected to

11:00:26  16  legislation, is actually unjust enrichment.

11:00:28  17       I'm not conceding that point, that it is here.  But

11:00:31  18  my point is simply to say, as it wrote in Dowdy, it may

11:00:35  19  be harder to prove a bribery case or fraud case because

11:00:38  20  of Speech or Debate.

11:00:39  21       THE COURT:  Don't you have to first establish

11:00:40  22  that there's a legislative act?

11:00:41  23       MR. HURSON:  That's correct.  I think that's

11:00:42  24  true.  Or fact-finding --

11:00:44  25       THE COURT:  And I haven't heard you get to that

11:00:47  1    yet, other than there have been communications with

11:00:49  2    staff.  So tell me what's the legislative act?

11:00:53  3        Because it's not --

11:00:54  4            MR. HURSON:  Specifically --

11:00:54  5            THE COURT:  You agree it's a discussion with

11:00:57  6    staff, or a request for a stapler, a request for

11:01:00  7    funding, in and of itself --

11:01:02  8            MR. HURSON:  No stapler request, Your Honor.

11:01:04  9    That was an example of something that probably wouldn't

11:01:06  10   be.

11:01:06  11       But that --

11:01:06  12           THE COURT:  You agree that that, in and of

11:01:08  13   itself, is not a legislative act.  So what's a

11:01:10  14   legislative act --

11:01:13  15           MR. HURSON:  Research --

11:01:13  16           THE COURT:  -- that would preclude inquiry into

11:01:16  17   the motive?

11:01:17  18           MR. HURSON:  Documentation request and research

11:01:19  19   that was ultimately part of the debate and/or

11:01:22  20   preparation for Bill 28-159, later Senate Act 7158,

11:01:29  21   commemorating the Fire Burn would be exempt from

11:01:32  22   questioning and exempt from, that essentially immune

11:01:37  23   from oversight under the Speech or Debate Clause.

11:01:40  24       Act 7157, the centennial act --

11:01:43  25           THE COURT:  What's the evidence that predates

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 11:01:47 | 1  | the undertaking?                                             |
| 11:01:48 | 2  | You can put it on the Elmo.                                  |
| 11:01:50 | 3  | MR. HURSON:  It's attached -- unfortunately, I               |
| 11:01:52 | 4  | do not have the attachments.  I thought I had the           |
| 11:01:55 | 5  | attachments.  It's attached to my filing.  The grand        |
| 11:01:58 | 6  | jury testimony of the individual discussing the             |
| 11:02:01 | 7  | legislation is in my filing.                                |
| 11:02:04 | 8  | And I think also that the debate and the transcript         |
| 11:02:11 | 9  | that was attached of the actual debate from the             |
| 11:02:14 | 10 | committee on those bills is also attached, and also         |
| 11:02:21 | 11 | supports the argument that Fire Burn-related research        |
| 11:02:25 | 12 | was --                                                       |
| 11:02:25 | 13 | THE COURT:  Okay.                                            |
| 11:02:26 | 14 | MR. HURSON:  -- directly related to these                    |
| 11:02:28 | 15 | bills.                                                       |
| 11:02:28 | 16 | THE COURT:  When the -- isn't the nub of your               |
| 11:02:30 | 17 | argument that there's some legislative fact-finding          |
| 11:02:33 | 18 | that's underway here, legitimate legislative                 |
| 11:02:37 | 19 | fact-finding?                                                |
| 11:02:38 | 20 | MR. HURSON:  That's correct, yes.                            |
| 11:02:39 | 21 | THE COURT:  So what's the legislative fact                   |
| 11:02:40 | 22 | finding that was underway that would make this some          |
| 11:02:43 | 23 | legislative act, the motivation of which you cannot          |
| 11:02:46 | 24 | inquire into?                                                |
| 11:02:47 | 25 | MR. HURSON:  The securing of and -- of these                 |

11:02:50  1    documents from Danish National Archives and the

11:02:52  2    translation of these documents.  This is to be treated,

11:02:55  3    in my opinion, no differently than subpoenas for records

11:02:59  4    for legislative committees.

11:03:00  5        And as we know, as we know well from watching --

11:03:04  6        THE COURT:  But you're saying it's in aid of

11:03:05  7    what, drafting some legislation?

11:03:08  8        MR. HURSON:  That's a point that I was making,

11:03:10  9    that I'm in the process of trying to track down the

11:03:12  10   exact future bill that was -- I don't want to say

11:03:15  11   "future bill" because it was actually draft, but yes.

11:03:17  12       THE COURT:  All right.  Connect it up.

11:03:19  13       MR. HURSON:  It is connected up in the

11:03:21  14   discussion before the committee.  They are talking

11:03:22  15   about, "We need to commemorate the Fire Burn, and this

11:03:25  16   is why."

11:03:26  17       And one of the main reasons why is because of the

11:03:28  18   research that was done.  It's no different than --

11:03:30  19       THE COURT:  Let me say it this way:  I'd like

11:03:33  20   to see it.

11:03:33  21       MR. HURSON:  Okay.  I'm at a little bit at a

11:03:35  22   loss because I do not have the attachments to my motion.

11:03:38  23   That is my fault and I apologize for that.  I can submit

11:03:44  24   it to the Court as soon as I get back to the office and

11:03:46  25   get copies of it.

11:03:48  1          THE COURT:  What is it that you're referring

11:03:50  2     to?

11:03:51  3          MR. HURSON:  The transcript of the committee

11:03:55  4     hearing.  The testimony before the grand jury.

11:03:57  5          I believe -- and I didn't submit the entire thing,

11:04:00  6     but the testimony of the case agent, Mr. Peru, if I'm

11:04:06  7     pronouncing his name correctly, is also replete with

11:04:11  8     requests for document requests for translations.  It's

11:04:14  9     replete with discussions of e-mails by Mr. James,

11:04:16 10     allegedly, to other people, all part of the process of

11:04:20 11     procuring the documents.

11:04:21 12          And, in fact, the government's response lays out

11:04:24 13     precisely how they intend to try their case.  And they

11:04:27 14     intend to try their case by showing the jury e-mail

11:04:30 15     after e-mail -- and I believe they've actually attached

11:04:34 16     some of those; I don't have their attachments either --

11:04:36 17     but e-mail after e-mail wherein requests are made for

11:04:40 18     translations, funding and what have you.

11:04:42 19          That is all related to the ongoing Fire Burn

11:04:45 20     research.  That is all for a legislative purpose, which

11:04:49 21     is to pass a bill commemorating the Fire Burn, to pass a

11:04:54 22     bill allowing for a centennial celebration to encompass

11:04:57 23     Fire Burn celebrations and cherishing, what have you.

11:05:00 24          And as I mentioned before, there's another bill

11:05:03 25     that I believe was pending that was in the drafting

| | |
|---|---|
| 11:05:06 | 1 |
| 11:05:09 | 2 |
| 11:05:13 | 3 |
| 11:05:17 | 4 |
| 11:05:20 | 5 |
| 11:05:23 | 6 |
| 11:05:26 | 7 |
| 11:05:29 | 8 |
| 11:05:31 | 9 |
| 11:05:37 | 10 |
| 11:05:39 | 11 |
| 11:05:43 | 12 |
| 11:05:45 | 13 |
| 11:05:48 | 14 |
| 11:05:51 | 15 |
| 11:05:53 | 16 |
| 11:05:57 | 17 |
| 11:06:00 | 18 |
| 11:06:03 | 19 |
| 11:06:04 | 20 |
| 11:06:09 | 21 |
| 11:06:13 | 22 |
| 11:06:14 | 23 |
| 11:06:18 | 24 |
| 11:06:21 | 25 |

phase related to actually having a day off, so to speak,
an official holiday related to the Fire Burn. That's
how it's all connected.

And we know that that type of fact-finding is
protected behavior. In fact, there's numerous cases
cited in the brief. I talk about Dowdy, which the
government of course says Dowdy was somewhat rejected by
the Third Circuit. But it wasn't for this point. It
wasn't rejected for the point that fact-finding is a
critical aspect of legislative behavior.

And in fact, in Lee, the issue in Lee was trips to
New York. In fact, there's no reference even in Lee to
what the underlying legislation may have been. The only
reference into Lee is that fact-finding is, in fact, a
protected activity.

And it seems that in this instance the government
cannot prove its case and, indeed, couldn't secure its
indictment without making reference to fact-finding
efforts by Mr. James.

Now, they've come in now and say it was all fake;
they didn't really intend to follow through with any of
this.

Again, that delves into motivations, and the
Legislature is free to take that issue up. The
Legislature was free to sanction Mr. James. The

| | | |
|---|---|---|
| 11:06:23 | 1 | Legislature was free to engage in whatever procedural |
| 11:06:25 | 2 | mechanisms they have to punish someone if, in fact, they |
| 11:06:28 | 3 | came to the same conclusion the government did. |
| 11:06:30 | 4 | But what the Speech or Debate Clause does not allow |
| 11:06:34 | 5 | is for attorneys from Washington, DC, to come to the |
| 11:06:39 | 6 | Virgin Islands and prosecute senators for their |
| 11:06:42 | 7 | legislative-related behavior.  And that's why I'm asking |
| 11:06:45 | 8 | for the motion to be granted. |
| 11:06:55 | 9 | THE COURT:  Okay.  Attorney Weitz? |
| 11:06:57 | 10 | Attorney Jupiter, you need to find your evidence. |
| 11:06:59 | 11 | You have argued, but you're asking the Court to sift |
| 11:07:03 | 12 | through your papers to figure out which portion of a |
| 11:07:06 | 13 | transcript is -- helps your case.  I don't think that |
| 11:07:10 | 14 | the Court is -- should be the entity digging for |
| 11:07:13 | 15 | truffles here.  That's your obligation, not mine. |
| 11:07:15 | 16 | MR. HURSON:  Your Honor, I agree with you.  May |
| 11:07:18 | 17 | I respond to that? |
| 11:07:19 | 18 | THE COURT:  Not now. |
| 11:07:20 | 19 | Attorney Weitz? |
| 11:07:21 | 20 | ARGUMENT BY THE GOVERNMENT |
| 11:07:21 | 21 | MR. WEITZ:  Thank you, Your Honor. |
| 11:07:22 | 22 | As a preliminary matter, the government has |
| 11:07:25 | 23 | advanced two arguments here.  I would respectfully |
| 11:07:27 | 24 | request that my colleague Attorney Vaughn be permitted |
| 11:07:30 | 25 | to argue the legislative acts issue, and that I be |

| | | |
|---|---|---|
| 11:07:32 | 1 | permitted to argue the Organic Act issue. |
| 11:07:35 | 2 | THE COURT:  Sure. |
| 11:07:36 | 3 | MR. WEITZ:  Thank you, Your Honor. |
| 11:07:37 | 4 | There is simply no reason to think that, despite |
| 11:07:39 | 5 | Attorney Hurson's claim, that the speech or debate |
| 11:07:42 | 6 | immunity within the Organic Act is designed to protect |
| 11:07:45 | 7 | territorial legislators from prosecution in Washington, |
| 11:07:48 | 8 | DC. |
| 11:07:49 | 9 | There's simply no reason to think that Congress -- |
| 11:07:51 | 10 | THE COURT:  Why shouldn't it? |
| 11:07:53 | 11 | Congress passed the law, didn't it? |
| 11:07:55 | 12 | MR. WEITZ:  Because it would lead to absurd |
| 11:07:58 | 13 | results, Your Honor, whereby the Government of the |
| 11:08:00 | 14 | Virgin Islands is deprived of the same privilege and |
| 11:08:01 | 15 | rights and the same powers that are given to every state |
| 11:08:04 | 16 | in the Union. |
| 11:08:05 | 17 | THE COURT:  Doesn't that proceed on the |
| 11:08:07 | 18 | assumptions that the Revised Organic Act cannot be two |
| 11:08:11 | 19 | things? |
| 11:08:11 | 20 | The two things would be, one, a federal enactment; |
| 11:08:14 | 21 | and two, the equivalent of the Virgin Islands |
| 11:08:19 | 22 | constitution. |
| 11:08:20 | 23 | Why can't it be both? |
| 11:08:21 | 24 | MR. WEITZ:  In some ways it is both -- |
| 11:08:23 | 25 | THE COURT:  And if it is both, but |

11:08:25   1    significantly if it is at least one of those things, and

11:08:28   2    that one is a federal act, why doesn't that indicate

11:08:36   3    Congressional intent?

11:08:38   4        That is, Congress said that the Speech or Debate

11:08:42   5    Clause applies in the Virgin Islands.  It's part of a

11:08:45   6    federal act.  They weren't talking about some other

11:08:49   7    state and they weren't talking about the United States

11:08:53   8    Congress.  They were talking about the Virgin Islands.

11:08:55   9        So why wouldn't that apply here?

11:08:59  10        MR. WEITZ:  Your Honor, the Supreme Court and

11:09:00  11    the Third Circuit have both repeatedly said that it's a

11:09:03  12    basic principle of statutory construction that we should

11:09:06  13    avoid interpretations of statutes that lead to absurd

11:09:09  14    results.

11:09:10  15        Your Honor --

11:09:10  16        THE COURT:  Why isn't it -- why is it absurd?

11:09:13  17    That is, couldn't the Congress, if it chose to, couldn't

11:09:17  18    it say, "You know what?  Senators in Tennessee, you

11:09:21  19    benefit from the Speech or Debate Clause."

11:09:25  20        Wouldn't that assist them and wouldn't that be

11:09:29  21    something that's applicable in federal prosecutions with

11:09:32  22    respect to Tennessee legislators, if they, if the

11:09:36  23    Congress chose to do that?

11:09:37  24        MR. WEITZ:  Congress could have absolutely done

11:09:39  25    that.  And as the Court in Gillock has noted, Supreme

11:09:42  1    Court noted, Congress chose not to do that.

11:09:45  2         This speech or debate language that's in the

11:09:47  3    Organic Act was passed in 1954.  From a review of the

11:09:51  4    legislative history surrounding that discussions in the

11:09:54  5    United States Congress, there was no discussion of what

11:09:56  6    the meaning was supposed to be.

11:09:58  7         But in 1954, the situation in the Government of the

11:10:03  8    Virgin Islands was quite different.  There was an

11:10:04  9    appointed governor, not an elected governor.  And over

11:10:07  10   the course of the last six decades, Congress has

11:10:10  11   generally moved in the direction of encouraging and

11:10:12  12   manifesting in the Government of the Virgin Islands the

11:10:15  13   same rights, privileges and powers that exist in every

11:10:18  14   state.

11:10:19  15        To deprive the Government of the Virgin Islands,

11:10:21  16   which is as Your Honor knows is composed of three

11:10:24  17   co-equal branches -- it mirrors the United States

11:10:27  18   Government and the government of every single state --

11:10:29  19   to deprive it the right to be -- and the citizens of the

11:10:33  20   Virgin Islands -- of the right to engage in their own

11:10:35  21   checks and balances simply doesn't comport with the way

11:10:37  22   the Congress, from 1954 through the Elected Governor's

11:10:41  23   Act, through the dispositions to establish a Superior

11:10:44  24   Court --

11:10:44  25             THE COURT:  But Attorney Weitz, you agree that

| | | |
|---|---|---|
| 11:10:47 | 1 | the Supreme Court said that the Congress, if it chose |
| 11:10:51 | 2 | to, could extend the Speech or Debate Clause protections |
| 11:10:56 | 3 | to a state legislature -- |
| 11:11:01 | 4 | MR. WEITZ: If Congress -- |
| 11:11:01 | 5 | THE COURT: -- in Gillock, did they not? |
| 11:11:03 | 6 | MR. WEITZ: They said that, yes, 25 years after |
| 11:11:05 | 7 | the Organic Act was passed. |
| 11:11:07 | 8 | THE COURT: Whether it's 25 years or at the |
| 11:11:08 | 9 | time or before they said that, the Congress could |
| 11:11:11 | 10 | exercise that prerogative, could they -- didn't they? |
| 11:11:15 | 11 | MR. WEITZ: Yes, Your Honor. |
| 11:11:16 | 12 | THE COURT: Why would I not look at that and |
| 11:11:18 | 13 | couple it with the Revised Organic Act and say, "Well, |
| 11:11:21 | 14 | the Congress did in this case." That is, "this case" |
| 11:11:25 | 15 | meaning the Revised Organic Act. |
| 11:11:26 | 16 | And so while the Revised Organic Act is recognized |
| 11:11:30 | 17 | as the functional equivalent of a state constitution, |
| 11:11:35 | 18 | there's also plenty of case law that says it is a |
| 11:11:38 | 19 | federal enactment, and that's why it's subject to |
| 11:11:42 | 20 | interpretation by this Court, because it is a federal |
| 11:11:45 | 21 | act. |
| 11:11:45 | 22 | Why wouldn't I say that Congress's intent was to |
| 11:11:50 | 23 | provide something coextensive with the Speech or Debate |
| 11:11:55 | 24 | Clause, and they chose to apply it here? |
| 11:11:57 | 25 | And if the Virgin Islands Government wished to have |

| | |
|---|---|
| 11:11:59 | 1 |
| 11:12:06 | 2 |
| 11:12:10 | 3 |
| 11:12:15 | 4 |
| 11:12:15 | 5 |
| 11:12:18 | 6 |
| 11:12:19 | 7 |
| 11:12:22 | 8 |
| 11:12:24 | 9 |
| 11:12:27 | 10 |
| 11:12:30 | 11 |
| 11:12:32 | 12 |
| 11:12:35 | 13 |
| 11:12:37 | 14 |
| 11:12:40 | 15 |
| 11:12:45 | 16 |
| 11:12:48 | 17 |
| 11:12:52 | 18 |
| 11:12:54 | 19 |
| 11:13:01 | 20 |
| 11:13:03 | 21 |
| 11:13:07 | 22 |
| 11:13:11 | 23 |
| 11:13:13 | 24 |
| 11:13:16 | 25 |

some separation, as I think just about every other state and territory does, the Virgin Islands could enact its own constitution and create that distance and that buffer.

But that hasn't happened, has it?

MR. WEITZ:  No, Your Honor.  And, Your Honor, nobody is disputing this is a federal act.  And we're asking this Court to interpret it in the most reasonable and sensible light.  Nobody is disputing that this is a federal act.  At the end of the day, it simply doesn't make sense that Congress would choose to extend this privilege only to the Virgin Islands.

In Gillock, the Supreme --

THE COURT:  Well, Congress has done other things in the Revised Organic Act.  For instance, the Oath Clause that is in the Constitution was specifically extended to the Virgin Islands Legislature.  That was something that Congress chose to do.

Are you suggesting that because Congress extended that clause to the Virgin Islands, that somehow it would have less effect here as the federal mandate, because it's in the Revised Organic Act?

MR. WEITZ:  No, Your Honor.  Nobody is disputing Congress's power under the Revised Organic Act.

11:13:16   1          THE COURT:  Well, I think as a federal

11:13:17   2   mandate --

11:13:18   3          MR. WEITZ:  No, Your Honor.  The issue in --

11:13:20   4          THE COURT:  -- or an expression of federal

11:13:22   5   intent.

11:13:22   6          MR. WEITZ:  It is an expression of federal

11:13:24   7   intent.

11:13:25   8       There is no question, intent, that this is a

11:13:26   9   federal law and the Court has to interpret it as a

11:13:29   10  federal law.  Nobody disputes that, Your Honor.

11:13:31   11      The issue is, and as Your Honor pointed out,

11:13:34   12  Congress could choose to extend the Speech and Debate

11:13:34   13  Clause's privileges.

11:13:39   14      In federal prosecution, the Legislature --

11:13:39   15          THE COURT:  In statutory construction, am I not

11:13:42   16  constrained to take the words as intended, or at least

11:13:48   17  start with the point with what Congress says it means?

11:13:51   18      And that is, if it says something like the Speech

11:13:55   19  or Debate Clause applies here, that's Congress's intent

11:13:59   20  that the Speech or Debate Clause applies here, and not a

11:14:03   21  surrogate for the state legislature?

11:14:06   22          MR. WEITZ:  The Court can start with that

11:14:08   23  proposition, and it should start with that proposition.

11:14:10   24  But the Court should dive into the legislative intent

11:14:13   25  and should dive into seeking a result that is not

11:14:17  1    absurd.

11:14:18  2        Your Honor, the Court in Gillock said that, yes,

11:14:21  3    Congress can extend the Speech or Debate Clause to the

11:14:23  4    states, but it didn't say that it can extend it to

11:14:25  5    Tennessee and to New York, but not to California and to

11:14:28  6    Florida.  It simply said that it could extend it to the

11:14:31  7    states as a whole.

11:14:33  8        There seems to be no support for the proposition

11:14:35  9    that when Congress -- Congress passed this law, the

11:14:37  10   Revised Organic Act, that what it sought to do was

11:14:42  11   completely exempt --

11:14:43  12       THE COURT:  Why couldn't the Congress proceed

11:14:44  13   under Article 4 under the All Needful Things Provision,

11:14:47  14   and say it's what's needed in the territories, and so

11:14:49  15   that's what Congress chose to do?

11:14:53  16       MR. WEITZ:  Your Honor, Congress has the power

11:14:55  17   to do this.  There's no question that Congress has the

11:14:57  18   power to do this.  And Congress has the power to say

11:14:59  19   that if it wants, the federal government cannot

11:15:02  20   prosecute Virgin Islands legislators for anything.

11:15:05  21       It could even put that in and go beyond legislative

11:15:08  22   immunity.  It could just put that into the statute.  But

11:15:10  23   it doesn't -- under Article 4 and under its powers under

11:15:15  24   Article 1, Congress didn't do that.

11:15:16  25       What appears to have happened here is that we're

11:15:18   1       looking at a holdover of a 1954 law, the Revised Organic

11:15:23   2       Act, that doesn't reflect the situation in the

11:15:25   3       Virgin Islands today.

11:15:26   4           Over the course of the last six decades, Congress

11:15:29   5       has again and again shown that it's interested in

11:15:31   6       treating the Virgin Islands like a state.  It's

11:15:32   7       interested in respecting the separation of powers --

11:15:36   8           THE COURT:  Indeed.  But isn't Congress also

11:15:38   9       capable of amending the Revised Organic Act if they

11:15:41   10      chose to?

11:15:42   11          In fact, with respect to oaths, for instance, there

11:15:45   12      was a specific oath in the Revised Organic Act, and

11:15:48   13      Congress specifically excised that and then inserted a

11:15:52   14      provision right out of the Constitution, and made that

11:15:54   15      part of the Organic Act.

11:15:57   16          So if Congress chose to, if they wished to have

11:16:00   17      that federal-state compact or federal-state relationship

11:16:04   18      that you might find in other, in other settings,

11:16:08   19      couldn't the Congress, if it chose to, have excised

11:16:11   20      that?

11:16:12   21          MR. WEITZ:  If it chose to, yes, Your Honor.

11:16:14   22      But it hasn't done that.

11:16:15   23          THE COURT:  So wouldn't that suggest that their

11:16:17   24      intention is to have it apply?

11:16:19   25          MR. WEITZ:  Your Honor, I would suspect that we

11:16:21  1   can't rely simply on what Congress does or doesn't do or

11:16:24  2   chooses not to do over the course of six decades, as far

11:16:27  3   as the intention.

11:16:28  4        But I would also point out, Your Honor, that the

11:16:30  5   situation in 1954 when this language passed is quite

11:16:33  6   different than the situation today.  The District Court

11:16:36  7   of the Virgin Islands has changed in the way that it

11:16:39  8   acts in the last six decades.

11:16:41  9        There's a Superior Court across the street that has

11:16:44  10  a lot more power in terms of dealing with local laws,

11:16:46  11  and really reflects a true state judiciary.

11:16:49  12       There's an Executive Branch which is elected and

11:16:51  13  reflects a true state governorship.

11:16:54  14       Those things were not in place in the format that

11:16:56  15  they're in place now in 1954, when Congress passed this

11:17:00  16  law.

11:17:00  17       Should Congress have clarified itself?  Of course.

11:17:03  18  It would be great if Congress had clarified what it

11:17:06  19  meant here, and we probably wouldn't be having this

11:17:09  20  argument.

11:17:10  21       But, Your Honor, the issue at the end of the day is

11:17:11  22  whether Congress sought to extend protections that it

11:17:14  23  extends to no other state legislator and does not extend

11:17:17  24  to legislators in Puerto Rico, extend that simply to the

11:17:20  25  Virgin Islands, and perhaps to Guam as well, extend

| | | |
|---|---|---|
| 11:17:23 | 1 | those protections to -- |
| 11:17:24 | 2 | THE COURT:  Well, the reason why I said -- |
| 11:17:27 | 3 | MR. WEITZ:  -- federal -- |
| 11:17:28 | 4 | THE COURT:  -- that only territories, because I |
| 11:17:30 | 5 | believe Guam has a constitution, Puerto Rico has a |
| 11:17:34 | 6 | constitution, I believe the Northern Marianas may, as |
| 11:17:37 | 7 | well. |
| 11:17:37 | 8 | The Virgin Islands, I think, is the outlier that |
| 11:17:39 | 9 | doesn't.  So I hear what you're saying, that it might be |
| 11:17:43 | 10 | something that is unique to territories.  But possibly, |
| 11:17:47 | 11 | and arguably, it's something that's unique only to the |
| 11:17:49 | 12 | Virgin Islands, because there is no constitution here. |
| 11:17:54 | 13 | MR. WEITZ:  Your Honor -- |
| 11:17:54 | 14 | THE COURT:  Wouldn't that strengthen the |
| 11:17:56 | 15 | defense argument, though, that Congress under Article 4 |
| 11:17:59 | 16 | is doing all needful things, and if it chooses to it can |
| 11:18:03 | 17 | extend whatever it chooses to? |
| 11:18:06 | 18 | MR. WEITZ:  This is not a question of |
| 11:18:08 | 19 | congressional power.  The government does not dispute |
| 11:18:10 | 20 | that Congress has the power to fashion a Speech or |
| 11:18:13 | 21 | Debate Clause or, frankly, all needful things, which it |
| 11:18:15 | 22 | is to do in regard to the Virgin Islands. |
| 11:18:17 | 23 | It's the government's position that it simply is |
| 11:18:19 | 24 | inconsistent with the way Congress has treated the |
| 11:18:22 | 25 | Virgin Islands to read the, any other tribunal language |

11:18:25   1    in that speech or debate language in 48 USC 1572(d),

11:18:30   2    that it's inconsistent to read that in a matter that

11:18:33   3    bars any federal inquiry into state legislative

11:18:37   4    activity.

11:18:37   5        What it would lead to, Your Honor, is a gray area

11:18:40   6    where Virgin Islands legislators alone are exempt from

11:18:44   7    any kind of federal inquiry and any kind of local

11:18:46   8    inquiry, which means that the Executive Branch of the

11:18:48   9    Government of the Virgin Islands can do no inquiry into

11:18:51   10   anything related to the Legislature, as long as it

11:18:54   11   applies to legislative acts, and the federal government

11:18:57   12   is similarly proscribed from doing that.

11:19:00   13       That can't be what Congress intended, and certainly

11:19:03   14   can't be what Congress intends today.

11:19:05   15       THE COURT:  Could it not mean that Congress was

11:19:07   16   trying to create something that was coextensive with

11:19:09   17   what applies to, say, members of Congress?

11:19:14   18       MR. WEITZ:  First of all, Your Honor, I would

11:19:16   19   point out that the language is quite different.  The

11:19:18   20   language in the federal Constitution, Speech or Debate

11:19:22   21   Clause, is that no member shall be questioned and held

11:19:25   22   liable and that no member shall be held to answer, which

11:19:27   23   may seem different but -- may seem similar, but is

11:19:30   24   actually different language.

11:19:31   25       But yes, Congress could have chosen to do that.

| 11:19:34 | 1 | But there's no reason why -- |
| 11:19:35 | 2 | THE COURT:  You're not, you're not suggesting |
| 11:19:37 | 3 | that members of Congress couldn't be held accountable |
| 11:19:41 | 4 | for criminal activity? |
| 11:19:43 | 5 | MR. WEITZ:  No, Your Honor.  As -- frankly, as |
| 11:19:45 | 6 | Attorney Vaughn will argue these -- what's -- the basis |
| 11:19:48 | 7 | of the indictment here doesn't involve legislative acts |
| 11:19:51 | 8 | anyway.  And so, frankly, Your Honor could avoid |
| 11:19:54 | 9 | reaching the Revised Organic Act interpretation |
| 11:19:57 | 10 | questions if Your Honor wants, and simply find that |
| 11:19:59 | 11 | there's no legislative activity at stake, and we can |
| 11:20:01 | 12 | proceed to trial on Monday. |
| 11:20:02 | 13 | THE COURT:  All right.  Well, let me hear from |
| 11:20:05 | 14 | Attorney Vaughn. |
| 11:20:07 | 15 | MS. VAUGHN:  Yes, Your Honor. |
| 11:20:10 | 16 | THE COURT:  All right. |
| 11:20:16 | 17 | MS. VAUGHN:  Good morning, Your Honor.  Amanda |
| 11:20:17 | 18 | Vaughn for the United States. |
| 11:20:18 | 19 | THE COURT:  Good morning. |
| 11:20:20 | 20 | MS. VAUGHN:  What Attorney Weitz just alluded |
| 11:20:22 | 21 | to, I think, is the most important thing to keep in mind |
| 11:20:26 | 22 | here, is that the indictment in this case does not turn |
| 11:20:28 | 23 | on what the defendant may or may -- may have done while |
| 11:20:32 | 24 | he was in the Legislature.  It turns upon what he did |
| 11:20:36 | 25 | not do. |

| 11:20:36 | 1 | The indictment is based on the defendant's fraud, |
| 11:20:39 | 2 | his request for money and then conversion of those funds |
| 11:20:43 | 3 | for his own use -- |
| 11:20:45 | 4 | THE COURT:  Well, I think your brother's |
| 11:20:48 | 5 | position is that they -- the inquiry here is permeated |
| 11:20:54 | 6 | with legislative acts in a way that in order for the |
| 11:20:58 | 7 | government to meet its burden, you would have to inquire |
| 11:21:01 | 8 | into motives of legislative acts. |
| 11:21:03 | 9 | And I think what he's saying is that what was |
| 11:21:06 | 10 | undertaken were legislative acts.  It's not just a |
| 11:21:10 | 11 | discussion with a staffer.  It's a discussion with a |
| 11:21:13 | 12 | staffer connected up to a legitimate legislative inquiry |
| 11:21:18 | 13 | into the drafting of legislation, or something along |
| 11:21:21 | 14 | those lines. |
| 11:21:22 | 15 | Let's assume for the sake of argument that's what |
| 11:21:25 | 16 | he's arguing.  What's your response to that? |
| 11:21:30 | 17 | MS. VAUGHN:  One, I would point out that -- I |
| 11:21:32 | 18 | have two responses.  First, the defendant hasn't |
| 11:21:34 | 19 | actually identified pieces of evidence -- |
| 11:21:39 | 20 | THE COURT:  Well, I agree.  I think I pointed |
| 11:21:41 | 21 | that out to him.  I think I said that the Court's not an |
| 11:21:45 | 22 | entity digging for truffles.  It's his burden to point |
| 11:21:50 | 23 | out what's here, and I haven't seen it just yet. |
| 11:21:53 | 24 | But perhaps -- that doesn't mean it doesn't exist. |
| 11:21:55 | 25 | But go ahead. |

11:21:57  1          MS. VAUGHN:  Yes, Your Honor.

11:21:57  2          And the inquiry we're in right now is factual

11:22:00  3    inquiry, at this -- at a motion to dismiss on the basis

11:22:03  4    of speech or debate, the Court is not constrained to the

11:22:06  5    allegations of the indictment.

11:22:07  6          And --

11:22:07  7          THE COURT:  I think your brother said something

11:22:09  8    along the lines of, "on information and belief."  What's

11:22:13  9    the government's position on that?

11:22:15  10         Is that an adequate basis on which the Court is to

11:22:18  11   make any decision under these circumstances?

11:22:21  12         MS. VAUGHN:  Well, Your Honor, the defendant

11:22:22  13   has to prove by a preponderance that he is entitled to

11:22:25  14   immunity in this case.  And so without evidence,

11:22:29  15   extrinsic evidence that this Court can rely on, the

11:22:33  16   government would submit that that is not sufficient.

11:22:37  17         In any event --

11:22:37  18         THE COURT:  Well, assuming for the sake of

11:22:39  19   argument that the defense were to produce -- I think he

11:22:43  20   said some grand jury transcripts, among other things

11:22:53  21   that he says link up the interaction with staff and

11:22:58  22   others to some legitimate legislative activity.  How

11:23:03  23   would you respond to that?

11:23:05  24         MS. VAUGHN:  Yes, Your Honor.  That takes me to

11:23:07  25   my second point.

| | | |
|---|---|---|
| 11:23:08 | 1 | The Supreme Court in Brewster made clear that |
| 11:23:12 | 2 | legislative immunity does not reach anything in any way |
| 11:23:17 | 3 | related to the legislative process. |
| 11:23:20 | 4 | In Gravel, the Court made it clear it has to be an |
| 11:23:24 | 5 | integral part of the deliberative and communicative |
| 11:23:26 | 6 | processes by which the Legislature legislates. |
| 11:23:31 | 7 | And so at the point that we're sitting here trying |
| 11:23:35 | 8 | to find links between a bill on one topic and fraudulent |
| 11:23:38 | 9 | request for money claiming to be for the same topic, not |
| 11:23:41 | 10 | even the same bill, that is too attenuated to fall |
| 11:23:46 | 11 | within the realm of what is protected legislative |
| 11:23:49 | 12 | activity. |
| 11:23:50 | 13 | And again, I think it's helpful here to review what |
| 11:23:53 | 14 | is and is not protected.  The courts are clear, a |
| 11:23:57 | 15 | request -- |
| 11:23:57 | 16 | THE COURT:  You would agree, you would agree |
| 11:23:59 | 17 | that if I were to conclude that there is some |
| 11:24:02 | 18 | legislative act that was undertaken with respect to that |
| 11:24:05 | 19 | specific act, you couldn't inquire as to the motives for |
| 11:24:09 | 20 | it. |
| 11:24:10 | 21 | MS. VAUGHN:  I agree -- the government agrees |
| 11:24:12 | 22 | with that, Your Honor. |
| 11:24:13 | 23 | THE COURT:  All right. |
| 11:24:14 | 24 | MS. VAUGHN:  However, that first assumes that |
| 11:24:16 | 25 | we've determined that there was a legislative act.  And |

11:24:18  1    in deciding that question the Court is free to consider

11:24:21  2    the content and purpose of that act.

11:24:23  3         So in Lee, for example, the Third Circuit, yes,

11:24:25  4    absolutely recognized that legislative fact-finding was

11:24:28  5    protected.  However, it also noted that -- it also found

11:24:31  6    that the defendant-in-that-case's request for

11:24:35  7    reimbursement for a trip, even though referencing

11:24:38  8    meetings with other government officials, does not mean

11:24:40  9    that that trip or the meetings he had were legislative

11:24:43  10   acts.

11:24:43  11        THE COURT:  So you agree there can be some

11:24:45  12   parsing, which I think the circuit also indicated that

11:24:49  13   there were some communications that might be and some

11:24:50  14   that might not be.

11:24:52  15        Are you suggesting that there's some parsing -- to

11:24:54  16   the extent there is some legislative act component here,

11:24:58  17   that there might be some parsing of communications?

11:25:03  18        MS. VAUGHN:  The government's position is there

11:25:05  19   is no legislative act.  But even if there was, the

11:25:07  20   Court -- and that is the proper procedure the Court

11:25:10  21   should follow.

11:25:10  22        The question, as Brewster made clear, is that, can

11:25:14  23   the government make a prima facie case -- for dismissing

11:25:18  24   the indictment as a whole, can the government make a

11:25:20  25   prima facie case without referencing legislative acts?

11:25:24  1    Based on the indictment in this case, that is clear

11:25:26  2  that the government can do that.

11:25:28  3    So then the question becomes, if there are certain

11:25:30  4  pieces of evidence that the defendant objects to as

11:25:33  5  evidence of a legislative act, he must identify those

11:25:36  6  pieces of evidence, just as he would object to any other

11:25:38  7  piece of evidence.

11:25:39  8    And then any legislative act --

11:25:41  9    THE COURT:  Let's deal with the first thing.

11:25:42  10  You mentioned the prima facie case.  Tell me, what is it

11:25:45  11  that establishes that you, that is, a prima facie case

11:25:51  12  that would place the burden on Attorney Hurson?

11:25:56  13    MS. VAUGHN:  The prima facie case that doesn't

11:25:59  14  require legislative acts, Your Honor?

11:26:01  15    THE COURT:  Yes.

11:26:02  16    MS. VAUGHN:  So this -- Lee also made clear

11:26:06  17  that requests for reimbursement are not legislative

11:26:09  18  acts.  So what our indictment is based on --

11:26:15  19    THE COURT:  Well, wasn't that to be read as, a

11:26:16  20  request for reimbursement, in and of itself, doesn't?

11:26:19  21    But if it's tied to some legitimate fact-finding

11:26:23  22  inquiry, could it not be part of a legislative act?

11:26:27  23    MS. VAUGHN:  No, Your Honor, it cannot be part

11:26:30  24  of the legislative act.

11:26:31  25    So a precondition for a legislative act is not

| | |
|---|---|
| 11:26:34 | 1 |
| 11:26:38 | 2 |
| 11:26:41 | 3 |
| 11:26:44 | 4 |

protected.  In McDade, the Third Circuit decided whether travel to and from a location, a location at which the congressman intended to engage in legislative acts, whether that travel to get there was protected.

And even though the legislator could not perform legislative acts because he wasn't able to travel to the location, the Court said that travel is not protected. It is a precondition for a legislative act.  It is not a legislative act in and of itself.

And the same thing is here.  His --

THE COURT:  What's the result of the McDade case?

MS. VAUGHN:  The McDade case, they -- the court -- I don't remember the legislative history, Your Honor.  However, I know that they --

THE COURT:  Not the legislative history.

MS. VAUGHN:  I'm sorry, the procedural history. I don't remember the procedural history.

THE COURT:  That was involving Congressman Joe McDade from Pennsylvania, right?

MS. VAUGHN:  It was, yes, Your Honor.

THE COURT:  And what was the result?

MS. VAUGHN:  In that case they held that the travel was not protected.

They were also addressing Executive Branch contacts

11:27:29  1    in that case, and they ended up not reaching the issue

11:27:32  2    and sending it back to the District Court.

11:27:35  3             THE COURT:  All right.  Go ahead.

11:27:37  4             MS. VAUGHN:  So between McDade and Lee and, let

11:27:41  5    me clarify Lee, for example -- for a moment.

11:27:44  6             So the District Court was considering a travel

11:27:46  7    reimbursement in which the defendant, Senator Lee, had

11:27:51  8    referenced several meetings with government officials he

11:27:54  9    had, and had stated explicitly in his request for

11:27:57  10   reimbursement, "I had these meetings for legislative

11:28:01  11   purposes."

11:28:02  12            Even with those statements in the reimbursement

11:28:05  13   tying it to a legislative act, the Court said it's clear

11:28:08  14   the reimbursement is -- request is not protected.

11:28:12  15            And again, it's because it is a precondition,

11:28:15  16   essentially in the same way that the travel was in

11:28:18  17   McDade for the legislative act.  The conversation, the

11:28:21  18   fact-finding, that is protected.  But the money to get

11:28:24  19   there or the travel to get there, that is not

11:28:27  20   protected.

11:28:27  21            Getting a check from the Legislature is not an

11:28:31  22   integral part of the deliberative and communicative

11:28:35  23   processes by which legislation is debated and bills are

11:28:40  24   passed.

11:28:40  25            So that's what we have in this case.  If you look

11:28:42  1    at the indictment, paragraph, paragraphs 8 through 11

11:28:47  2    articulate the manner and means by which the defendant

11:28:49  3    executed his scheme to defraud, none of which required

11:28:53  4    the defendant -- the government to enter any evidence of

11:28:56  5    legislative acts.

11:28:57  6        Because the indictment alleges he didn't take any

11:28:59  7    acts at all.  He double-billed the Legislature.  He

11:29:03  8    claimed he was doing work to get money and then kept the

11:29:05  9    money for himself.  He billed the Legislature for work

11:29:07  10   that he had had done before he ever entered the

11:29:11  11   Legislature.  None of this was legislative acts.

11:29:14  12       And so that's what the indictment is based on, and

11:29:16  13   that's why the government can make a prima facie case

11:29:20  14   without any reference to legislative acts.

11:29:23  15       And notably, all of the bills and hearings that the

11:29:27  16   defendant references, none of those were provided by the

11:29:30  17   government in discovery.  None of those were discussed

11:29:32  18   in grand jury testimony.  They're not mentioned in the,

11:29:37  19   in the indictment.

11:29:38  20       And I think what that really demonstrates is this

11:29:42  21   attempt to try to find any piece of legislative work

11:29:44  22   that touches on the same topic.  And --

11:29:48  23           THE COURT:  But you're not saying that just

11:29:50  24   because you didn't include it in your investigation,

11:29:53  25   that if there was some, I don't know, a bill that was

11:30:00  1    directly on point of, I don't know, Danish interaction

11:30:06  2    with Fire Burn, that that couldn't assist the defendant

11:30:11  3    in establishing that he was making some legitimate

11:30:15  4    legislative inquiry in aid of formulating some piece of

11:30:19  5    legislation pending on the, in the Legislature.

11:30:23  6        That is, the fact that you don't have it in your

11:30:27  7    grand jury investigation doesn't mean, one, the

11:30:31  8    legislation doesn't exist or, two, there wasn't some

11:30:34  9    legislative purpose behind the inquiry.

11:30:39  10        MS. VAUGHN:  The fact that we don't have it,

11:30:40  11   alone, doesn't establish that.  But the fact that there

11:30:42  12   was a bill on the same topic even does not, does not,

11:30:48  13   alone, meet the defendant's burden either.

11:30:51  14        Again, this -- the Supreme Court was concerned in

11:30:55  15   Brewster that legislators would do exactly what the

11:31:00  16   defendant attempted to do here, just try to find any tie

11:31:03  17   to a manifestly legislative act in order to shield their

11:31:07  18   unprotected activity.

11:31:08  19        THE COURT:  Well, I think one of the things --

11:31:10  20   I think I posed the question to your brother whether,

11:31:14  21   you know, there could be some posthoc rationalization

11:31:18  22   that was going on here, and I think he concedes you

11:31:20  23   can't have that.

11:31:20  24        But he's suggesting he's not doing that.  There are

11:31:23  25   conversations and there were interactions that were

11:31:26  1    going on, and I suspect the things to which he referred

11:31:32  2    are evidence of that.

11:31:33  3         To the extent there are conversations in these

11:31:37  4    interactions in aid of some pending legislation that was

11:31:40  5    proved up here or could be proved up, would that not

11:31:44  6    tend in the direction of suggesting that there was some

11:31:48  7    legitimate legislative act underway?

11:31:50  8         MS. VAUGHN:  If there was, that's not part of

11:31:53  9    the government charges in the case.  The government's

11:31:55  10   charges in this case is that the defendant obtained

11:31:57  11   money under false pretenses and never used it for its

11:32:00  12   intended purpose in any event.

11:32:02  13        And the only evidence that the defendant has

11:32:04  14   offered that it was tied to any legislation was an

11:32:07  15   e-mail he sent to the Senate president, who has to sign

11:32:09  16   off on his request, stating that it was for legislation;

11:32:14  17   and conversations he had with his, with his senior

11:32:18  18   adviser, who, again, the only references to her

11:32:21  19   testimony is about his intended use for that money.

11:32:24  20        THE COURT:  Now, I'm permitted to look into

11:32:26  21   that e-mail, correct?

11:32:29  22        MS. VAUGHN:  Yes, Your Honor.  And that goes to

11:32:31  23   the defendant's burden in this case.  It's not enough to

11:32:33  24   stand up and say this was about legislation.  The

11:32:36  25   defendant has to prove, in fact, that it was.

11:32:39  1          And the Third Circuit has made that clear in

11:32:42  2     Menendez, it made it clear in Lee, and it rejected any,

11:32:48  3     any reading of the case law on this issue saying that

11:32:54  4     the defendant can satisfy his burden by just putting

11:32:57  5     forth purportedly legislative acts.

11:33:00  6          So without evidence that these, that he was engaged

11:33:04  7     in legislative acts, the defendant hasn't met his

11:33:08  8     burden.

11:33:08  9          But again, the indictment in this case is about

11:33:10  10    fraudulent request for money, not about engaging in

11:33:13  11    legislative acts.  It's no different from a defendant

11:33:15  12    who agrees to pass a bill and accepts a bribe.  That

11:33:19  13    defendant can still be prosecuted for that, even though

11:33:21  14    he's promising a legislative act in exchange for that

11:33:25  15    bribe money.

11:33:26  16         Here, the defendant promised:  "I'm going to use

11:33:28  17    this money for obtaining documents."  And actually the

11:33:32  18    government doesn't even agree that obtaining the

11:33:35  19    documents was a legislative act.  But for the sake of

11:33:37  20    argument --

11:33:37  21         THE COURT:  Well, there is at least one e-mail

11:33:43  22    that indicates that, or references a critical role in

11:33:49  23    the research component of several bills.  How should I

11:33:52  24    take that e-mail?

11:33:55  25         MS. VAUGHN:  That was -- Your Honor, that's an

11:33:57  1    e-mail I just referenced.  It's an e-mail to the Senate

11:34:01  2    president that happens to sign off on the defendant's

11:34:02  3    request for money, and his statement that it is critical

11:34:05  4    for legislation.

11:34:06  5        That is part of the fraud that is charged in this

11:34:09  6    case.  He is promising to undertake legislative acts in

11:34:13  7    the future.  And promises for future legislative acts

11:34:15  8    are not protected.

11:34:16  9        His request for money from the Legislature, his

11:34:20  10   representation that he's going to use this money to

11:34:23  11   engage in some sort of legislative bill-making, that's

11:34:26  12   simply a promise.  That's not protected under the case

11:34:29  13   law.

11:34:32  14       So --

11:34:33  15           THE COURT:  With respect to the evidence, is --

11:34:36  16   do all parties agree that the evidence submitted, that

11:34:39  17   the Court can consider those, or do you have some

11:34:41  18   objection to the evidence?

11:34:44  19           MS. VAUGHN:  No, Your Honor.  It is entirely

11:34:46  20   appropriate for the Court to consider extrinsic evidence

11:34:49  21   at this stage.

11:34:49  22           THE COURT:  All right.  So you don't question

11:34:51  23   the authenticity of the documents, then, or anything

11:34:55  24   that's attached?

11:34:55  25           MS. VAUGHN:  No, Your Honor.

| 11:34:56 | 1 | THE COURT:  Okay.  Very good.  Go ahead. |
| 11:35:00 | 2 | MS. VAUGHN:  So, one, the indictment does not |
| 11:35:02 | 3 | require the government to introduce evidence of any |
| 11:35:04 | 4 | legislative acts to prove its case.  And so that should |
| 11:35:06 | 5 | end the inquiry there. |
| 11:35:07 | 6 | But even if the Court were to consider the |
| 11:35:11 | 7 | documents that the defendant actually obtained, that was |
| 11:35:15 | 8 | not a legislative act.  As the e-mails that the |
| 11:35:18 | 9 | government attached to its, to its filing -- and I can |
| 11:35:22 | 10 | give up those references here, Your Honor.  It's |
| 11:35:25 | 11 | Exhibits 2, 3 -- |
| 11:35:26 | 12 | THE COURT:  What you're referring to, you can |
| 11:35:27 | 13 | put it on the Elmo so the defense can see, the Court can |
| 11:35:31 | 14 | see it. |
| 11:35:59 | 15 | MS. VAUGHN:  I'll start with the first example |
| 11:36:01 | 16 | that the government included in its filing, and that is |
| 11:36:03 | 17 | a request the defendant submitted to pay for the |
| 11:36:08 | 18 | translation of a book by someone named Kjaer.  The book |
| 11:36:21 | 19 | was by Kjaer. |
| 11:36:22 | 20 | And so what we have here in Exhibit 2 -- |
| 11:36:49 | 21 | THE COURT:  Let me ask the government, is there |
| 11:36:51 | 22 | any reason why the document can't be published? |
| 11:36:55 | 23 | MS. VAUGHN:  Your Honor, the reason that we |
| 11:36:56 | 24 | filed this in a sealed pleading was only because it had |
| 11:36:59 | 25 | people's -- |

| 11:36:59 | 1 | THE COURT:  Let me ask my question:  Is there |
| 11:37:01 | 2 | any reason why it can't be published? |
| 11:37:06 | 3 | MS. VAUGHN:  Only because it has personal |
| 11:37:07 | 4 | identifying information, people's contact information in |
| 11:37:10 | 5 | it, Your Honor. |
| 11:37:14 | 6 | THE COURT:  All right.  I don't see that on the |
| 11:37:16 | 7 | first page. |
| 11:37:18 | 8 | MS. VAUGHN:  Sorry.  It's just their e-mail |
| 11:37:20 | 9 | addresses here.  So in this e-mail, which is dated |
| 11:37:23 | 10 | December 3rd, 2006, over two years -- |
| 11:37:27 | 11 | THE COURT:  Other than that, is there any |
| 11:37:28 | 12 | reason why it can't be published? |
| 11:37:31 | 13 | We can proceed -- |
| 11:37:32 | 14 | MS. VAUGHN:  I'm sorry.  No, there's no other |
| 11:37:34 | 15 | reason. |
| 11:37:34 | 16 | THE COURT:  All right.  Then you can put a |
| 11:37:37 | 17 | sticky or something to cover up any personal information |
| 11:37:39 | 18 | or any information you feel -- what I'll tell the |
| 11:37:43 | 19 | parties is this:  If you feel that there's something |
| 11:37:45 | 20 | that cannot be published, then we'll address that. |
| 11:37:48 | 21 | If it's something that can be published but there |
| 11:37:52 | 22 | are portions that need to be redacted, and you can |
| 11:37:54 | 23 | redact it efficiently, then we'll redact it. |
| 11:37:58 | 24 | To the extent it just needs to be covered up with a |
| 11:38:00 | 25 | piece of paper or folded over because it's at the top, |

| 11:38:04 | 1 | you can do that and we can publish it. |
| 11:38:05 | 2 | Right now your brother can see what you're seeing |
| 11:38:08 | 3 | and I can see what you're showing.  The question is |
| 11:38:10 | 4 | whether there's any reason in this public hearing that |
| 11:38:13 | 5 | it cannot be published.  And if you say there's none, |
| 11:38:15 | 6 | the Court doesn't see any, other than the private |
| 11:38:18 | 7 | information.  But if that can be excised or folded |
| 11:38:21 | 8 | under, then I'll proceed to publish. |
| 11:38:24 | 9 | MS. VAUGHN:  Yes, Your Honor.  I'm covering |
| 11:38:28 | 10 | right now the personal identifying information. |
| 11:38:31 | 11 | So -- |
| 11:38:31 | 12 | THE COURT:  All right.  So it can be published, |
| 11:38:34 | 13 | Attorney Hurson? |
| 11:38:37 | 14 | Do you have any problem with that? |
| 11:38:38 | 15 | MR. HURSON:  Oh, no, I have no problem with it. |
| 11:38:42 | 16 | Thank you. |
| 11:38:42 | 17 | THE COURT:  Okay.  There we go. |
| 11:38:44 | 18 | MS. VAUGHN:  What we have here in Government's |
| 11:38:46 | 19 | Exhibit 2 is an e-mail from December 3rd, 2006.  That's |
| 11:38:50 | 20 | almost -- that's over two years before the defendant |
| 11:38:52 | 21 | became a legislator.  And he is communicating with |
| 11:39:00 | 22 | someone named Brian Calhoj, who is the Brian Calhoj in |
| 11:39:04 | 23 | the government's filing, discussing payment here for |
| 11:39:09 | 24 | translation. |
| 11:39:10 | 25 | And if we go earlier into the chain, we have an |

| | | |
|---|---|---|
| 11:39:27 | 1 | e-mail, an earlier e-mail from the defendant.  Again, |
| 11:39:32 | 2 | this is from December 2006.  And here he's asking -- |
| 11:39:43 | 3 | sorry -- I'm sorry, Your Honor, I have my pages mixed |
| 11:39:57 | 4 | up. |
| 11:39:58 | 5 | So here in 2006 the defendant is asking Brian |
| 11:40:02 | 6 | Calhoj, "Would it be possible for you to send me the |
| 11:40:04 | 7 | translation of the Kjaer book as soon as possible?"  And |
| 11:40:11 | 8 | he says, "How much more do I owe you?" |
| 11:40:13 | 9 | And again, that is in 2006.  So the defendant has |
| 11:40:16 | 10 | already had this translation done by Brian Calhoj. |
| 11:40:23 | 11 | In Government's Exhibit 3, he follows up with Brian |
| 11:40:30 | 12 | in June 2008, again before he's a senator, before he's |
| 11:40:35 | 13 | even been elected as a senator.  And he tells Brian that |
| 11:40:39 | 14 | he is scheduled to get some money around July 7th, and |
| 11:40:43 | 15 | he will send him $6,000 for "your wonderful translation |
| 11:40:47 | 16 | of the ^ ? Annie Kjaer document." |
| 11:41:00 | 17 | And finally, in September 2009, when the defendant |
| 11:41:04 | 18 | is a senator, he asked again for Brian to now send an |
| 11:41:08 | 19 | invoice for this same translation.  And he asked him to |
| 11:41:12 | 20 | please date it with the current date, September 2009. |
| 11:41:19 | 21 | And in Government's Exhibit 12, the defendant |
| 11:41:40 | 22 | submits a request on September 2009 to the business |
| 11:41:42 | 23 | office at the Senate, claiming he needs translation for |
| 11:41:47 | 24 | Fire Burn work.  He attaches an invoice dated |
| 11:41:56 | 25 | September 2009 from Brian Calhoj for the work he had |

11:42:01  1    already had him complete, the Kjaer documents.

11:42:05  2         So as this example demonstrates, the defendant was

11:42:09  3    asking the Legislature to give him money to pay for work

11:42:14  4    that he had already completed.  And he didn't disclose

11:42:17  5    that fact to the Legislature.

11:42:20  6         In addition, work like this was not for

11:42:24  7    legislation, despite the defendant's rationalizations

11:42:30  8    now.

11:42:31  9         So if we look at -- sorry -- we look at

11:42:44  10   Government's Exhibit 6, this is an e-mail chain to

11:42:54  11   someone named Adam Kronegh of the Danish National

11:42:58  12   Archives.  And the defendant sends him pages from the

11:43:01  13   Kjaer's book dealing with the government's secretary.

11:43:04  14        Later in this chain, the defendant forwards it to a

11:43:07  15   friend -- this is February 1st, 2010 -- and he lets him

11:43:12  16   know -- scrolls down to the English translation of these

11:43:15  17   Danish documents.  "It is this reference in this book

11:43:18  18   that led me to do the research.  I think it will make a

11:43:21  19   great movie.  I will do a screenplay when I get the

11:43:23  20   pages of translated documents from the Danish National

11:43:27  21   Archives."

11:43:27  22        Again, "This is very confidential."

11:43:38  23        The defendant sends another e-mail the same day to

11:43:42  24   another friend and says, "Here is the scoop.  We have to

11:43:46  25   talk.  As I indicated, I'm going to Cannes in May.  I

11:43:50  1    will write up a screenplay and shop it around while at

11:43:53  2    the Film Festival."

11:43:56  3        And again, it's referencing government secretary

11:43:59  4    documents here.  But if you look at Government's

11:44:06  5    Exhibit 6, that's tied to the Kjaer books, government

11:44:12  6    secretary documents and the Kjaer book dealing with the

11:44:15  7    government secretary.

11:44:16  8        So despite the defendant's claim now, that his

11:44:20  9    efforts to get these documents and getting the money

11:44:22  10   from the Legislature was for legislation, the evidence,

11:44:24  11   the actual contemporaneous e-mails that the defendant

11:44:28  12   was sending would indicate otherwise.

11:44:30  13       And I can keep going through examples with the

11:44:34  14   exhibits if Your Honor would like, but I can also move

11:44:36  15   on.

11:44:37  16            THE COURT:  You can move on.

11:44:38  17            MS. VAUGHN:  So in any event, even though the

11:44:41  18   indictment does not require proof of any legislative

11:44:44  19   acts the defendant took, even if the Court were to

11:44:47  20   examine his -- whether getting the documents -- because

11:44:52  21   that's the act, getting the documents, requesting money

11:44:55  22   from the Legislature to pay for those is not a

11:44:58  23   legislative act, as we've already established.

11:45:00  24       So if we're now examining whether getting the

11:45:03  25   documents is a legislative act, these exhibits

11:45:06   1    demonstrate that it was not, that it was for the

11:45:08   2    defendant's personal gain, for his private projects.  It

11:45:12   3    was not for any legislation.

11:45:13   4         And the fact that the defendant can point out bills

11:45:15   5    to have a commemorate -- commemoration date for Fire

11:45:21   6    Burn or centennial commemoration doesn't tie getting

11:45:25   7    those documents as a legislative act.

11:45:44   8         Unless Your Honor --

11:45:44   9              THE COURT:  Attorney Vaughn, the other matters,

11:45:47  10    is the government ready to proceed on the other matter

11:45:49  11    as well?

11:45:49  12         That is, I believe nothing has been conceded with

11:45:52  13    respect to the search warrant.  So it's the government's

11:45:54  14    burden on that.  Defense motion, government burden.  And

11:45:57  15    I think nothing is conceded.

11:45:58  16         So go ahead.

11:45:59  17              MS. VAUGHN:  We are, Your Honor.  And if my

11:46:01  18    colleague, Attorney Weitz, could address that issue.

11:46:06  19              MR. HURSON:  Your Honor, I would like an

11:46:07  20    opportunity to respond to the government's arguments, if

11:46:10  21    I will.

11:46:10  22              THE COURT:  Yes, you will.  But since the

11:46:12  23    government is up, I will take their arguments on the

11:46:14  24    evidence they wish to present on the search warrant.

11:46:16  25    And you'll have your opportunity, and we'll go from

| | | |
|---|---|---|
| 11:46:23 | 1 | there. |
| 11:46:23 | 2 | MR. WEITZ:  Thank you, Your Honor.  Again, |
| 11:46:24 | 3 | Justin Weitz on behalf of the United States. |
| 11:46:28 | 4 | Again, the government is proceeding without a |
| 11:46:30 | 5 | witness -- |
| 11:46:30 | 6 | THE COURT:  You said "without a witness"? |
| 11:46:31 | 7 | MR. WEITZ:  Without a witness.  I believe |
| 11:46:34 | 8 | Attorney Hurson conceded that this wasn't something a |
| 11:46:37 | 9 | witness was necessary for, in his view. |
| 11:46:39 | 10 | THE COURT:  That's why I asked him -- it's a |
| 11:46:41 | 11 | search warrant, and I asked him -- I didn't know if he |
| 11:46:43 | 12 | was contesting the validity of the warrant, whether |
| 11:46:46 | 13 | there's probable cause. |
| 11:46:48 | 14 | And I thought he said no -- or rather, I think he |
| 11:46:51 | 15 | said he's not conceding anything with respect to |
| 11:46:54 | 16 | probable cause. |
| 11:46:57 | 17 | So I'll take a look again at his motion.  I don't |
| 11:47:01 | 18 | know if he challenges the underpinnings of the search |
| 11:47:05 | 19 | warrant. |
| 11:47:06 | 20 | Or I'll just ask him. |
| 11:47:07 | 21 | What is the thing you seek to suppress, and why? |
| 11:47:11 | 22 | MR. HURSON:  There are two warrants in -- |
| 11:47:12 | 23 | THE COURT:  Tell me what is the thing you seek |
| 11:47:14 | 24 | to suppress. |
| 11:47:15 | 25 | MR. HURSON:  What I seek to suppress is any and |

11:47:17   1   all evidence taken from the two e-mail accounts that are

11:47:20   2   the subjects of the two separate warrants and attached

11:47:23   3   affidavits.  One is e-mails taken from a Hotmail

11:47:28   4   account.  The second are e-mails taken from a Yahoo

11:47:32   5   account.

11:47:33   6       And so I'm clear, I'm not making at this point a

11:47:37   7   Franks allegation that there's been some lie or

11:47:39   8   misstatement or omission in the search warrant

11:47:41   9   affidavit.  My argument for both affidavits is simply

11:47:44   10  that, on their face, they do not establish probable

11:47:49   11  cause sufficient to sanction the searches that were

11:47:49   12  authorized.

11:47:55   13      I will be frank, but I intend to submit on the

11:48:01   14  argument with respect to the Hotmail account I said, as

11:48:01   15  written.

11:48:01   16      I think with respect to the Yahoo account, there's

11:48:04   17  a slightly different inquiry.  And so there is case law,

11:48:09   18  I concede, that does not require a witness when we're

11:48:12   19  hashing out whether the four corners of the affidavit

11:48:16   20  sufficiently establish probable cause.

11:48:18   21          THE COURT:  So your question is just a facial

11:48:20   22  one, on its face, whether --

11:48:23   23          MR. HURSON:  That's correct.  And I think the

11:48:24   24  Court has to do a good-faith analysis, as well, if the

11:48:28   25  Court was inclined to find that there was not probable

11:48:30  1    cause in the affidavit.  But I think both those

11:48:37  2    inquiries, to be frank, don't require a witness.

11:48:40  3        THE COURT:  All right.

11:48:41  4    Go ahead, Attorney.

11:48:42  5        MR. WEITZ:  Thank you.

11:48:43  6    Your Honor, first of all, I would point out that

11:48:44  7    these are both, both warrants are warrants that were

11:48:48  8    issued by a federal magistrate judge on a finding of

11:48:50  9    probable cause.

11:48:50 10    As this Court knows, in reviewing a magistrate

11:48:54 11    judge's decision whether to authorize a warrant based on

11:48:56 12    an affidavit or probable cause, the Court must decide

11:48:59 13    whether the magistrate judge had a substantial basis for

11:49:01 14    determining that that probable cause existed.

11:49:03 15    However, the Court was required to give, quote,

11:49:06 16    great deference to the judge's assessment in issuing

11:49:10 17    that.

11:49:11 18    Starting with the Hotmail warrant, which I -- it

11:49:15 19    sounds like the defendant is prepared to submit on.  The

11:49:19 20    affidavit behind the Hotmail warrant details allegations

11:49:24 21    of criminal behavior, it details -- including reference

11:49:27 22    to specific e-mails that were sent.  And it shows that

11:49:32 23    the defendant used that e-mail address, the Hotmail

11:49:35 24    address, as his primary e-mail address throughout the

11:49:38 25    time that he was defrauding the Legislature and the

11:49:41  1    people of the Virgin Islands by obtaining these cash

11:49:44  2    advances, purportedly to get documents from Denmark, but

11:49:46  3    really just for his own personal purposes.

11:49:49  4        As for the Yahoo warrant, the Yahoo warrant was

11:49:53  5    issued based on an issue of probable cause.  It wasn't

11:49:56  6    issued only on the magistrate's finding of probable

11:49:59  7    cause.

11:50:02  8        I would point Your Honor's attention to page, to

11:50:08  9    paragraph 8 on page 2 of the Yahoo warrant.  I apologize

11:50:12  10   for that, Your Honor.  Paragraph 8 details that this

11:50:15  11   warrant was actually --

11:50:16  12            THE COURT:  Put it on the Elmo.

11:50:25  13            MR. WEITZ:  Paragraph 8 notes that a grand jury

11:50:27  14   had already issued an indictment against Mr. James at

11:50:30  15   the time that this warrant was issued.  So a grand jury

11:50:33  16   had made a finding of probable cause that Mr. James had

11:50:36  17   violated these two statutes.

11:50:40  18       The magistrate was going off that, in part, but

11:50:42  19   also made an independent determination that there was

11:50:44  20   probable cause of the crimes being committed, and also

11:50:47  21   that there was probable cause in the Yahoo account

11:50:50  22   containing evidence of those crimes.

11:50:52  23       There's simply no reason advanced as to why this

11:50:56  24   warrant and this affidavit -- there's no allegation of

11:50:58  25   any false statements.  It's not a thin warrant.  The

11:51:01   1    magistrate relied on the grand jury's determination of

11:51:04   2    probable cause, but also on the evidence that had been

11:51:07   3    put before her in that affidavit.

11:51:09   4         And there's simply no reason provided to doubt that

11:51:11   5    there's probable cause that the defendant committed the

11:51:13   6    crimes alleged in the warrant, and that the Yahoo

11:51:16   7    Account contained evidence, or might have contained

11:51:18   8    evidence, of those crimes.

11:51:21   9              THE COURT:  All right.

11:51:21   10              ARGUMENT BY THE DEFENDANT

11:51:28   11             THE COURT:  Attorney Hurson, you said this is

11:51:29   12   not a Franks challenge.  Why isn't it that what's on the

11:51:34   13   four corners was enough to allow the magistrate to cause

11:51:37   14   the warrant to be issued?

11:51:39   15             MR. HURSON:  With respect to the first warrant,

11:51:42   16   the Hotmail warrant, I agree that the application does

11:51:46   17   lay out numerous exchanges.

11:51:51   18        They appear to already be in the possession of the

11:51:53   19   government when they laid them out, meaning that they

11:51:56   20   already had those e-mails, and what they're requesting

11:51:58   21   is an overbroad warrant to essentially pilfer the entire

11:52:02   22   Hotmail Account, looking not just for those e-mails that

11:52:05   23   they already have, but some unnamed and unknown warrants

11:52:07   24   that they don't.

11:52:09   25        My issue with the Hotmail Account is that they do

| | | |
|---|---|---|
| 11:52:12 | 1 | not lay out any particular expertise, knowledge that the |
| 11:52:17 | 2 | affiant would have to know that there would be more |
| 11:52:20 | 3 | conversation than what they already have.  They're |
| 11:52:24 | 4 | essentially saying he used -- |
| 11:52:26 | 5 | THE COURT:  Tell me, what is the offensive |
| 11:52:28 | 6 | thing on the face of it that you're challenging? |
| 11:52:30 | 7 | MR. HURSON:  What I'm challenging is the -- |
| 11:52:32 | 8 | THE COURT:  You can put it on the Elmo and show |
| 11:52:34 | 9 | me. |
| 11:52:34 | 10 | MR. HURSON:  Well, it's the entire warrant, but |
| 11:52:36 | 11 | I'll show you -- |
| 11:52:36 | 12 | THE COURT:  Give me some examples, then, what |
| 11:52:39 | 13 | is it that's -- you're questioning the breadth? |
| 11:52:41 | 14 | MR. HURSON:  Yes.  The final -- I'll turn to |
| 11:52:43 | 15 | the last page of the warrant, which is, I guess it's |
| 11:52:57 | 16 | Attachment B on page -- now for the record these are all |
| 11:53:04 | 17 | listed at Document 109, which is a sealed filing.  This |
| 11:53:06 | 18 | is on page 20 of 42, which is the Attachment B. |
| 11:53:11 | 19 | Your Honor will see that there is no limitation -- |
| 11:53:13 | 20 | THE COURT:  Speak into the microphone. |
| 11:53:15 | 21 | MR. HURSON:  -- there is no limitation on the |
| 11:53:17 | 22 | dates sought.  And I'll pan out.  But my reading of it, |
| 11:53:23 | 23 | and I'll -- |
| 11:53:24 | 24 | THE COURT:  That's the attachment.  Shouldn't I |
| 11:53:26 | 25 | look at the warrant, though, to see what the magistrate |

11:53:28  1    in fact did?

11:53:29  2        MR. HURSON:  Well, the warrant asked the

11:53:32  3    magistrate to issue -- the affidavit asked the

11:53:35  4    magistrate judge to issue a warrant for what is in

11:53:39  5    Attachment B.

11:53:40  6        And my biggest challenge to what is in Attachment B

11:53:44  7    is that it is overbroad.  I think it's clear that they

11:53:48  8    are laying out a number of e-mails that have gone back

11:53:51  9    and forth.  They already have those e-mails.

11:53:54  10       But what they offer in the warrant, they offer

11:53:57  11   nothing in the warrant application, and no knowledge,

11:54:00  12   training or experience on the part of the affiant that

11:54:04  13   would lead the issuing judge to conclude that there's

11:54:08  14   more out there, and that there's enough stated to assume

11:54:12  15   that an unbridled survey of the e-mail account, which we

11:54:17  16   know from the description of the e-mail account contains

11:54:19  17   e-mails forever, as long as they're on the server, that

11:54:23  18   it in fact is an overbroad search.

11:54:25  19       So when Your Honor asked to point to the specific

11:54:28  20   paragraph, what I'm pointing to is what they're asking

11:54:30  21   for and, indeed, what they received, which is access to

11:54:34  22   Mr. James's entire e-mail account.  That is not

11:54:38  23   supported by the claims made in the accompanying

11:54:41  24   affidavit.

11:54:42  25       With respect to the Yahoo Account --

| | | |
|---|---|---|
| 11:54:43 | 1 | THE COURT:  When you say "the accompanying |
| 11:54:47 | 2 | affidavit," you're talking about the, the affidavit and |
| 11:54:51 | 3 | its attachment? |
| 11:54:53 | 4 | MR. HURSON:  That's correct. |
| 11:54:56 | 5 | With respect to the Yahoo request -- and that |
| 11:55:02 | 6 | begins on page 23 of 42 of my ECF submission Number |
| 11:55:08 | 7 | 100 -- I agree that it does make reference to the fact |
| 11:55:12 | 8 | that Mr. James has been, at the time that the warrant is |
| 11:55:15 | 9 | requested, indicted.  That's on paragraph 8. |
| 11:55:22 | 10 | But a reading of this application yields the |
| 11:55:28 | 11 | obvious conclusion that all it references, almost |
| 11:55:31 | 12 | throughout, is the Hotmail Account and the contents of |
| 11:55:34 | 13 | the Hotmail Account:  This is what we found in Hotmail. |
| 11:55:37 | 14 | This is what we found in Hotmail.  This is what we found |
| 11:55:39 | 15 | in Hotmail. |
| 11:55:40 | 16 | Now I think ultimately the subject account -- |
| 11:55:45 | 17 | THE COURT:  Okay.  You have the evidence there, |
| 11:55:47 | 18 | right?  Point to it. |
| 11:55:49 | 19 | MR. HURSON:  Yes.  I'm looking for the actual |
| 11:55:50 | 20 | page where the government finally references the subject |
| 11:55:55 | 21 | account, and why they believe there's probable cause -- |
| 11:55:57 | 22 | excuse me -- why the affiant believes there's probable |
| 11:56:02 | 23 | cause to search that. |
| 11:56:03 | 24 | What I'm seeing is on page 9 of the actual |
| 11:56:07 | 25 | application, and I'm putting it up on the Elmo.  It |

11:56:12   1    mentions in the -- I guess it's paragraph 48, "The

11:56:17   2    subject account may contain e-mail communications which

11:56:21   3    James was reluctant to relay, using the Hotmail Account

11:56:24   4    for fear that the Hotmail Account was under government

11:56:28   5    surveillance."

11:56:29   6         There is no support, there is no factual support

11:56:32   7    for that statement, and there is no expert or

11:56:38   8    professional opinion attached that would give support

11:56:41   9    for that claim.

11:56:43   10         And by that, I mean that I concede that there are

11:56:47   11   circumstances where, for example, certain warrants to

11:56:52   12   search residences or, frankly, even computers in the

11:56:55   13   context where that's what's being requested to be

11:56:59   14   searched, where an affiant can say, "I have been an

11:57:02   15   agent for 20 years and in my knowledge, training and

11:57:05   16   experience, this is the technique that I typically see

11:57:09   17   employed in...name the crime."

11:57:10   18         We don't have that here.  We have a certain

11:57:12   19   affidavit saying that, "I have a lot of experience," but

11:57:14   20   we do not have any claims on the part of the affiant to

11:57:19   21   substantiate the argument that the subject account is

11:57:22   22   going to contain any evidence relevant to the

11:57:26   23   investigation beyond, I think, perhaps one e-mail that

11:57:29   24   they already have.

11:57:33   25         And with this, the government receives permission

11:57:36  1    to search the entire account without any date

11:57:40  2    restrictions.  They are essentially given unbridled

11:57:45  3    access to the entire e-mail account as far back in time

11:57:49  4    as they want to go, based on nothing but conjecture.

11:57:52  5        Therefore, it's clear with respect to the Hotmail

11:57:54  6    Account that they did not establish probable cause to

11:57:56  7    believe it would contain evidence or fruits of a crime.

11:58:00  8    And --

11:58:00  9        THE COURT:  I thought you were speaking as to

11:58:03  10   the Yahoo Account.

11:58:04  11       MR. HURSON:  I misspoke and caught myself

11:58:08  12   two seconds later.  Yahoo Account.  That's the argument.

11:58:11  13   And again, the attachment which is incorporated into the

11:58:14  14   request does not put any date limitations on what

11:58:17  15   they're seeking.

11:58:18  16       THE COURT:  All right.  Thank you.

11:58:20  17       MR. HURSON:  With respect --

11:58:21  18       THE COURT:  Okay --

11:58:22  19       MR. HURSON:  I'm sorry, Your Honor.  I didn't

11:58:24  20   mean to cut you off.

11:58:25  21       THE COURT:  Go ahead.

11:58:25  22       MR. HURSON:  I was going to respond to the

11:58:27  23   government's arguments on the motion to dismiss.

11:58:30  24       THE COURT:  Okay.  I'm going to give you a

11:58:31  25   chance to do that later.

| 11:58:32 | 1 | MR. HURSON:  Okay. |
| 11:58:33 | 2 | THE COURT:  Let me hear Attorney Weitz. |
| 11:58:36 | 3 | MR. HURSON:  Certainly -- |
| 11:58:37 | 4 | THE COURT:  I'm sorry, Attorney -- who is doing |
| 11:58:39 | 5 | this?  Weitz.  All right. |
| 11:58:42 | 6 | MR. WEITZ:  Thank you, Your Honor. |
| 11:58:42 | 7 | ARGUMENT BY THE GOVERNMENT |
| 11:58:42 | 8 | THE COURT:  The Yahoo Account affidavit, show |
| 11:58:56 | 9 | me where it says that, you know, the typical language |
| 11:58:58 | 10 | says the training, et cetera, suggests that people do |
| 11:59:01 | 11 | this sort of crime, keep it in their e-mail accounts. |
| 11:59:05 | 12 | Show me what it is that ties up the Yahoo Account such |
| 11:59:10 | 13 | that the conclusion could be made that the fruits and |
| 11:59:13 | 14 | instrumentalities of some crime may be found by looking |
| 11:59:16 | 15 | into that account. |
| 11:59:20 | 16 | MR. WEITZ:  Yes, Your Honor.  First of all, |
| 11:59:21 | 17 | Attorney Hurson failed to mention -- he pointed to |
| 11:59:26 | 18 | paragraph 48 of the warrant and said that was the only |
| 11:59:28 | 19 | basis. |
| 11:59:35 | 20 | Paragraphs 27 and 28, that I'm putting up on the |
| 11:59:37 | 21 | screen here, those paragraphs detail the evidence that |
| 11:59:39 | 22 | Mr. James was using this account for purposes having to |
| 11:59:42 | 23 | do with his alleged obtaining of documents or attempts |
| 11:59:47 | 24 | to obtain documents from Danish National Archives. |
| 11:59:51 | 25 | THE COURT:  This is the Hotmail Account.  I |

11:59:53  1    think that your brother's position is that with respect

11:59:55  2    to Yahoo, there is no reference to Yahoo, and it only

11:59:59  3    gets a tangential sort of reference until paragraph 48.

12:00:04  4         MR. WEITZ:  That's incorrect, Your Honor, what

12:00:06  5    my brother counsel has said.

12:00:08  6         If you read paragraph 27, it says, "On May 3rd,

12:00:11  7    2010, James informs Kronegh by e-mail from his Hotmail

12:00:14  8    Account, that he had not receive the files and asked

12:00:17  9    that Kronegh instead forward them to the subject

12:00:19  10   account."

12:00:19  11        The subject account is the Yahoo Account in the

12:00:23  12   Yahoo warrant.  And that also shows, and the magistrate

12:00:27  13   as well, that it's information that allowed her to

12:00:28  14   conclude that the subject account was also being used

12:00:31  15   for communications between the defendant and individuals

12:00:34  16   from Denmark.  That there is evidence that the subject

12:00:36  17   account may contain evidence of his communications.

12:00:38  18        Now we don't know -- we didn't know beforehand on

12:00:42  19   what occasions he might have used it for communications

12:00:45  20   with Denmark.  We were aware of the Hotmail Account.

12:00:48  21   But upon realizing that there were other accounts that

12:00:50  22   he had, it became necessary to go ahead and request a

12:00:53  23   warrant to be able to obtain the contents of that

12:00:56  24   subject account.

12:00:58  25        As to Your Honor's earlier question, which was

| | |
|---|---|
| 12:01:00 | 1 |
| 12:01:03 | 2 |
| 12:01:06 | 3 |
| 12:01:10 | 4 |
| 12:01:13 | 5 |
| 12:01:16 | 6 |
| 12:01:19 | 7 |
| 12:01:24 | 8 |
| 12:01:26 | 9 |
| 12:01:29 | 10 |
| 12:01:36 | 11 |
| 12:01:39 | 12 |
| 12:01:41 | 13 |
| 12:01:45 | 14 |
| 12:01:48 | 15 |
| 12:01:49 | 16 |
| 12:01:51 | 17 |
| 12:01:55 | 18 |
| 12:01:57 | 19 |
| 12:01:59 | 20 |
| 12:02:02 | 21 |
| 12:02:06 | 22 |
| 12:02:09 | 23 |
| 12:02:11 | 24 |
| 12:02:15 | 25 |

where is the evidence of training or expertise.  It's found throughout this affidavit.

I point Your Honor, first of all, to the first six paragraphs which details Special Agent Worth's extensive training and experience in white collar crimes, in investigations that involves search warrants, and explains why, why he has the ability to be the affiant on this kind of issue.

I would also point Your Honor to sections -- I'm sorry -- to paragraph 52 and the paragraphs following paragraph 52, which provides background about the way in which e-mail is used in criminal activity, especially in fraud schemes, and discusses it extensively over the course of many paragraphs, based on Special Agent Worth's training and experience.

This is not a thin warrant in any way, Your Honor. It's a warrant that goes through the exact reasons that there's probable cause for a crime having been committed.  It's a warrant that goes to the exact reasons that there's probable cause that the Yahoo Account had proceeds or evidence of those crimes.

I would also point Your Honor to a misconception that the defense had argued and is advancing in regard to the way in which the government executed these warrants.  Attorney Hurson pointed to Attachment B and

12:02:22  1    showed Your Honor page 1 of Attachment B, which is the

12:02:27  2    particular things to be seized and information to be

12:02:29  3    disclosed --

12:02:30  4              THE COURT:  Speak into the microphone, please.

12:02:33  5              MR. WEITZ:  I'm sorry, Your Honor.

12:02:34  6        That's Attachment B, Section 1, that's the

12:02:36  7    information that Yahoo is obligated under the warrant to

12:02:39  8    disclose.

12:02:40  9        Attorney Hurson told us there was no limitation on

12:02:44  10   that, either in time or in content.  But the fact of the

12:02:46  11   matter is that all that Attorney Hurson had to do was

12:02:48  12   turn the page to Section 2 of Attachment B, which is a

12:02:52  13   list of the information to be seized by the government.

12:02:54  14   And here there's a discussion of the precise things that

12:02:58  15   the government is allowed to actually seize.

12:03:00  16       Now as Attorney Hurson knows, although the

12:03:02  17   government did seize some e-mails from the Hotmail and

12:03:05  18   Yahoo Accounts, the vast majority of e-mails in those

12:03:09  19   accounts were not examined by the government.  They're

12:03:12  20   not going to be used in the government's case-in-chief.

12:03:14  21       The government had them turned over to a filter

12:03:17  22   attorney as part of the process by which the government

12:03:20  23   ensured that it was not engaged in any kind of rummaging

12:03:23  24   through the defendant's e-mails that were not relevant

12:03:26  25   to the items that it was permitted to seize as a result

12:03:29  1    of these two search warrants.

12:03:31  2        The government executed the search warrant under

12:03:33  3    the procedure that had been upheld by many courts, this

12:03:37  4    two-step procedure.  And the only way to do it, Your

12:03:39  5    Honor, is to get everything from Yahoo, to get

12:03:41  6    everything from Hotmail, and then execute a search

12:03:45  7    procedure that protects the defendant's Fourth Amendment

12:03:47  8    rights.

12:03:47  9        It's no different, Your Honor, than if the

12:03:50  10   government had executed a search warrant on an office

12:03:53  11   and had taken out five filing cabinets and had, in the

12:03:57  12   context of executing that warrant, reviewed it and found

12:04:02  13   20 files.

12:04:02  14       The government would have technically taken

12:04:04  15   everything.  And they haven't looked at many of those

12:04:07  16   documents, but it only would have seized the relevant

12:04:09  17   files that were permitted to be seized pursuant to the

12:04:13  18   terms of the search warrant.

12:04:13  19       That is exactly what the government did here.  And

12:04:17  20   there's been no claim of any specific document that was

12:04:20  21   improperly seized.

12:04:21  22       Instead, what the defendant wants us to do and

12:04:24  23   wants this Court to do is throw out a magistrate's

12:04:27  24   finding of probable cause, which is entitled, as Your

12:04:30  25   Honor knows, to great deference based on claims that

12:04:34  1    simply don't hold water.

12:04:35  2          THE COURT:  All right.  Thank you, Attorney

12:04:37  3    Weitz.

12:04:37  4       Attorney Hurson, you wanted to speak on the

12:04:40  5    dismissal issue?

12:04:41  6          MR. HURSON:  I also would like to quickly

12:04:43  7    address the search warrant question.

12:04:44  8          THE COURT:  I think the way it works, the

12:04:46  9    government has the burden on that.  They get the last

12:04:48  10   word.

12:04:49  11      So I'll give you the last word on the motion,

12:04:51  12   though, since that is your burden.  Go ahead.

12:04:54  13              ARGUMENT BY THE DEFENDANT

12:04:54  14          MR. HURSON:  Thank you.

12:04:57  15      The argument as to whether the Speech or Debate

12:05:03  16   Clause can even apply to these proceedings, I was struck

12:05:07  17   by how often the government referenced that Congress

12:05:11  18   could have included --

12:05:12  19          THE COURT:  Just focus on the Vaughn argument.

12:05:15  20          MR. HURSON:  Well, the -- let me show you,

12:05:16  21   first off, that --

12:05:17  22          THE COURT:  Which is the legislative act.

12:05:20  23          MR. HURSON:  Okay.  The --

12:05:23  24          THE COURT:  As I understand, the government

12:05:26  25   says that really what they're looking into here is

12:05:29  1    something that didn't occur.  And I believe the

12:05:35  2    suggestion might be that there's some support in Lee for

12:05:40  3    this.  It's whether some act actually was undertaken.

12:05:44  4    And I think the government's position is nothing was

12:05:47  5    undertaken.

12:05:49  6         MR. HURSON:  Well, the government presented the

12:05:50  7    Court with a number of e-mails predating -- it's

12:05:53  8    critical to note this:  they predate the charged

12:05:56  9    conduct.

12:05:56  10        The government's indictment in this case, perhaps

12:05:58  11   because they had significant Statute of Limitation

12:06:01  12   issues with respect to the charged conduct, is for two

12:06:05  13   e-mails, not the e-mails that they included in their

12:06:08  14   presentation to the Court.

12:06:08  15        And, frankly, if they intend to come into the

12:06:11  16   courtroom and try the case over the course of weeks with

12:06:13  17   tons of correspondence that occurred prior to the dates

12:06:17  18   at issue in the indictment, that is only relevant, that

12:06:22  19   is only probative of the allegations in the case if it's

12:06:26  20   related to his legislative acts.  It's only relevant if

12:06:30  21   it violates the Speech or Debate Clause.

12:06:33  22        So I appreciate the presentation that they gave and

12:06:36  23   find that, obviously, they have some documents that they

12:06:39  24   believe were mailed, e-mailed, prior to his time as a

12:06:43  25   legislator.  But he's not indicted for that.  What he

was indicted for was conduct occurring while he was a

legislator.

And so the Elmo presentation that was just given

can only be presented to a jury, if at all, if it

relates to legislative activity.  And specifically what

I was referencing is this:  Bill 28-0159, which is

attached to my Document Number 87.  This is a bill that

was presented to the Legislature, to Mr. James's

committee, and includes a number of whereas clauses,

including explicit reference to the Fire Burn.

This is information that was the exact subject of

the inquiries that the government is claiming are not

fraudulent.  This is the type of information that was

requested from Danish National Archives.  It was

requested to be translated by their individuals.  This

is precisely the point.

Now the government may laugh at it, or may find it

to be insignificant, but the Speech or Debate Clause

does not allow us to do what the government is trying to

do, which is to pull back the legislative immunity cloak

and question whether Mr. James's motives were pure or

his intentions were pure.

The government, in its presentation to the grand

jury in this case, specifically asked a witness a

question, and that question was -- I want to read it

| | | |
|---|---|---|
| 12:08:27 | 1 | verbatim so that I don't get it wrong.  That question |
| 12:08:34 | 2 | was posed to someone who was on Mr. James's staff.  And |
| 12:08:40 | 3 | that question was specifically -- I have to find that |
| 12:08:54 | 4 | page.  I had tabbed it.  Now I lost it. |
| 12:09:05 | 5 | I'm sorry, I'm looking at the redacted one.  I'm |
| 12:09:28 | 6 | sorry for the delay, Your Honor. |
| 12:09:35 | 7 | The question was -- and this is citing to page 8, |
| 12:09:38 | 8 | the question was -- I'm going to have to paraphrase it, |
| 12:09:43 | 9 | like I was hoping not to, but it's quoted directly in |
| 12:09:46 | 10 | the brief:  What was he going to do in the Legislature |
| 12:09:49 | 11 | with these funds? |
| 12:09:51 | 12 | That was the specific question elicited in the |
| 12:09:54 | 13 | grand jury. |
| 12:09:55 | 14 | And the answer to that question was:  He was going |
| 12:10:00 | 15 | to research and promulgate legislation related to the |
| 12:10:04 | 16 | Fire Burn. |
| 12:10:05 | 17 | So it's the government itself that is eliciting |
| 12:10:07 | 18 | this type of testimony.  And that witness is, to my |
| 12:10:10 | 19 | knowledge and understanding, under subpoena for trial. |
| 12:10:12 | 20 | And that witness's testimony is critical because |
| 12:10:15 | 21 | everything the government listed, the requests for |
| 12:10:18 | 22 | reimbursement, the requests for funding, while it may in |
| 12:10:22 | 23 | fact be true that an exact check that is issued may not |
| 12:10:25 | 24 | be a legislative act, but that issuance of a check is |
| 12:10:28 | 25 | irrelevant to the government's case if it is not tied to |

12:10:32   1       a request for funding that is underneath of the

12:10:38   2       legislative act.

12:10:39   3            And --

12:10:40   4            THE COURT:  But isn't the government's case one

12:10:43   5       that proceeds along these lines:  That they're really

12:10:48   6       inquiring -- or rather charging that there were acts

12:10:51   7       that weren't done -- and I believe that was the

12:10:54   8       reference to the Kjaer translation, or rather, the

12:11:01   9       subsequent requests for reimbursement was for something

12:11:04   10      that had already taken place, not something that was to

12:11:06   11      take place?

12:11:07   12           So their suggestion is, I think, is that he is

12:11:11   13      asking for reimbursement for something that wasn't done,

12:11:16   14      that is, a current translation of some Danish documents.

12:11:22   15      And it couldn't be done currently because it had

12:11:24   16      previously been done.

12:11:27   17           Why isn't -- why isn't the inquiry into whether

12:11:31   18      some legislative act occurred appropriate?

12:11:35   19           Wasn't that sort of the question that was posed or

12:11:37   20      that the Third Circuit said was appropriate in Lee; that

12:11:43   21      is, not an inquiry into the motives, but whether the act

12:11:47   22      occurred?

12:11:49   23           MR. HURSON:  Yes, I think in Lee --

12:11:51   24           THE COURT:  And isn't that arguably what the

12:11:53   25      government's doing here?

12:11:54    1          They're saying whether something occurred, and

12:11:56    2    they're saying it just didn't occur.  I think their

12:11:59    3    proof is, or there's a suggestion their proof would be

12:12:02    4    this thing, translation, or some other things didn't

12:12:06    5    occur.  The only thing that did occur were petitions for

12:12:11    6    money, reimbursement.

12:12:13    7          MR. HURSON:  That's certainly part of their

12:12:14    8    case, apparently, that there are times when, the

12:12:19    9    government alleges, that requests were made for funding,

12:12:22   10    funding was issued, and then the work was not done.

12:12:24   11          There are other times where they say some of the

12:12:27   12    work was done.  There are other times where they're

12:12:29   13    claiming work wasn't done and, frankly, there may be

12:12:32   14    evidence that work was done.  That's more of a trial

12:12:34   15    issue.

12:12:35   16          But the bigger issue here is that in order to

12:12:37   17    engage in that inquiry as to whether work was done or

12:12:39   18    work was not done, the government has no choice but to

12:12:43   19    inquire of legislators, legislative aides, legislative

12:12:47   20    staffers, and correspondence that is legislative in

12:12:51   21    nature, it has no way to prove its case but to probe

12:12:55   22    those aspects of the legislator's job that are immune.

12:13:01   23          I agree --

12:13:02   24          THE COURT:  For the Court's purposes, though,

12:13:03   25    in this assessment, am I not to inquire into the purpose

12:13:07  1    of the, what you say are legislative acts?

12:13:11  2         MR. HURSON:  That's correct.  You are.  You are

12:13:13  3    to inquire not into the purpose, necessarily.  You are

12:13:15  4    to inquire into whether there were legislative acts, and

12:13:18  5    whether the government must necessarily refer to them in

12:13:21  6    its case-in-chief, or did refer to them during its grand

12:13:24  7    jury presentation.

12:13:25  8       What the government responds with is:  Well, we

12:13:27  9    have a lot of e-mails that predate his time as a

12:13:30  10   legislator that would go to show that when he was a

12:13:33  11   legislator and he made requests, he was doing so in a

12:13:36  12   way that was fraudulent.

12:13:37  13      Again, those e-mails are only relevant if the

12:13:41  14   second point gets debated before the jury.  And it can't

12:13:44  15   be, because it's protected conduct.  And we have the

12:13:50  16   government claiming that:  Well, we didn't put it in the

12:13:52  17   indictment, we didn't say it in the indictment.

12:13:54  18      Well, the case law is clear on that point, that we

12:13:57  19   don't leave it up to what the plain language of the

12:14:00  20   indictment says.  Otherwise, the validity of an

12:14:02  21   indictment would depend solely on what the prosecutor

12:14:04  22   elected to allege, and he would be limited only by his

12:14:07  23   sense of self-restraint in alleging fact.

12:14:10  24      That comes from Dowdy, and that part of Dowdy is

12:14:13  25   unquestionably good law and still a part of this

```
12:14:16   1    circuit.
12:14:17   2                THE COURT:  You agree that the rest of the
12:14:18   3    Dowdy is not, though, with respect to this circuit?
12:14:20   4                MR. HURSON:  What I think is not, I don't --
12:14:21   5                THE COURT:  Or rather, I should say it's
12:14:23   6    limited by this circuit.
12:14:25   7                MR. HURSON:  And I think that the part of the
12:14:26   8    Dowdy that was limited is not applicable here.  The part
12:14:29   9    of the Dowdy that was limited, I think, was an
12:14:32  10    understanding you're not even allowed to have a
12:14:34  11    discussion as long as a legislator says, "Well, it's all
12:14:38  12    legislative."
12:14:38  13        And Dowdy seemed to stand in part for the
12:14:42  14    proposition that you, as a court, would be limited in
12:14:44  15    inquiring further.  And the Third Circuit says, "No, I
12:14:46  16    would read that more narrowly."
12:14:48  17        But we don't have that issue here, because the
12:14:48  18    issue in Dowdy, the issue in Menendez, the issue in all
12:14:55  19    these other cases, are acts and behaviors aren't on
12:14:58  20    their face legislative.
12:15:00  21        My point is this:  The government's case rests
12:15:02  22    almost exclusively on Mr. James's efforts to secure
12:15:05  23    documents, his efforts to procure information for use
12:15:08  24    during the legislative session.
12:15:10  25        And again, I'm referencing not just the bill I put
```

12:15:14  1    up on the Elmo, but I'm also referencing the centennial

12:15:19  2    bill.  I'm also referencing the e-mail to Senator Hill

12:15:23  3    in 2009, which I'm putting up on the Elmo -- and all the

12:15:27  4    personal information is redacted -- where he describes

12:15:29  5    what transpired on one of his trips and what the purpose

12:15:35  6    of it was.

12:15:36  7        "These documents serve a critical research

12:15:38  8    component of several bills I've introduced during the

12:15:41  9    20th Legislature."

12:15:42  10   This predates the bills that I'm referencing,

12:15:45  11   including predating the bill for the centennial

12:15:50  12   commemoration.

12:15:50  13   We have attached as Exhibit 97 -- or excuse me, I

12:15:54  14   think it's 87-6.  We have a memo -- and this all comes

12:15:58  15   from the government's discovery, from Ms. Rowe, who is a

12:16:03  16   special adviser to Mr. James, talking about several

12:16:06  17   documents pertaining to the ongoing request for archival

12:16:11  18   material pertaining to the Fire Burn, the findings with

12:16:14  19   respect to it gleaned from and used for legislation.

12:16:17  20   And then what we later see is legislation making

12:16:19  21   explicit reference to the Fire Burn, and the information

12:16:22  22   included in the documents.

12:16:23  23   Now I respect the government's position.  They

12:16:27  24   think this was all a ruse.  They think there was no

12:16:30  25   truth to this at all.  In fact, that appears to be the

12:16:32   1    summary of their factual section, that Mr. James was

12:16:35   2    apparently pulling one over on everyone.

12:16:38   3         But the point of the matter is, at this stage, the

12:16:40   4    immunity question doesn't let us get to that.  You can't

12:16:44   5    prove your case in this indictment, you can't prove this

12:16:48   6    case to this jury, without delving into specific

12:16:53   7    communications that are protected.

12:16:55   8         And the fact that the indictment may not make

12:16:57   9    reference to those specific communications means little,

12:17:00  10    because the grand jury testimony that I cite to

12:17:02  11    specifically does.

12:17:04  12         And I do agree that there is case law certainly to

12:17:08  13    substantiate that simply making a request for

12:17:10  14    reimbursement may not be protected, but this case goes

12:17:14  15    far beyond the simple checks.  This case, in fact, rests

12:17:17  16    not just on the checks were issued, but the checks were

12:17:20  17    issued because Mr. James told the Legislature, "I need

12:17:23  18    this money for protected activity."

12:17:27  19         THE COURT:  Are you suggesting that if the

12:17:29  20    government -- well, let me ask this first.  You agree

12:17:31  21    that if the government presented a case that relied in

12:17:35  22    no way on legislative acts, that you could bring in

12:17:40  23    legislative acts if you chose to, if the matter were to

12:17:43  24    proceed to trial?

12:17:46  25         MR. HURSON:  The case law is clear that the

12:17:48    1    legislative immunity provision can be waived.

12:17:50    2                THE COURT:  So the answer is yes or no?

12:17:52    3                MR. HURSON:  The answer to your question would

12:17:54    4    be yes.

12:17:54    5                THE COURT:  All right.  Now, if the government

12:17:57    6    were to present a case that relied entirely on

12:18:05    7    reimbursements and the nonoccurrence of certain things,

12:18:11    8    would that necessarily involve legislative acts?

12:18:14    9                MR. HURSON:  In this case, yes.  In this case

12:18:15   10    the answer to your question is unequivocally yes.  It's

12:18:19   11    not just the reimbursements that the government is

12:18:21   12    claiming is illegal here.

12:18:23   13        What the government is claiming is illegal here is

12:18:24   14    Mr. James's claiming that the reimbursements are to

12:18:28   15    cover legislative acts.  And the government's claim is

12:18:31   16    that he did have conversations.

12:18:33   17        In fact, in our motions to continue the trial, the

12:18:37   18    government responded with:  We're bringing people here

12:18:40   19    from Denmark to discuss these conversations about the

12:18:43   20    procurement of documents.

12:18:44   21        Well, that's precisely the type of behavior the

12:18:48   22    legislative fact-finding, the subpoenaing of documents,

12:18:51   23    the conversations related to that, that is protected.

12:18:54   24        So I think -- could I dream up a prosecution that

12:18:57   25    does not rely on legislative acts, that does charge a

12:19:01  1    sitting Congress person with illegal behavior?

12:19:04  2        Absolutely.  All I have to do is read Menendez or

12:19:08  3    one of those opinions and you could see factual

12:19:11  4    scenarios that wouldn't run afoul, or at least the Court

12:19:14  5    has concluded hasn't run afoul.

12:19:16  6        But in this particular instance, these e-mails --

12:19:19  7        THE COURT:  Well, as I understand it, the

12:19:20  8    government was suggesting that Menendez or McDade were

12:19:25  9    at least two cases that lend support to their position.

12:19:28 10        MR. HURSON:  I am not as familiar with McDade

12:19:31 11    as I would like to be, and frankly don't feel so

12:19:34 12    comfortable going back and forth on it.

12:19:34 13        I can say about Menendez, that is an entirely

12:19:40 14    different case.  Menendez is a case that alleges that

12:19:42 15    the senator had private meetings with individuals, both,

12:19:46 16    my understanding is, with an individual involved with

12:19:50 17    pharmaceutical regulations, and in a separate instance

12:19:54 18    with individuals related to security and safety at ports

12:19:58 19    in the Dominican Republic.  And in essence, what the

12:20:00 20    argument is, is that he was being compensated privately

12:20:04 21    for engaging in those activities.

12:20:07 22        And I go sort of back to where Your Honor suggested

12:20:10 23    this conversation a couple hours ago.  That is, the type

12:20:13 24    of constituent service is not necessarily protected.

12:20:16 25    And in fact, I think on the numerous times that the case

12:20:19  1    has gone up and down to the Third Circuit, it has been

12:20:21  2    on this question as to whether that type of activity is

12:20:24  3    protected activity.

12:20:26  4         But that's not the allegation here.  The allegation

12:20:28  5    here is not that there were kickbacks or some sort of

12:20:32  6    private deals or that there was, you know, nights in the

12:20:37  7    Lincoln bedroom, so to speak, in exchange for money.

12:20:38  8    That's not what's happening in this case.

12:20:40  9         The government is clear in its indictment, it is

12:20:42  10   clear in its presentation to the grand jury, it is clear

12:20:44  11   in its questions to the grand jury, that it is resting

12:20:48  12   its argument that Mr. James broke the law on the claim

12:20:52  13   that he presented to the Legislature requests, in an

12:20:56  14   interest in getting documents that he claimed were for

12:21:01  15   legislation, but that they say that wasn't true.

12:21:03  16        And that's, I admit, frustrating to the government.

12:21:08  17   And the case law says the same, that the point here

12:21:11  18   says, yes, there will be situations where the government

12:21:13  19   will feel frustration.  But the Speech or Debate Clause

12:21:16  20   protects that behavior regardless of what the motivation

12:21:19  21   is.

12:21:19  22        And again, I rest on the -- and I can provide Your

12:21:22  23   Honor with the full transcript from the grand jury

12:21:25  24   from -- for the individual that I cite to, and I think

12:21:28  25   that's perhaps a good idea, and I can supplement the

12:21:31  1    record this afternoon with that.

12:21:33  2        I am waiting, Your Honor, for the rest of the

12:21:36  3    transcript debating the bill, Fire Burn commemoration

12:21:44  4    date bill.  We ordered the transcript.  And in somewhat

12:21:47  5    ironic fashion, unfortunately, the transcriber is

12:21:51  6    working on another matter, I believe perhaps one of Your

12:21:54  7    Honor's other matters and that took obvious precedence

12:21:57  8    over a request from us.  But that should be finished

12:22:00  9    soon.

12:22:00  10       And I will also submit that, and that will show

12:22:04  11   further discussion and debate invoking and involving at

12:22:08  12   least, I believe it will, Mr. James's interest.

12:22:11  13       So I think unquestionably the act does apply to

12:22:16  14   this situation.  I think that it is not an absurd result

12:22:19  15   of the kind that is envisioned in the case law, that

12:22:21  16   asks you to do legislative history.  Those are typos,

12:22:26  17   those are issues that aren't here.

12:22:28  18       And to the extent the government said Congress

12:22:30  19   should have acted, Congress should have acted.  Well,

12:22:33  20   the response to sort of channel my inner Clarence Thomas

12:22:37  21   or Scalia, they did act.  They wrote the bill, and they

12:22:40  22   wrote the bill clearly and unequivocally.  So it does

12:22:43  23   apply, and it applies to this situation.

12:22:45  24       And I thank Your Honor for your time.

12:22:46  25           THE COURT:  All right.  Thank you.

                        RULING BY THE COURT

           THE COURT:  All right.  Before the Court is
defense's motion to suppress certain evidence and also
to dismiss the indictment.

     There's a threshold issue that the Court needs to
tend to, and that is whether the Speech or Debate Clause
applies here.

     The government suggests that it does not,
proceeding primarily on the theory that the Revised
Organic Act is a constitution, should be -- for the
Virgin Islands, should be treated like a local
constitution or local law.

     And the government is correct in one respect, but
not in another.  It has been regarded as the
constitution for the Virgin Islands.  It is the thing
that sets up the organic structure for the government,
for the Virgin Islands.  It creates three branches,
separate and equal, among other things.

     Significantly, though, it is a federal statute.
There is nothing that makes it anything less than a
federal statute.

     While it might be something -- while it might have
another purpose, and that purpose has served as the
thing that sets up the system of government in the
Virgin Islands, it still is a federal statute.

12:24:11  1      And a federal statute on its face reflects the

12:24:15  2  intent of Congress.  And the intent of Congress was to

12:24:18  3  make the Speech or Debate Clause applicable here.

12:24:23  4      And as the Supreme Court has said in at least one

12:24:26  5  other instance, if the Congress chose to, it could make

12:24:30  6  the Speech or Debate Clause applicable.  I think it was

12:24:33  7  in Tennessee.  If it chose to.

12:24:36  8      In this case, the Congress chose to make it

12:24:41  9  applicable in the Virgin Islands.  And the Court would

12:24:47  10  have to take a tortured reading of the statute and its

12:24:52  11  intent to reach the conclusion that somehow it's not

12:24:56  12  applicable.

12:24:59  13      Having resolved that threshold issue, the next

12:25:02  14  question is whether, one, there is a prima facia case

12:25:07  15  that's been established by the government; two, whether

12:25:10  16  there has been some demonstration that there is some

12:25:13  17  legislative act that would trigger the application of

12:25:17  18  the Speech or Debate Clause.

12:25:20  19      And the Court finds that there is a prima facie

12:25:24  20  case that has been made here.

12:25:27  21      The question now is whether there's some

12:25:28  22  legislative act that would trigger the Speech or Debate

12:25:36  23  Clause.

12:25:36  24      This is not an easy question.  None of these

12:25:38  25  questions are easy when it comes to application or

12:25:43    1    triggering the Speech or Debate Clause.  Because some

12:25:49    2    act arguably my implicate speech or debate that is

12:25:53    3    contemplated by the clause, doesn't mean that

12:25:55    4    necessarily is so.

12:25:57    5        And while there is an argument that some conduct

12:26:05    6    contemplated may be implicated by the conduct here, the

12:26:13    7    Court is not persuaded that there is some legislative

12:26:18    8    act.  There is -- it is not clear that there's some

12:26:27    9    significant legislative component to the acts undertaken

12:26:30   10    by Mr. James that would trigger the protection of the

12:26:33   11    Speech or Debate Clause.

12:26:38   12        Now the Court makes this finding and holds this way

12:26:41   13    in light of the record currently before it.  So this is

12:26:44   14    without prejudice to the defense submitting such other

12:26:47   15    matters as it referred to, as it feels would inform the

12:26:51   16    Court.

12:26:51   17        So I'm going to give the defense until, I guess

12:26:56   18    3:30 today to submit and supplement the record with the

12:27:01   19    materials to which defense counsel referred, which he

12:27:08   20    did not have presently at his disposal.

12:27:11   21        There's a final issue that remains outstanding, and

12:27:14   22    that's the issue of the warrant.  It is a facial attack,

12:27:17   23    and I believe defense acknowledges that the Hotmail

12:27:22   24    search warrant is one that on its face meets all the

12:27:30   25    requisites that would lead the Court to conclude that it

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
| 12:27:32 | 1  | is valid on its face.  The question is with the Yahoo  |
| 12:27:37 | 2  | Account.                                               |
| 12:27:37 | 3  | Defense counsel points out that there might be some    |
| 12:27:39 | 4  | issue with respect to the breadth and depth of that, and |
| 12:27:43 | 5  | there might be some issue with respect to the          |
| 12:27:45 | 6  | qualifications, or the stated qualifications of the    |
| 12:27:48 | 7  | affiant to make certain representations.               |
| 12:27:53 | 8  | The Court finds that the representations with          |
| 12:27:56 | 9  | respect to the qualifications of the affiant do not    |
| 12:28:01 | 10 | place its qualifications in doubt to make some of the  |
| 12:28:04 | 11 | representations in the affidavit.  And significantly,  |
| 12:28:07 | 12 | the Court doesn't find that on its face the affidavit is |
| 12:28:12 | 13 | a free-for-all when it comes to searches in a time and |
| 12:28:18 | 14 | scope in a way that is constitutionally permissible.   |
| 12:28:22 | 15 | So with respect to the search warrant issue, the       |
| 12:28:24 | 16 | Court finds there's no basis to grant the defense's    |
| 12:28:27 | 17 | petition.                                              |
| 12:28:28 | 18 | Similarly, with respect to the triggering of the       |
| 12:28:34 | 19 | Speech or Debate Clause, the Court appreciates the     |
| 12:28:36 | 20 | defense's position, but is not persuaded that it's the |
| 12:28:39 | 21 | winning argument at this point.                        |
| 12:28:43 | 22 | I think that resolves our issues, Counsel.             |
| 12:28:46 | 23 | We are set for trial on Monday.  As I said, this is    |
| 12:28:50 | 24 | without prejudice to the defense providing such        |
| 12:28:53 | 25 | additional support as it feels it has at its disposal, |

12:29:03  1    and the Court will rule promptly if that alters the

12:29:08  2    Court's judgment.

12:29:09  3         All right.  Let me ask counsel, I think I said

12:29:14  4    3:00.  Did I say 3:00 or 3:30?

12:29:16  5         MR. HURSON:  You may have lost a half hour.

12:29:18  6    You said 3:30, Your Honor.  At least that's what I

12:29:21  7    heard.

12:29:21  8         MR. WEITZ:  I heard 3:30 as well.

12:29:23  9         THE COURT:  All right.  Let me ask counsel to

12:29:25  10   be available at 3:30.  That's not to say we will have a

12:29:27  11   hearing then, but in the event there is one, based on

12:29:31  12   what's submitted, I'll need you to come to court to be

12:29:34  13   heard on that.

12:29:35  14        MR. HURSON:  Thank you, Your Honor.

12:29:35  15        THE COURT:  Thank you, counsel.

12:29:36  16        MR. WEITZ:  Your Honor, may the government

12:29:38  17   raise one issue?

12:29:39  18        THE COURT:  Yes.

12:29:39  19        MR. WEITZ:  It will be very brief, Your Honor.

12:29:40  20   The government noticed several weeks ago its intent

12:29:43  21   to introduce several documents that are kept in the

12:29:46  22   ordinary course of business under Federal Rules of

12:29:48  23   Evidence 902(11) and 803(6).

12:29:51  24   As per the rule, we've haven't seen any objection

12:29:54  25   from the defendant on these issues, and we intend to not

12:29:57  1    call the custodians.  There has been no objection to

12:30:00  2    date.

12:30:00  3        It seems unfair to require people to come from

12:30:04  4    California or Washington State to the Virgin Islands.

12:30:06  5    And since there's been no objection, the government

12:30:08  6    intends to cancel those individuals' travel.

12:30:12  7        We want to make sure the Court and the defendant

12:30:14  8    are aware of that.

12:30:15  9            THE COURT:  Well, I can't speak for the defense

12:30:16 10    counsel.  You say there's currently no objection.  That

12:30:19 11    doesn't mean that there won't be one, even leading up to

12:30:22 12    trial.  So if there's some arrangement that you have

12:30:25 13    between your brother and yourself, then certainly you

12:30:30 14    can explore that.

12:30:32 15        But stating that you're not going to -- you know,

12:30:40 16    you will proceed in accordance with what the law

12:30:42 17    requires.  But if you're suggesting your brother may, I

12:30:47 18    guess, be foreclosed from objecting, I don't know if

12:30:50 19    that is the case.

12:30:51 20            MR. WEITZ:  Your Honor, we would ask the Court

12:30:53 21    to just make clear -- I suppose we would move the Court

12:30:56 22    to take notice of our notice that was filed several

12:30:59 23    weeks ago, note that the rule requires an objection from

12:31:03 24    the defendant or another party in order to invalidate

12:31:07 25    the admissibility of those custodials certificates, and

| | | |
|---|---|---|
| 12:31:10 | 1 | allow us to cancel that travel by ruling that they will |
| 12:31:14 | 2 | be admissible, those documents that were noticed will be |
| 12:31:17 | 3 | admissible absent a custodian appearing here in this |
| 12:31:20 | 4 | courtroom. |
| 12:31:20 | 5 | THE COURT:  I think what I said is currently |
| 12:31:23 | 6 | have no objection.  I don't know if that forecloses your |
| 12:31:26 | 7 | brother from making some objection at some later time, |
| 12:31:28 | 8 | though.  That's why I think it's some accommodation, to |
| 12:31:33 | 9 | the extent there is one, that you reach with your |
| 12:31:34 | 10 | brother. |
| 12:31:35 | 11 | But I don't know if you're asking the Court to |
| 12:31:37 | 12 | force your brother to make an accommodation or to state |
| 12:31:44 | 13 | the position whether they intend to object or not. |
| 12:31:48 | 14 | MR. WEITZ:  We're not asking the Court to force |
| 12:31:50 | 15 | the defendant to do anything.  What we're asking the |
| 12:31:52 | 16 | Court to do is rule, pretrial and in limine, that those |
| 12:31:57 | 17 | custodial certificates will be sufficient to admit the |
| 12:32:00 | 18 | evidence that's referred to in that notice, absent the |
| 12:32:04 | 19 | presence of a custodian testifying in court. |
| 12:32:06 | 20 | THE COURT:  All right.  It's under advisement. |
| 12:32:08 | 21 | I'll give your brother an opportunity to be heard on the |
| 12:32:11 | 22 | papers, if he wishes to be heard on the papers. |
| 12:32:13 | 23 | All right.  Thank you, Counsel. |
| 12:32:25 | 24 | (Court in recess, 12:32 p.m.) |
| 12:32:25 | 25 | |



---



1

2

3                              CERTIFICATE

4

5              This document is hereby certified

6            to be a true and accurate transcript

7                of the foregoing proceedings.

8

9

10     /s_____      February 9, 2017
              Chandra Kean, RMR                    DATE
11         Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I, OMODARE JUPITER, an attorney admitted to practice before this Court

by virtue of his position in the Office of the Federal Defender, District of the Virgin

Islands, do hereby certify that Appellant's Appendix – Volume II was

electronically filed with the Clerk of the Court using the CM/ECF system and that

I caused an original and three (3) copies to be mailed to the Honorable Marcia

Waldron, Clerk of the Court, United States Court of Appeals for the Third Circuit,

21400 U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106; two (2)

copies of the foregoing to be mailed to AUSA Amanda Vaughn, Office of the

United States Attorney, 5500 Veterans Drive, Suite 260, Charlotte Amalie, St.

Thomas, VI 00802; and one (1) copy to be hand delivered to Wayne A.G. James

this 20th day of March, 2017.


OMODARE JUPITER
Federal Public Defender
1115 Strand Street
St. Croix, VI 00820
Tel (340) 773-3585
Fax (340) 773-3742
E-mail: Omodare_jupiter@fd.org
Counsel for Appellant